EXHIBIT "B"

**Page 1**

UNITED STATES DISTRICT COURT,
SOUTHERN DISTRICT OF FLORIDA

CASE NO.:  20-60352-CIV-ALTONAGA

RENTAL BOAT CORP.,

     Plaintiff,

vs.

GREAT LAKES INSURANCE SE,

     Defendant,

_____/

LOCATION:  Remote Audio-Video Communication
     Pursuant to Supreme Court of Florida
     Administrative Order No. AOSC20-23

DATE:  September 30, 2020

TIME:  10:06 a.m. - 1:41 p.m.

VIDEOTAPED DEPOSITION OF B.A. (TONY) USHER
AS CORPORATE REPRESENTATIVE OF
GREAT LAKES INSURANCE SE
VIA ZOOM CONFERENCE

Taken before Elena Robaina, Florida
Professional Reporter, Notary Public in and for the
State of Florida at Large, pursuant to Notice of
Taking Deposition filed in the above case.

**Page 2**

ALL APPEARANCES VIA ZOOM CONFERENCE:
ON BEHALF OF THE PLAINTIFF:
SALAS LAW FIRM, P.A.
8551 West Sunrise Blvd.
Suite 300
Plantation, Fl 33322
BY: JOHN P. SALAS, ESQ.

ON BEHALF OF THE DEFENDANT:
GOLDMAN & HELLMAN
8751 West Broward Blvd
Suite 404
Ft. Lauderdale, Fl 33324
BY: STEVEN E. GOLDMAN, ESQ.

ALSO PRESENT:
Brandon Mendiola, Video Court Reporting

I N D E X

E X A M I N A T I O N S

B.A. (TONY) USHER
     DIRECT  CROSS  REDIRECT  RECROSS
BY MR. SALAS    5

**Page 3**

EXHIBITS FOR IDENTIFICATION

PLAINTIFF'S                  PAGE

No. 1   Deposition Notice   37
No. 2   document entitled Marine   37
     Surveyors Bureau
     Prepurchase...
No. 3   Insurance Policy   43
No. 4   Letter of Survey Compliance  51
No. 5   Survey Report   53
No. 5A  Photographs   68
No. 6   7/30/19 Document   68
No. 6A  Photographs   89
No. 6B  Photographs   91
No. 7   E-mail from Mr. Gilhooly to   93
     Mr. Thomas, et cetera
No. 7A  E-mail dated 8/8/2019..   97
No. 7B  E-mail from Amy to Iriarte   99
No. 8   8/8/2019 Letter   100
No. 9   Mr. Iriarte Response   102
No. 11A 8/21/19 E-mail   106
No. 12* 9/12/2019 E-mail
No. 13  Denial Letter   115
No. 14* 10/15/ E-mail
No. 15  Answer's to Plaintiff's   126
     Interrogatories

*numbered but not used in deposition

**Page 4**

1     VIDEOGRAPHER:  In the case styled

2  Rental Boat Corp. versus Great Lakes

3  Insurance SE.  This is the video deposition

4  of Tony Usher on September 30th, 2020.  The

5  time is now 10:06 a.m.

6     Would counsel please state their

7  appearances for the record.

8     MR. SALAS:  John Salas on behalf of

9  the plaintiff, Rental Boat Corp.

10     MR. GOLDMAN:  Steven Goldman of the

11  law firm of Goldman & Hellman for the

12  defendant, Great Lakes Insurance.

13     COURT REPORTER:  All right, sir; if

14  you could raise your right hand for me,

15  please.

16     Do you swear to tell the truth, the

17  whole truth, and nothing but the truth, so

18  help you God?

19     THE WITNESS:  Yes, I do.

20     COURT REPORTER:  Thank you, sir.

21  Thereupon:

22     B.A. (TONY) USHER

23  was called as a witness and, having been first duly

24  sworn, was examined and testified as follows:

25     THE WITNESS:  I do.

**5**

1 DIRECT EXAMINATION
2 BY MR. SALAS:
3        Q.    Good morning, sir.  My name is John
4 Salas.  As you heard, I represent Rental Boat Corp.
5 In this matter.  We're here for the corporate
6 representative deposition of the defendant, Great
7 Lakes Insurance Company SE, Case Number 20-CV-60352
8 in front of Judge Cecilia Altonaga.
9             Can you please state your name for the
10 record, sir?
11       A.    My full name is Barrett Anthony, with
12 an H, Usher, U-S-H-E-R.
13       Q.    Have you ever had your deposition
14 taken before?
15       A.    Yes, many times.
16       Q.    Can you give me a ballpark of how many
17 times?
18       A.    Hundred and fifty.
19       Q.    Did you say 150?
20       A.    Yes.
21       Q.    And that's an approximation, correct?
22       A.    Absolutely.
23       Q.    Okay.  I'm 100 percent certain that
24 you're very familiar with the ground rules with the
25 deposition, but just so that we have it on record,

**6**

1 I'd like to go over those with you at this time.
2 Okay?
3        A.    Yes.
4        Q.    I'm going to be asking you a series of
5 questions regarding this case.  The questions and
6 answers are being transcribed by the court
7 reporter.
8             I ask that you please let me know if
9 you don't understand the question.  If you don't
10 understand, I will do my best to rephrase.  Is that
11 understood?
12       A.    Yes.
13       Q.    Otherwise, if you answer a question, I
14 will assume that you understood the question.
15 Okay?
16       A.    Yes.
17       Q.    In order for us to keep a clean record
18 of these proceedings, I ask that you please wait
19 until I finish my question before answering.  Okay?
20       A.    I understand.
21       Q.    And also, if we speak over each other,
22 it will be very difficult for the court reporter to
23 accurately take down what we are saying.  Okay?
24       A.    Yes.
25       Q.    All right.  We're going to be taking

**7**

1 some breaks perhaps, but certainly if you need one,
2 please let me know, I'll be happy to accommodate
3 you.  My only request and my only requirement is
4 that you answer any question that's pending before
5 taking a break.  Is that understood?
6        A.    Understood.
7        Q.    And you recognize that this is a court
8 proceeding and that you're under oath?
9        A.    Yes.
10       Q.    And I always have to ask these
11 questions and don't take it personally; are you
12 under the influence of any drugs or alcohol?
13       A.    No.
14       Q.    Have you ever been convicted of a
15 crime?
16       A.    No.
17       Q.    Is there anything impeding you from
18 providing me with truthful answers to my questions?
19       A.    No.
20       Q.    Okay.  So you're here today as the
21 designated corporate representative of Great Lakes
22 Insurance.  You recognize that, correct?
23       A.    Correct.
24       Q.    And I am going to share with you on
25 the share screen here the deposition notice for

**8**

1 today's deposition, if I could figure out how to do
2 this correctly.  Here we go.
3             (Sharing screen.)
4 BY MR. SALAS:
5        Q.    Do you see that -- do you see that
6 document, sir --
7        A.    Yes, I do.
8        Q.    -- on the screen?  Okay.
9             Have you reviewed this document before
10 today?
11       A.    Yes, I have.
12       Q.    Now, there's an Exhibit A attached to
13 this document which outlines 14 separate areas of
14 inquiry for today's deposition, and I just want to
15 confirm that you are the representative that is
16 going to be answering all of these areas of
17 inquiries for today's deposition.  Is that
18 accurate?
19       A.    That's correct.
20       Q.    Okay.  In addition, there's a Schedule
21 B which asks for you to provide today any documents
22 that have not yet been produced that were
23 responsive to previously filed discovery requests,
24 any documents you reviewed in preparation for this
25 deposition, or any documents that you found in

9

1  response to the areas of inquiry in regards to this
2  deposition notice.
3          Did you bring any of those documents
4  with you today, sir?
5          MR. GOLDMAN:  There are no such
6          documents, counsel.  Everything has been
7          produced.
8          MR. SALAS:  Okay.  I'd like to hear it
9          from the witness.
10 BY MR. SALAS:
11         Q.   Sir, did you bring any of those
12 documents with you today?
13         A.   No.  I have electronic copies on my
14 computer.
15         Q.   Okay.  So is it Great Lakes
16 Insurance's position that every single document
17 that's responsive to the deposition request have
18 been previously produced to me and there are no
19 other documents with regard to this lawsuit and
20 this claim that need to be produced?
21         MR. GOLDMAN:  Object to the form.
22         And I'll again inform you, Mr. Salas,
23         everything has been produced.
24         MR. SALAS:  I'd like to hear it from
25         the witness, sir.

10

1          MR. GOLDMAN:  Not a problem.
2          THE WITNESS:  Everything has been
3          produced.
4  BY MR. SALAS:
5          Q.   So just to clarify, there are no other
6  documents with regard to this claim that we've
7  requested either in our discovery request or in our
8  deposition notice that have not been produced?
9          A.   That's correct.
10         Q.   Thank you.
11         Were you involved at all in the search
12 for the documents and information related to the
13 topics of this deposition, the documents requested,
14 or any request for production?
15         A.   My staff would have dealt with it.
16         Q.   Okay.  So you didn't directly deal
17 with it, correct?
18         A.   That's correct.
19         Q.   Did you confirm with your staff that
20 all the documents that were responsive to our
21 discovery requests were provided?
22         A.   Yes.
23         Q.   Okay.  Who in your staff did you
24 confirm that with?
25         A.   Samantha Thomas, Mark Thomas.  I think

11

1  that's it.  It might be Sarah Delacey-Simms as
2  well.
3          Q.   Okay.  Anyone else?
4          A.   I don't believe so.
5          Q.   Okay.
6          And Samantha Thomas, what is her
7  position with the -- with the company?
8          A.   She's a claims assistant.
9          Q.   What about Mark Thomas?
10         A.   He's claims director.
11         Q.   And Ms. Simms?
12         A.   Claims manager.
13         Q.   Do you know if Great Lakes Insurance
14 provided a Privilege Log with respect to any
15 documents that were produced or not produced?
16         A.   I'd have to refer to counsel.
17         Q.   Okay.  Well, I can tell you that there
18 hasn't been a Privilege Log produced; and I just
19 want to know if --
20         MR. GOLDMAN:  I'll tell you for about
21         the fifth time, counselor, that everything
22         has been produced.  The reason is there no
23         Privilege Log is because we didn't assert
24         privilege with respect to anything.
25         MR. SALAS:  Okay.  So I'd like to hear

12

1  from the witness.
2  BY MR. SALAS:
3          Q.   Is it accurate that Great Lakes
4  Insurance has not asserted privilege to any
5  documents which haven't -- which haven't -- have
6  not been produced in regard to our discovery
7  request in this case?
8          A.   As far as I'm aware.
9          Q.   So you're not aware of any privilege
10 documents that are being withheld from production?
11         A.   That's correct.
12         Q.   Thank you.
13         Have you had an opportunity to review
14 the documents that you identified that have -- that
15 you identified as having been produced in response
16 to Schedule B to the deposition notice?
17         A.   Yes.
18         Q.   Did you speak with anybody, other than
19 your counsel -- I don't want to know what you spoke
20 with your counsel about -- I don't want to know the
21 substance of what you spoke with your counsel
22 about, but did you speak with anybody in your staff
23 with regards to your testimony here today?
24         A.   No, only counsel.
25         Q.   Okay.  Did you do anything else

13

1  besides speaking with your counsel or reviewing the
2  documents that were compiled by your staff in
3  preparation for today's deposition?
4      A.   No.
5      Q.   Can you tell me a little bit about
6  your current position at Great Lakes Insurance?
7      A.   Yes.  I'm the managing director.  I am
8  what is referred to as the control person under the
9  binding authority and the managing general agency
10 agreement with Great Lakes.  And I am responsible
11 for the conduct of business transacted under that
12 binding authority.
13     Q.   Okay.  What entity is Concept Special
14 Risks?  Is that at all related to Great Lakes
15 Insurance?
16     A.   No.  We're an independent company.  We
17 operate as a managing general agent in the United
18 Kingdom.
19     Q.   So are you employed by Concept Special
20 Risks as well?
21     A.   Yes.
22     Q.   And you're also employed by Great
23 Lakes Insurance, correct?
24     A.   No.
25     Q.   You're not?

14

1      A.   No.  Only I represent them as their
2  agent.
3      Q.   Okay.  And can you give me a little
4  bit of the summary of what your duties are as the
5  managing director for Concept Special Risks, which
6  is the agent for Great Lakes Insurance?  Can you
7  give me a little bit more detail as to what your
8  daily duties are?  And I lost your image there.  I
9  don't know what happened.
10     A.   Yes.  I'm just trying to get it back.
11 I was just on -- it was just showing me; it wasn't
12 showing anything else.  I couldn't see you.
13     Q.   Well, I think I'm going to stop the
14 sharing because that's probably the issue.  But I
15 still don't see the --
16     A.   Can you see me now?
17     Q.   No, sir.  I just see like a black and
18 gray --
19          VIDEOGRAPHER:  You have something
20     covering your camera, I believe.
21          THE WITNESS:  There we go.
22          VIDEOGRAPHER:  You're back.
23          MR. SALAS:  Thank you.
24 BY MR. SALAS:
25     Q.   Do you have any supervisor --

15

1      Q.   -- question, please?
2      Q.   -- at Concept Special Risks?
3      A.   Yeah.  But I think it was something to
4  do with what my duties and responsibilities were?
5      Q.   Yes.
6          Can you give me details as to what
7  your duties and responsibilities are at Concept
8  Special Risks as agent for Great Lakes Insurance?
9      A.   Yes.  We're the exclusive underwriting
10 agency underwriting yacht business for Great Lakes.
11 My duties are to control the underwriting of each
12 risk, the reporting and accounting of all business.
13 The overseeing the claims handling of all business;
14 analyze the reserves and claims reports to the
15 insurer, and occasionally deal with counsel.
16     Q.   How long have you held that position,
17 sir?
18     A.   Basically since 1993.
19     Q.   Okay.  Have you held any other
20 positions within that company?
21     A.   No.  I've always been the managing
22 director, and I am the principal stockholder of
23 Concept Special Risks, that was formerly Osprey
24 Special Risks, that was formerly TL Dallas (Special
25 Risks).

16

1      Q.   What was the last name, sir, TL?
2      A.   TL Dallas, T-L, double L, A-S.
3  Nothing to do with Texas.  It's a name, Thomas
4  Lessers (ph) Dallas.
5      Q.   Understood.
6          Do you hold any degrees, sir?
7      A.   No.
8      Q.   Any professional licenses?
9      A.   I'm an approved control person by the
10 Financial Conduct Authority.
11     Q.   And that's an agency that's in the
12 United Kingdom, correct?
13     A.   It's the principal financial
14 regulatory authority.
15     Q.   Okay.  And when did you obtain the
16 Financial Conduct Authority licensure or
17 designation?
18     A.   It was originally called the Financial
19 Services Authority, and it was formed in 2005.  We
20 were approved the moment it came into force.
21     Q.   And prior to 2005 were there any other
22 licensing requirements that you had -- that you
23 obtained?
24     A.   No.
25     Q.   Okay.  Can you tell me a little bit

17

1 about any of your formal training in the insurance
2 industry?
3     A. Just experience.
4     Q. Okay. I'd like to call that the
5 school of hard knocks. I'm still learning about
6 it.
7     Any marine-related licenses?
8     A. No. There aren't really those sort of
9 licenses in the U.K. Everything is controlled by
10 the Financial Conduct Authority. So you have to
11 evidence your knowledge and experience of
12 transacting the business and running a company in
13 the financial industry, financial services
14 industry.
15     Q. Okay. Do you have any military
16 background?
17     A. Military?
18     Q. Yeah.
19     A. No.
20     Q. Excuse me. Have you ever given any
21 testimony at trial?
22     A. Yes.
23     Q. Okay. And that's here in the U.S.?
24     A. Yes.
25     Q. Okay. Can you tell me approximately

18

1 how many times?
2     A. Nineteen.
3     Q. Nineteen, okay.
4     And was that in the capacity as the
5 representative of Great Lakes Insurance?
6     A. Not always, no.
7     Q. Okay. Other --
8     A. I've been working on behalf of Great
9 Lakes for 17 years. So for the last years 17
10 years, it would be Great Lakes.
11     Q. Okay.
12     A. Prior to that it was Occidental Risk.
13 Prior to that, it was a company called LaRuela
14 Reunion Francais (ph). And prior to that, it was
15 Lloyd's.
16     Q. So in the last 17 years, of the 19
17 trials, at least those in the last 17 years have
18 been in the capacity as a representative for Great
19 Lakes Insurance; is that accurate?
20     A. That's correct. Yes.
21     Q. Do you happen to recall the name of
22 any other case where you previously testified as
23 the corporate representative for Great Lakes
24 Insurance?
25     A. I can remember a few. There was *Great*

19

1 *Lakes versus Rosen*, R-O-S-E-N. I believe it was
2 *LaRue Frances versus Thomas*. *LaRue Frances versus*
3 *Frank Pierre*. Now it's a stretch of a memory game.
4     Q. Well, again, this isn't a memory test,
5 so I don't want you to guess, but were all those
6 cases in the Southern District of Florida, or were
7 they in other jurisdictions, if you know?
8     A. Other jurisdictions as well.
9     Q. Were any of them in the Southern
10 District of Florida?
11     A. Yes.
12     Q. Okay. Of the ones that you
13 identified, *GLI v. Rosen, LaRue Frances versus*
14 *Thomas*, and *LaRue Frances versus Frank Pierre*, were
15 any of those particularly in the Southern District
16 of Florida?
17     A. All three of those were.
18     Q. Okay. And, of course, as you sit here
19 today, you don't remember any others, correct?
20     A. I can't remember them -- remember the
21 name. If I sat here for half an hour, I could
22 probably come up with some more.
23     Q. No. We're not going to do that, but I
24 respect your response, sir.
25     Really quickly, when did you first get

20

1 involved with the claim that is the subject of this
2 lawsuit?
3     A. Around October 2019.
4     Q. And can you describe for me what your
5 involvement was back in October of 2019?
6     A. I spoke to my claims director because
7 we were discussing the possibility of denying this
8 particular claim.
9     Q. Do you recall the substance of that
10 discussion?
11     A. No. Well, only inasmuch as we looked
12 at the information that was available, and I agreed
13 that we should proceed to deny it.
14     It may have been slightly earlier than
15 that. It might have been August instead of
16 October.
17     Q. Okay. Do you recall the date of loss
18 for this particular claim?
19     A. I believe it was July the 17th, 2019.
20     Q. Do you agree that the policy was in
21 effect on the date of loss?
22     A. Yes.
23     Q. Do you know if the plaintiff's premium
24 payments were current as of the date of loss?
25     A. As far as I'm aware, yes.

21

1     Q.   Can you tell me the date that the
2 claim was reported?
3     A.   Either the 17th or 18th of July.
4 Fairly promptly, anyway.
5     Q.   Do you know who it was reported to?
6     A.   We have generic e-mail addresses.  It
7 may well have been originally reported to
8 Claim@Special-Risks, but for ease I shall tell you
9 exactly who reported it.
10         Yes, it was sent initially to our
11 generic e-mail address.  Claims@special- -- pardon
12 me -- Claims@Special-Risks.Co.uk.
13     Q.   Okay.  Is there anyone in particular
14 who checks these e-mails as they come in?
15     A.   Yes, it would be anyone of Samantha
16 Thomas, Mark Thomas, or Sarah Delacey-Simms.
17 Probably it would be Sam- -- Samantha Thomas.
18     Q.   Okay.
19     A.   All three people are copied in --
20 sorry, on all claims that go to that -- that
21 website address, that e-mail address.
22     Q.   So Mrs. Thomas, Mark Thomas, and
23 Mrs. Simms -- Delacey-Simms, are all copied on that
24 e-mail -- on that e-mail, then?
25     A.   That's correct.  It's Miss Thomas.

22

1     Q.   Yeah, and just out of curiosity more
2 than anything, are Mark and Samantha related in any
3 way?
4     A.   A niece, I believe.
5     Q.   Okay.
6         Do you know about if Rental Boat
7 Corp's insurance agent had any involvement with
8 regard to the reporting of the claim?
9     A.   I believe so, because the property
10 loss notice, it was forwarded to us by Hull and
11 Co., who were the service line broker that we dealt
12 with, but it was sent to them by Preferred
13 Insurance Network, Inc.
14     Q.   At the time of reporting is there a
15 claim number assigned to the claim?
16     A.   I believe so.  I've got to go into the
17 database to locate that, but at the moment I just
18 have the paperless file open.
19     Q.   Well, I'm just talking -- I'm just
20 asking in general the procedures.  At the time of
21 the claim is a claim number generated?
22     A.   Yes.
23     Q.   Okay.
24     A.   But everything -- everything primarily
25 refers to the policy number.

23

1     Q.   Okay.
2     A.   Excuse me.  So everything will be
3 under our file number 175020.
4     Q.   And that's the file number or the --
5 the policy number, or the claim number of the
6 policy?
7     A.   It's the last six digits of the policy
8 number.
9     Q.   Okay.
10         Now, this is going to be a -- a --
11 kind of an open-ended question, so just be
12 prepared.  I know you have some records in front of
13 you, and maybe you can go through them quickly, but
14 what I want to know right now is if you can tell
15 me, chronologically, from the moment that the claim
16 was reported to the final determination on the
17 claim, if you can express to me chronologically
18 everything that Great Lakes did to investigate this
19 claim and come up with a coverage determination.
20         (Pause.)
21     A.   I'm just trying to put the dates
22 together for you.
23     Q.   Sure.  Take your time.
24     A.   Okay.  So the date the loss was
25 actually reported was the 22nd of July.  That's

24

1 when we received the e-mail.  And we received it at
2 13:26 p.m. on the 22nd, and at 15:55 p.m. on the
3 22nd we referred the matter to Arnold & Arnold, who
4 are a firm of surveyors and adjusters.
5         We received our first report from
6 Arnold & Arnold on the 31st of July, 2019.  On the
7 1st of August -- sorry -- 1st of August they sent
8 us an invoice.
9     Q.   And when you say "they," you're
10 referring to Arnold & Arnold?
11     A.   I beg your pardon?
12     Q.   When you say "they," you're referring
13 to Arnold & Arnold?
14     A.   That's correct, yes.
15     Q.   Okay.  Just want to be clear.
16     A.   On the same date as we received the
17 report, Mark Thomas, my claims director, sent a
18 copy of the file to one of my underwriters, Liam
19 Gilhooly.
20         What he was inquiring is -- was on the
21 basis -- well, basically, all he said is, can you
22 take a look at this;" which was the first report
23 from Arnold & Arnold.
24         The reason Mark Thomas referred the
25 file to Liam Gilhooly is because he was the

25

1 underwriter that originally worked on the account.
2 And, effectively, what he's being asked to do is
3 have a look at the report and see if there are any
4 issues from an underwriting perspective.
5         Mr. Gilhooly's response was that, yes,
6 there were issues because Mr. Iriarte was supposed
7 to be being supervised by a qualified person and he
8 wasn't, and that -- And that was basically it.  And
9 he just checked the file to make sure that they
10 never received anything to request Mr. Iriarte to
11 be approved as a sole operator, upon which time
12 Mr. Gilhooly would have requested more information
13 about his experience.
14         And on the 8th of August, we had just
15 received a contact from Arnold & Arnold requesting
16 a telephone conversation, which was had, I believe,
17 with Sarah.
18         Oh, God.  Sorry; it just kicked me out
19 of the file.  Won't be a sec.
20         Okay.  Mark Thomas went back to Arnold
21 & Arnold and requested that they ask a number of
22 questions.
23     Q.    And that was on the 8th of August?
24     A.    That was on the 21st of August.
25 Sorry.  Going back to the 8th of August -- yes, we

26

1 went back on the 8th of August, and Arnold & Arnold
2 were asked to inquire, it says, "Would you be kind
3 enough to advise the following:  How many times
4 Esteban Iriarte has operated the vessel within the
5 last year?  How many times he has operated without
6 supervision?  A full explanation as to why he was
7 operating without supervision; and in your opinion,
8 does Mr. Iriarte have sufficient experience to
9 operate the vessel without supervision?"
10     Q.    Okay.
11     A.    On the 13th of August we received a
12 request for an update from Hull and Co.  And it
13 then went on to say, "The agent had a specific
14 question.  Noted on the policy that it is warranted
15 scheduled vessel is operated by a professional,
16 licensed captain at all times while it's operating
17 as a charter; and warranted Esteban Iriarte is to
18 be fully supervised by Luis Campoo.
19         Does Walter Cryan (ph) need to be
20 supervised to operate?"  I believe Walter Cryan was
21 somebody that the broker requested be approved as
22 an operator of the vessel.
23         Our response was on the same day.
24 It's to Kelly Russell at Hull and Co. (As read):
25 "We have provided instructions to Arnold & Arnold

27

1 last week.  They are requesting more information
2 from the insured.  Our questions were as follows:
3 How many times Esteban Iriarte has operated the
4 vessel within the last year?  How many times he had
5 operated without supervision?  And a full
6 explanation as to why he was operating without
7 supervision.
8         Furthermore, we also require an
9 explanation as to why the recommendations as
10 detailed in the survey were not complied with,
11 considering that a letter of compliance attesting
12 to the fact that they were complied with was
13 provided on application.  In response to our --
14 your inquiry, the policy does not have a
15 supervision warranty for Mr. Cryan (ph), as he has
16 sufficient experience and suitable qualifications
17 for operating the vessel without supervision."
18     Q.    Okay.  So what happened after the
19 13th of August?
20     A.    Okay.  The 23rd of August we were sent
21 copies of our letter to Mr. Iriarte -- well, this
22 is all coming from Arnold & Arnold.  It was a
23 letter from Arnold & Arnold to Esteban Iriarte
24 basically repeating all the things that we'd asked
25 him to inquire about.  That included, again, the

28

1 how many times have you operated the vessel in the
2 last year; explanation as to why he operated that
3 vessel without supervision; how many times you've
4 operated the vessel without supervision; how many
5 times have you operated the vessel under the
6 supervision of Luis Campoo.
7         And then it then goes on to list all
8 the items in -- ten items of recommendations that
9 Arnold & Arnold had established had not been
10 complied.  Sorry, and these were surveyor's
11 recommendations.
12         We'd also included snapshots of what
13 appears to be WhatsApp or text, and some videos and
14 so on, and the covering e-mail says, "Per your
15 instructions, we requested to be sure to provide
16 answers to multiple questions in the below e-mail
17 and asked for written explanations as to why the
18 Pre-Purchase Survey recommendations were not
19 complied with, and I've attached the letter to this
20 e-mail.  Please see Esteban Iriarte's written
21 response attached to this e-mail."
22         It says, "In Iriarte's response, he
23 indicates that he has always been under the
24 supervision of Campoo through chats and telephone
25 calls.  In regards to the recommendations not

**29**

1  having been complied with," Iriarte responds none
2  are fundamental to the operation of the vessel."
3           And then he's attached a couple of,
4  let's see, videos and 19 WhatsApp screenshots of
5  text messages with Fernando Luis Campoo.
6      Q.   What date was the response received?
7      A.   From whom?
8      Q.   From Mr. Iriarte?
9      A.   Yes.  I've just said what his response
10  was.  He said that he was being supervised --
11      Q.   No.
12      A.   -- with chats and telephone.
13      Q.   I understand, sir.
14           I'm asking what date was that response
15  received, if you know?
16      A.   I don't know.  Hang on.  Let me open
17  this file.  It appears to be undated.  Clearly --
18  well, let's see if there's a date at the bottom.
19  And it's undated.  Therefore, it must have been
20  received sometime between the letter that was sent
21  and when we received it between the information
22  request date, which was the 8th of August, and when
23  it was sent to us, which was the 21st of August.
24      Q.   All right.  So you received his
25  response on the 21st -- sometime between the 8th

**30**

1  and the 21st?
2      A.   Yes.
3      Q.   And you testified that on the 23rd of
4  August something had occurred.  I'm unclear on what
5  occurred on the 23rd of August.
6      A.   That's when we received the file from
7  Arnold & Arnold.
8      Q.   Okay.
9      A.   All right.  So sometime between when
10  we requested the information and on the -- sorry,
11  the file won't open.  Right.
12           The information request was on the
13  8th of August.  That's when Arnold & Arnold wrote
14  to Mr. Iriarte.  Right?  His response is undated,
15  but it was sent to us on -- sorry -- on the 21st of
16  August.  Sorry.  It reached the file on the 23rd of
17  August.
18      Q.   But did anything occur on the 23rd of
19  August in response to my question, to my
20  chronological question?
21      A.   No, the reference to the 23rd of
22  August is because I'm looking at the dates and this
23  is when it was filed.
24      Q.   Okay.
25      A.   It was received by e-mail on the 21st

**31**

1  I and put into the file on the 23rd.
2      Q.   Understood.  Thank you, sir.
3           So after you received the response
4  from Mr. Iriarte, did anything occur with regard to
5  the investigation of this claim?
6      A.   Yes, I'm continuing.  Come on.  Open
7  up.  Come on.
8           At this point on the 4th of September,
9  I think something's happened before the 4th of
10  September because we asked Alexander -- asked
11  Arnold & Arnold -- sorry, it's just taking a while
12  to open.  I might have to go out and come in again
13  to reset it all.  There's a lot of documents here.
14           I can recall that we asked Arnold &
15  Arnold if, in their opinion, Mr. Iriarte had
16  adequate experience to operate the boat.  The
17  problem I'm now having is opening the actual files
18  that give you the actual dates so I recall exactly
19  what happened and in chronological order.  But
20  giving you the actual dates as well, I have to open
21  the files.
22      Q.   It's okay.  If you recall, if you need
23  the assistance of the file to recall, then you can
24  refer to them, but if you know --
25      A.   Okay.

**32**

1      Q.   -- if you know exactly what happened
2  from memory and chronological order but not the
3  exact dates, I'm sure we can figure that out --
4      A.   Okay.
5      Q.   -- from the documents since
6  everything's been produced, so...
7      A.   Okay.  I'll just say, I'll give you an
8  on or around date because at least I got the date
9  it was filed into the file.
10      Q.   Fair enough.
11      A.   We went back or Mark Thomas went back
12  to Arnold & Arnold and inquired as to whether, in
13  their opinion, Mr. Iriarte had adequate experience
14  to operate the vessel.  Their response was that on
15  review of the text messages or WhatsApp messages
16  between himself and Mr. Campoo, that they believed
17  he did not have adequate experience to operate the
18  vessel.
19           Mark Thomas then invited Arnold &
20  Arnold to prepare a draft denial letter.  The draft
21  denial letter was sent by Arnold & Arnold to us,
22  and then we issued a denial letter to Mr. Iriarte.
23      Q.   Okay.
24      A.   There were a couple of other things
25  that you'd be aware of.  For example, there was an

**33**

1 e-mail from Angeline Navarro of your office asking
2 us for our address, phone number, and fax number,
3 to which we said we don't have a fax, but you can
4 contact us by e-mail.
5      And we sent the denial letter to
6 Mr. Iriarte on the 12th of September.
7      Q.   Anything else with regard to the
8 investigation of the claim?
9      A.   No, I think that's kind of the end of
10 the investigation of the claim, but we wouldn't
11 send a denial letter until we completed our
12 investigation.
13      Q.   Understood.
14      Do you know how many times the actual
15 vessel was inspected in connection with this
16 investigation?
17      A.   I think just once. I mean, obviously
18 we had the Pre-Purchase Survey, and then we had the
19 post-incident survey.
20      Q.   Okay. So just to summarize your
21 testimony, I want to be able to -- I'm going to try
22 to do this as quickly as possible. Okay?
23      You received the claim sometime on
24 July 22nd. You received the first report from
25 Arnold & Arnold on 31 July. On August 8th or

**34**

1 thereabouts you contacted A and A, and I think A
2 and A -- you asked A and A to have Mr. Iriarte
3 answer some questions regarding the supervision and
4 how he was supervised.
5      You then received a response
6 containing answers to those questions from
7 Mr. Iriarte. And after review of those, you asked
8 A and A if their opinion -- if, in their opinion,
9 Mr. Iriarte had adequate experience, and their
10 conclusion was that he did not. And thereafter on
11 the 4th of September, the decision was made to deny
12 the claim, and thereafter on the 12th, a denial
13 letter was drafted and sent to Mr. Iriarte; is
14 that --
15      A.   That's correct.
16      Q.   That's accurate? Okay.
17      Is there anything else with regard to
18 the investigation of the claim that you would add
19 to that chronology that I just provided to you?
20      A.   No.
21      Q.   Okay. Do you -- do you -- did at any
22 point during the investigation -- well, we'll get
23 to that. Were any requests made of the insured in
24 this case, Rental Boat Corp, that were not complied
25 with during the investigation?

**35**

1      A.   No. I believe the insured responded
2 to our requests for information.
3      Q.   Okay. Did you -- during your
4 investigation did you obtain a recorded statement
5 from any of the individuals from Rental Boat Corp
6 regarding this loss or anything else?
7      A.   No.
8      Q.   Did you or Arnold & Arnold, your
9 agent, obtain any statements, written statements
10 from witnesses or third parties or anything like
11 that regarding the loss that's at issue in this
12 case?
13      A.   Well, I object to referring to Arnold
14 & Arnold as our agent. They are an independent
15 contractor.
16      Q.   Okay.
17      A.   But we didn't, no.
18      Q.   Okay. So you've identified a few
19 individuals from your office who participated in
20 the investigation of this claim, namely Mr. Thomas,
21 Ms. Samantha Thomas, and Ms. Delacey-Simms. Do you
22 know anyone in particular from Arnold & Arnold --
23 oh, and I think you also mentioned Mr. Gilhooly,
24 the underwriting person.
25      Is there anybody from Arnold & Arnold

**36**

1 that you know that participated in the
2 investigation of this claim?
3      A.   Yes. Skyler, but I'll have to find --
4 I can't remember his second name.
5      Q.   I think his last name is Cruz. Does
6 that ring a bell?
7      A.   Yes, that does ring a bell.
8      Q.   Do you know if Captain Ian Allen was
9 at any time involved in the investigation of this
10 claim?
11      A.   He may have been. Let's see. I mean,
12 he's a senior person at Arnold & Arnold, in that
13 office.
14      Q.   Is he more senior than Mr. Cruz?
15      A.   I believe so, yes. If I've got that
16 wrong, then I may have it the wrong way around.
17 But in my opinion, I thought that Ian Allen was the
18 senior person in that office.
19      Q.   So Arnold & Arnold --
20      A.   If you can wait just a second, I'm
21 just seeing it, because it's a long report from
22 Arnold & Arnold, I'm seeing if Ian Allen appears at
23 the bottom. No he doesn't, so I don't know if Ian
24 Allen was involved.
25      Q.   Now, insofar as the coverage

determination is concerned, that determination is made by your office, or is that determination -- let me rephrase the question. Strike that.
Is that determination made by your office in conjunction with Arnold & Arnold, or is that determination made solely by your office?
A. Solely by our office.
Q. But as you expressed, you rely on Arnold & Arnold's field investigation in order to arrive at that determination; is that accurate?
A. That's correct.
Q. Give me one second, sir. I want to make sure I have all my ducks in a row here because we have quite a bit to cover in terms of documents now. Too many notebooks.
I'm going to share with you -- give me one second.
(Sharing screen.)
(Thereupon, Plaintiff's Exhibit No. 1 was marked for identification.)
(Thereupon, Plaintiff's Exhibit No. 2 was marked for identification.)
BY MR. SALAS:
Q. I'm going to share with you a document that we've marked as -- Exhibit 1 is the depo

notice, and Exhibit 2 is this 61-page document entitled "Marine Surveyors Bureau Pre-Purchase Marine Survey" for When in Rome.
Do you see that document, sir?
A. Yes, I can.
Q. Okay. And do you have -- as part of your file, do you have a copy of this document?
A. Yes, it's just in a different file.
Q. Okay.
A. I'm just going into that file now because it's easier looking on my screen than here.
Q. Okay. I appreciate that. Easier is always good. Let me know when you have it available --
A. Ok.
Q. -- and you're ready to talk about it. Sorry about all the scrolling, but I'm trying to get somewhere here.
A. Okay. Go ahead.
Q. Does -- what -- first of all, do you recognize -- you said you recognize this document. Can you explain to me what the purpose of the survey is in terms of Great Lakes Insurance underwriting process?
A. Yes. It's to establish the condition

of the vessel and the valuation of the vessel --
Q. Okay.
A. -- for insurance purposes.
Q. Okay. So Great Lakes Insurance relies on this report when its making its decision whether to insure or not insure a yacht, correct?
A. This is one of the aspects that we use, yes.
Q. Okay. So you rely on it in part as on of the -- as your -- for Great Lakes's decision to insure a vessel?
A. That's correct, yes.
Q. Okay. And it's page 37 on my PDF document, but there's a section IV to this that says "Findings and Recommendations."
A. Yeah. Page 34, correct.
Q. Can you tell me when Arnold & Arnold -- I'm sorry -- Great Lakes Insurance received this survey as part of their underwriting process for this particular insurance policy?
A. Yes, we received it on the 11th of April, 2018.
Q. Okay. So if I am not mistaken, and you can correct me if I'm wrong, if you know, this -- we already established that this accident

that is the subject of this claim occurred in July of 2019; is that correct?
A. Yes, sir.
Q. Okay.
A. Yes.
Q. And the first time you insured this vessel was in April of 2018, correct?
A. That's correct.
Q. Okay. So there was a previous policy in effect prior to the policy at issue with regard to this claim. Do you agree with that statement, sir?
A. Yes.
Q. Okay. So this survey was used in the underwriting process when you initially insured the vessel, not for purposes of renewing the policy after the initial policy expired?
A. It was still used inasmuch as the survey would have been valid for three years.
Q. Okay. So you relied on this survey to initially insure the vessel, and you relied on this survey upon renewal in the decision to renew the policy after the initial term; is that accurate?
A. That's -- that's correct, yes.
Q. Okay. And these findings and

1 recommendations on this report, have you reviewed
2 these -- these findings and recommendations prior
3 to today?
4     A.   Yes.
5     Q.   Okay.  Initially did GLI agree to
6 insure the vessel despite the alleged deficiencies
7 on this -- on this report?
8     A.   Only subject to the recommendations
9 having been complied with.
10     Q.   Okay.
11     A.   We required that the insured attest
12 that either all the recommendations have been
13 complied with, or that he detailed any
14 recommendations that have not yet been complied
15 with.  If there's a list of recommendations not
16 complied with, then we will make a call as to
17 whether we will insure it, or if we will insure on
18 a different basis, i.e., with, for example, limited
19 navigation.
20     Q.   Okay.  But these deficiencies, you
21 would agree with me, were noted by the surveyor
22 prepurchase or prior to Rental Boat Corp purchasing
23 the vessel?
24     A.   Yes.
25     Q.   Okay.  And aside from Rental Boat Corp

1 BY MR. SALAS:
2     Q.   Correct.
3     A.   I assume so.
4     Q.   Besides the deficiencies that are
5 noted on this survey that was done -- the date
6 above is April 1st, 2018, does GLI know of any
7 other deficiencies that are not noted on this
8 survey?
9     MR. GOLDMAN:  Object to the form.
10     THE WITNESS:  I'm not aware of any,
11 no.
12 BY MR. SALAS:
13     Q.   So other than what's -- than what's
14 detailed here, GLI, Great Lakes Insurance, doesn't
15 have any knowledge of any other deficiencies,
16 correct?
17     A.   Not that I'm aware of.
18     Q.   Well, you're the corporate
19 representative of GLI, so I want to know what GLI's
20 position is?
21     A.   I don't believe there are.
22     Q.   Okay.  We'll hang onto that because we
23 might go back to that in a minute.
24     (Thereupon, Plaintiff's Exhibit No.
25 3 was marked for identification.)

1 relying on it for its decision to insure the
2 vessel, you would agree with me that Rental Boat
3 Corp also relied on it in its decision to purchase
4 the vessel?
5     MR. GOLDMAN:  Object to the form.  I
6 think you might want to rephrase that.  You
7 said Rental Boat relied on to issue the
8 policy.  I think you meant Great Lakes.
9 Why don't you rephrase the question,
10 counsel.
11 BY MR. SALAS:
12     Q.   Do you need me to rephrase the
13 question, sir?
14     A.   No, I mean, as far as I'm concerned, I
15 have no idea whether Boat Rental Corp relied on the
16 survey.  I could only assume they did, but I can't
17 know what's in their mind.
18     Q.   Okay.  I appreciate that.
19     But you understood my question,
20 correct?
21     MR. GOLDMAN:  Objection.
22     THE WITNESS:  Yes, your question
23 involves, as I understand it, did Rental
24 Boat Corp rely on this survey to purchase
25 the vessel?

1 BY MR. SALAS:
2     Q.   The next Exhibit is a 32-page
3 document, which is an insurance policy with an
4 effective date of April 13th, 2019, with a -- until
5 April 13th, 2020.  I just want you to -- I don't
6 know if you have a copy of it or if you can review
7 it on my screen, I can go through it slowly.  I'm
8 sure you have a copy of it.
9     I just want to know if this is a full
10 and a complete copy of the insurance policy that
11 was issued to my client, Rental Boat Corp, on the
12 dates described there in?
13     A.   It certainly looks like it.
14     Q.   Can you confirm for me one way or the
15 other?
16     A.   Just scroll down a little bit slowly,
17 slowly, slowly.  Hold it right there.  No, down a
18 bit.  Right.  Okay.  Yeah.  So now I know what
19 policy language it was and so on.  Yes, it's
20 certainly signed by us.  It would have had the
21 policy language attached.
22     Q.   Is that your signature, sir?
23     A.   No.
24     Q.   Do you know whose signature that is?
25     A.   Yes, Liam Gilhooly.

45

1  Q.  Okay. So he's the underwriter, the
2  underwriter signed it.
3      So are there any, and I can go through
4  it if you want --
5      MR. GOLDMAN:  Can you stop just a
6      moment, please.
7      (Off the record.)
8  BY MR. SALAS:
9  Q.  I'll just scroll through this if you
10 want to look at it.
11 A.  Yeah, I am familiar with the policy
12 language.
13     MR. GOLDMAN:  I'm sorry. I should
14     have mentioned that I was expecting a very
15     important call. It had just come in. I
16     apologize. If I can have everyone's
17     indulgence, it shouldn't take more than
18     another moment or two.
19     (Off the record.)
20     VIDEOGRAPHER:  We're going back on the
21     record at 11:12 a.m.
22     MR. SALAS:  Thank you.
23 BY MR. SALAS:
24 Q.  Mr. Usher, we were just going over
25 Exhibit 3, which is -- which was produced in

46

1  discovery in this case. It's Bates stamped
2  RBC_A&A72900-101. Document numbers 000012 to
3  000045 and my question is: Have you had a chance
4  to review that document?
5  A.  Yes.
6  Q.  Okay. And can you tell me if that is
7  the entirety of the policy that was issued to my
8  client, Rental Boat Corps [sic], for the effective
9  dates that are listed on the first page, which are
10 April 13th, 2019, through April 13th, 2020?
11 A.  That's correct.
12 Q.  Okay. There are no other pages or
13 riders or anything else to the policy; is that
14 accurate?
15 A.  Other than the fact obviously it
16 incorporates the application form that's detailed
17 in the body of the policy wording. We wouldn't
18 re-attach the application form.
19 Q.  Okay.
20 A.  So that is what we issued.
21 Q.  So the entirety of the policy consists
22 of the application form and these 32 pages which I
23 just presented to you, accurate?
24 A.  Yes. Well, the application --
25 everything to do with the application process is

47

1  embodied within the policy, but that, the document
2  you presented there, is precisely the document that
3  we issued.
4  Q.  Okay. So I can understand your
5  answer, we can get -- we can get -- we can dispense
6  with this, anything having to do with the
7  application plus these 32 pages which I just
8  presented to you, those comprise a totality of
9  Great Lakes Insurance policy with respect to the
10 vessel that is the subject of this litigation and
11 nothing else, correct?
12 A.  That's correct.
13 Q.  Okay. Now, you already agreed that
14 the loss that is the subject of this claim occurred
15 during the policy effective dates, correct?
16 A.  That's correct.
17 Q.  Okay. And you also -- you also
18 testified that the claim was ultimately denied
19 after a month and a half of investigation through
20 your independent contractor, Arnold & Arnold,
21 correct?
22 A.  Correct.
23 Q.  Okay. So if you know and if you can
24 point me to the specific terms of the policy that
25 you contend support your position in denying the

48

1  claim.
2  A.  Yes. As I mentioned earlier, the
3  application process is incorporated into the
4  contract between ourselves and Great Lakes.
5  Therefore, we've relied upon all the
6  representations made.
7      There were two aspects as far as this
8  claim is concerned. One was that the policy called
9  for if Mr. Iriarte was operating the vessel, he had
10 to be fully supervised by a named qualified
11 operator. Two, during the application process,
12 Mr. Iriarte signed a letter confirming that he had
13 complied with all the recommendations that had been
14 listed in the April 1st survey.
15     Our investigations revealed that
16 Mr. Iriarte was not competent to operate the vessel
17 and, therefore, should have been fully supervised
18 by somebody else. It also revealed that ten
19 recommendations that were listed in the survey had
20 not been complied with. That was the basis for our
21 denial.
22 Q.  Is there anything else that you've
23 uncovered with regard to your investigation, as we
24 sit here today, other than those two items that you
25 just described that serve as the basis for the

49

1  denial of coverage in this case?
2      A.   No, I think those are the two prime
3  issues.
4      Q.   Are there any secondary issues?
5      A.   Not at this time.
6      Q.   Okay.  So just to be clear as you sit
7  here today, other than those two issues that you
8  pointed out to me as the basis for the denial of
9  this claim, there are no -- there aren't any other
10 policy terms that Great Lakes is relying on for
11 their denial of the claim that's the subject of
12 this lawsuit, correct?
13     A.   The only issue that comes to mind is
14 that because we're looking at the competency of
15 Mr. Iriarte, then there's a seaworthy clause in the
16 policy language which calls for, if you look at I
17 believe it is the definition of seaworthiness, that
18 there has to be a competent crew on board.  I think
19 it's definition K.  You've just gone past it.  Go
20 back.
21          "K.  Seaworthy means fit for the
22 Scheduled Vessel's intended purpose.  Seaworthiness
23 applies not only to the physical condition of the
24 hull, but to all its parts, equipment and gear and
25 includes the responsibility of assigning an

50

1  adequate crew.  For the Scheduled Vessel to be
2  seaworthy, it and its crew must be reasonably
3  proper and suitable for its intended use."
4          So by virtue of the fact that we're
5  maintaining that Mr. Iriarte was not competent to
6  operate the vessel, then it raises the issue of
7  seaworthiness.
8      Q.   So aside from those two issues, your
9  contention or your position is also that the vessel
10 (voice breaking up); is that accurate?
11     A.   Sorry.  Can you repeat.  You went out
12 of sync there.
13     Q.   Okay.  You mentioned the seaworthy
14 clause just now, and prior to that you mentioned
15 two issues with respect to your GLI, Great Lakes
16 Insurance, basis for denial of the claim.  One was
17 that, in your opinion, Mr. Iriarte was not fully --
18 was not competent and was not fully supervised.
19 The second was that there were ten recommendations
20 from the Pre-Purchase Survey that you allege were
21 not complied with.  And the third was that the
22 insureds did not comply -- well, that the vessel
23 was not seaworthy, right?  Those are three separate
24 issues.
25     A.   Correct.

51

1      Q.   Those are the only three issues that
2  you are relying on with respect to your denial of
3  the claim in this case?
4      A.   Yes.
5          (Thereupon, Plaintiff's Exhibit No. 4
6          was marked for identification.)
7  BY MR. SALAS:
8      Q.   And more to that point, I'm going to
9  show you what we've marked as Exhibit 4 to the
10 deposition.  And this is a document that is signed
11 here and dated 4/22/2018, correct?
12     A.   If that's 4/22, yes.
13     Q.   Okay.  I'm -- I'm -- it looks like two
14 2s, but I can --
15     A.   I think it looks like 11, two 1s.
16     Q.   Okay.  That's possible too.
17          So let's call it April 11th?
18     A.   But the 18 at the end, that one in
19 front of the 8 looks a lot like the other two
20 numbers.
21     Q.   Fair enough.  So we'll call it
22 April 11th, 2018.  And this is the document that
23 you're stating is also incorporated into the policy
24 regarding the survey recommendations, correct?
25     A.   That's correct.

52

1      Q.   Okay.  Do you know if at any point in
2  time between the receipt of this document and the
3  accident that occurred on July -- or the denial --
4  strike that.
5          Do you know whether between the date
6  that Great Lakes Insurance received this document
7  and the denial of the insurance claim if Great
8  Lakes Insurance ever requested maintenance records
9  or repair records with regard to the pre-survey
10 recommendations?
11     A.   I don't believe we did, no.
12     Q.   Okay.  Do you know why not?
13     A.   We wouldn't normally do it.
14     Q.   Okay.  So when you're saying that
15 certain recommendations were not complied with,
16 you're relying on an inspection that took place a
17 year -- over a year after this document was signed;
18 is that accurate?
19     A.   That's correct.
20     Q.   So Great Lakes Insurance never
21 inspected the vessel to ensure that any of these
22 recommendations were complied with prior to denying
23 the claim on September 4th, 2019, a year and three
24 months, four months after the fact, right?
25          MR. GOLDMAN:  Object to the form.

53

1    THE WITNESS:  Yeah, we relied solely
2    on the insured's attestations that they had
3    been complied with.
4        Q.    Okay.
5              (Thereupon, Plaintiff's Exhibit No.
6        5 was marked for identification.)
7    BY MR. SALAS:
8        Q.    Now the next document I have is
9    Exhibit 5.  I'm going to ask you to take a look at
10   this document.  It was produced to us as A&A --
11   Bates stamped RBC_A&A72900-101_000001 through 8,
12   and it's a survey report signed by Captain Ian
13   Allen.
14             You mentioned earlier that you weren't
15   sure if Mr. Allen was involved in any way, shape,
16   or form with respect to this claim, and I am
17   wondering if you've seen this document before.
18       A.    Well, I'm just looking at -- when I
19   looked at my file, I have to say I thought it was
20   signed by Skyler Cruz.
21       Q.    It looks like it's addressed to
22   Mr. Cruz.  And, again, I don't know if you have a
23   copy of this document.  I'd be happy to send it to
24   your counsel and send it to you.  It was produced
25   by you guys, and produced by GLI.

54

1        A.    If you can just scroll up a moment and
2    show me the date of it.  And it's the 24th of July.
3        Q.    Right.
4        A.    Oh.  No, we don't have that document,
5    I don't think.  We have an identical document which
6    was sent to us, first report, on the 30th of July,
7    which is headed "First Report."  Oh, that's a
8    survey report.  Okay.  So -- so the short answer is
9    we did not have that document because that document
10   was, as you rightly say, addressed to Skyler Cruz
11   by Ian Allen who was -- did -- performed this field
12   survey, actually physically inspected the boat.
13       Q.    Do you know if Mr. Cruz actually
14   inspected the boat?
15       A.    It would appear, looking at that, that
16   he did not.  That Mr. Ian Allen from Arnold &
17   Arnold inspected the boat.  Mr. Cruz was the one
18   that wrote to us.
19       Q.    Okay.  I'm just -- I'm just trying to
20   figure out what happened here.  Because I have -- I
21   have two -- two different documents, and this
22   document is dated July 24th.  As you can see, it
23   looks like it's from -- it's from -- it doesn't
24   look like, it is from Captain Allen, Ian V. Allen.
25   And you mentioned that you don't -- you don't have

55

1    a copy of it in your file, is that correct?
2              MR. GOLDMAN:  Objection to form.
3              THE WITNESS:  That's correct, because
4    a file copy between two people working at
5    Arnold & Arnold.
6              MR. GOLDMAN:  Let me interject at this
7    point.  I don't want to take away from your
8    deposition, counsel, or put words in
9    Mr. Usher's mouth.  If you'll depose both
10   Arnold & Arnold's gentlemen tomorrow and
11   you'll find out how they go about surveying
12   and reporting, you'll find that it's fairly
13   standard.  One does the survey, he reports
14   to the other one, the other one then sends
15   the information on in a separate
16   correspondence to the --
17             MR. SALAS:  Thank you, Mr. Goldman.
18   Thank you.  I'd like to take my deposition
19   now.
20             MR. GOLDMAN:  All right.  Mr. Usher
21   may not be aware of how Arnold & Arnold
22   operate.
23             MR. SALAS:  I don't -- I don't know.
24   I don't know.  I'm trying to find out
25   what's going on.  So let me continue.

56

1        Okay?  Thank you.
2    BY MR. SALAS:
3        Q.    So, you know, this was -- this was --
4    obviously, you said you reviewed the areas of
5    inquiry.  One of those areas of inquiry were
6    documents that were produced.  This document was
7    produced to me, and I am just trying to figure out,
8    and if you know, and if you don't know, you can
9    tell me so, when exactly Mr. Ian Allen inspected
10   the boat.  What dates he inspected it.
11             And I'll -- and I'll preface this
12   question with we have a date of July 24th on the
13   letter, which could be the date he wrote it -- he
14   wrote it?
15       A.    He said on the 22nd of July.
16       Q.    Right.  And here it says the 22nd of
17   July.
18             But just to add to the confusion, the
19   header here says 28th of August.  So, you know, I
20   just want to see if you can -- if you can in any
21   way reconcile those -- those issues for me.  And,
22   again, if you don't have a copy of the document and
23   it would be easier for you to see, I'd be happy to
24   send it to your counsel or to you directly if your
25   counsel is okay with that.

57

1     A.   Yeah, I mean, I can tell you, I mean,
2  I'm looking at our file.  That document does not
3  appear in our file.
4     Q.   Okay.
5     A.   So it may well have been provided to
6  you, right, from the Arnold & Arnold file.
7         MR. GOLDMAN:  Bingo.
8         THE WITNESS:  In fact, it says at the
9  bottom RBC_A&A.
10 BY MR. SALAS:
11    Q.   Okay.  So it's not in your file?
12    A.   Correct.
13    Q.   Perfect.  Okay.
14        MR. GOLDMAN:  You may recall,
15 counselor, that I provided you with the
16 complete Arnold & Arnold file.
17        MR. SALAS:  I understand, sir.  Thank
18 you.
19 BY MR. SALAS:
20    Q.   Do you mind if I send you this
21 document so you can review it, because it's kind of
22 hard through the screen share?
23    A.   Yeah, by all means.  Have you got my
24 e-mail, or are you going to send it to Steve?
25 Yeah, send it to Steve, and he'll forward it to me.

58

1     Q.   I'll do that.
2         MR. GOLDMAN:  For the sake of brevity,
3  send it to me and to Mr. Usher.  You have
4  Mr. Usher's e-mail.  You can send it,
5  though, this way, or do you need his
6  e-mail?  Do whatever you'd like to.
7         I don't tell other people how to
8  practice law either, but I think it's
9  generally or even preferable procedure is
10 to send your proposed exhibits about a day
11 or two prior to the deposition.  That would
12 have avoided this kind of situation.  I
13 sent my proposed exhibits yesterday, the
14 day before that, but in reality, you just
15 waited until today, but you do what you
16 like.
17        MR. SALAS:  I appreciate that.  Thank
18 you.
19        I'm just e-mailed over the document to
20 you.
21        MR. GOLDMAN:  I'm looking for it.
22 When it comes I'll send it directly down to
23 Mr. Usher.
24        MR. SALAS:  You asked me -- you asked
25 me to copy both of them, so copy and I sent

59

1  it to both of you.
2         THE WITNESS:  I just got it now.
3         MR. GOLDMAN:  You got it too, Tony?
4  If not I can send you what John just sent.
5  BY MR. SALAS:
6     Q.   Okay.  All right.  So now, let me know
7  when you've had a chance to review that document,
8  Mr. Usher.
9     A.   Yeah, I've reviewed it now.
10    Q.   Okay.  And based on what you told me,
11 this is the first time you see this document,
12 correct, sir?
13    A.   That's correct.
14    Q.   Okay.  If we look at page 2 of the
15 document under "Prepurchase Compliance," you can
16 read the paragraph there that says, "We compared
17 recommendations reported on the Pre-Purchase Survey
18 dated 01 April 2018 with conditions found on board.
19 When comparing the Pre-Purchase Survey with
20 conditions found overall, it appeared considerable
21 work was performed after purchase."
22        Okay.  And you'll agree with me that
23 this was -- this -- I think it's from Mr. Allen's
24 perspective, this survey was done on July 22nd,
25 2019, correct?

60

1     A.   Yes.
2     Q.   Okay.  So Mr. Allen, in terms of this
3  document, is saying that there had been
4  considerable work done.  And looking through his --
5  and then he says, "Our inspection was limited to
6  items listed under 'A. Safety Deficiencies' and 'B.
7  Other Deficiencies Needing Attention'.  We were
8  unable to check items requiring electrical power."
9         You see that?
10    A.   Correct.
11    Q.   Okay.  Now if we go through this, for
12 lack of a better term, litany of categories, these
13 numbers that you see here A.1 through A.2, those
14 correspond with the findings and recommendations we
15 saw earlier on Exhibit 2, correct?
16    A.   Yes.
17    Q.   A.1 to B.1?
18        Okay.  Now, hold on.  This thing is
19 such a pain in the butt.  Sorry.
20        Now, with regards to the findings of
21 Captain Allen, if you're able to review, did he
22 note any deficiencies on his survey report on
23 July 22nd, 2019?
24    A.   He's noted the single clamp on the --
25 or the large single hose clamp on the wet exhaust

**Page 61**

1  system is not ABYC, but then goes on to say that
2  the hose clamps appear to be of a unique design
3  specifically used or supplied for this system.
4  　　　　Q.　Any other deficiencies?
5  　　　　A.　That the -- on B.23 he noted rust but
6  not as bad.  Looks like repaired, but it's still
7  rusting.
8  　　　　COURT REPORTER:  I'm sorry.  When you
9  first started, you were cut off.
10  　　　　THE WITNESS:  Yeah.
11  　　　　On recommendation B.23 it say, "Noted
12  rust, but not as bad as Pre-Purchase
13  Survey.  Most likely repaired, by
14  re-rusting."
15  BY MR. SALAS:
16  　　　　Q.　Okay.
17  　　　　A.　And the -- on B. 29 which is the
18  "Heavy rusting of the common drain outlets and
19  their fasteners," it says, "Noted rust, but to a
20  lesser degree from Pre-Purchase Survey," so
21  obviously it received some attention.
22  　　　　And that's the extent of his comment.
23  　　　　Q.　Okay.  So just to recap, from your
24  perspective, the item on B.18, B.23, and B.29, from
25  your perspective, those are deficiencies that were

**Page 62**

1  noted from the Pre-Purchase Survey by Captain
2  Allen, accurate?
3  　　　　A.　Yes.
4  　　　　Q.　Okay.  And if we look at the
5  Pre-Purchase Survey with regard to -- if we look at
6  this, it says unique design specifically used and
7  supplied for the system.  So, just from a -- from a
8  common sense perspective, it probably doesn't make
9  sense to use something that's not specifically
10  designed for the -- for a specific system, right?
11  　　　　A.　I'd accept that.
12  　　　　Q.　Okay.  So, and that is -- let me go
13  back, that is B.18.  It says the recommendation is
14  to provide two hose clamps for all wet exhaust hose
15  ends and inspect and renew any hose clamps suspect
16  to rusting or corrosion.  You see that?
17  　　　　A.　Yes.
18  　　　　Q.　And, in fact, Captain Allen said that
19  the rusting hose clamps appear to be -- appear to
20  have been replaced, correct?
21  　　　　A.　That's correct.
22  　　　　Q.　The next one you noted, I believe, was
23  B.23, "Alternator housings and connection terminals
24  are rusting."  And, again, Mr. Allen notes rust,
25  but not as bad as the Pre-Purchase Survey.  Most

**Page 63**

1  likely repaired, but re-rusting.
2  　　　　And if you look at B.23 it says, "All
3  three (3) alternator housings and connection
4  terminals are rusting," and it says treat all rust
5  and protect with anticorrosion coatings, right?  It
6  doesn't say replace the alternator housings, right?
7  　　　　A.　That's correct.
8  　　　　Q.　So at least from Mr. Allen's
9  perspective, the issue was likely addressed, but
10  was re- rusting because it's a -- well, strike
11  that.
12  　　　　The issue was addressed, correct, from
13  Mr. --
14  　　　　A.　It appears so, yes.
15  　　　　Q.　Okay.  And B.29, again, it says, as
16  you noted, "Heavy rusting on common drain outlets
17  and their fasteners.  Noted rust, but to a lesser
18  degree."  And if we look at the B.29, he says treat
19  all rustings -- "Treat all rusting, renew any
20  components that might be structurally compromised.
21  Forward rusting stains probably caused by rust in
22  air conditioner system.  Air conditioner system
23  should be cleaned when being serviced.  Monitor
24  through Hull and Co. for the rusting after treating
25  existing conditions."

**Page 64**

1  　　　　So I'm just trying to figure out if
2  the rust was treated, what is the -- what is the --
3  as the recommendation was, what is the deficiency
4  on B.29; do you know?
5  　　　　A.　No.  I'm assuming there must have been
6  further conversation between Skyler Cruz and Ian
7  Allen.
8  　　　　Q.　Okay.
9  　　　　A.　I'm not privy to any other documents
10  between those two people within Arnold & Arnold,
11  and obviously, I have not seen this document
12  before.
13  　　　　Q.　Understood.  But as it relates to Item
14  B.29, which you identified as a deficiency, at
15  least from the survey's perspective, the fact that
16  there is less rust than the -- than what was
17  present during the Pre-Purchase Survey would lead
18  to the conclusion that the vessel owners in this
19  case did, in fact, comply with the survey
20  recommendation, correct?
21  　　　　MR. GOLDMAN:  Object to the form.
22  　　　　THE WITNESS:  They've done some work
23  on it.
24  BY MR. SALAS:
25  　　　　Q.　Well, sir, isn't that what the

65

1  recommendation was, is to do some work on it and
2  not replace it?
3          MR. GOLDMAN: Object to the form.
4          THE WITNESS: It says "renew any
5      components that might be structurally
6      compromised and forward rusting stains
7      probably caused by rust in air conditioner
8      system. The air conditioner system should
9      be cleaned when being serviced and
10     monitored through hull collars for rust
11     deprivation or further rusting after
12     treating existing condition."
13         They'd obviously done some work on it.
14 BY MR. SALAS:
15     Q.   All right. So, but you -- are you
16 prepared to say that they complied with the
17 recommendation, based on Mr. Allen's survey of the
18 vessel on July 22nd?
19         MR. GOLDMAN: Object to the form.
20         THE WITNESS: I think certainly
21     they've done work. I mean, I'm not sure
22     whether that would warrant -- I mean, I'd
23     have to ask Ian Allen whether what they've
24     done was sufficient to comply with the
25     recommendation.

66

1  BY MR. SALAS:
2      Q.   Okay. So if I understand your answer
3  correctly, Great Lakes Insurance is deferring to
4  Ian Allen as to whether or not there was sufficient
5  compliance with the recommendations; is that
6  accurate?
7      A.   Ian Allen or Skyler Cruz.
8      Q.   Okay.
9      A.   To Arnold & Arnold, anyway.
10     Q.   Okay. And just to kind of close --
11 close the book up on this particular document, do
12 you have anything in your file -- and I think
13 you've already answered it -- as to the date that
14 Mr. Allen actually went?
15         I know the text of the letter says
16 July 22nd, but also there's some other indicia that
17 perhaps it was in August at some point. So, you
18 know, I'm just trying to find out if -- if you
19 know, and I'll certainly ask Mr. Allen, but I'm
20 trying to find out if you know.
21     A.   No, I don't know anything beyond the
22 fact that he says in his letter he attended on the
23 22nd of July.
24     Q.   So, and you may be guessing, but this
25 date here, August 28th, that maybe a typographical

67

1  error perhaps?
2      A.   It could be.
3      Q.   Okay. If you don't mind, Mr. Usher,
4  if I could -- I need to take like a brief
5  five-minute bathroom break, then go on. I probably
6  think I have about another hour or so of
7  questioning. So I just need to take a quick
8  ten-minute break, and then we'll go for another
9  hour. We'll work for another hour, and then we'll
10 most likely be done. Okay?
11     A.   Okay.
12         MR. GOLDMAN: Fine.
13         MR. SALAS: Everybody okay with that?
14         MR. GOLDMAN: Yes.
15         MR. SALAS: All right. I'll be back
16     between five and ten minutes. All right.
17     Thanks.
18         VIDEOGRAPHER: Going off the record at
19     11:47 a.m.
20         (Off the record.)
21       (At this time, a recess was taken.)
22         VIDEOGRAPHER: We're going back on the
23     record at 12:00 p.m.
24         MR. SALAS: Thank you.
25         (Thereupon, Plaintiff's Exhibit

68

1          No. 5A was marked for identification.)
2  BY MR. SALAS:
3      Q.   Okay. So the next exhibit I'm going
4  to show you is Exhibit 5A. This was also produced
5  in discovery through the Arnold & Arnold file
6  during the investigation of the claim. There's 112
7  photographs here, and I don't pretend to go through
8  every single one.
9          I just want to know, Mr. Usher, if you
10 know who took these photographs dated, and if you
11 see on the corner here it says 2019; July 22nd,
12 2019. If you know, who took these photographs?
13     A.   I can only assume it was Captain Ian
14 Allen, but I don't know.
15     Q.   Okay. So you don't know for sure,
16 right?
17     A.   That's correct.
18     Q.   All right. I just want to see if
19 there's anyone in particular... Bear with me,
20 please.
21         (Thereupon, Plaintiff's Exhibit
22         No. 6 was marked for identification.)
23 BY MR. SALAS:
24     Q.   The next exhibit is a document dated
25 July 30th, 2019. It looks like it's authored by

69

1  Mr. Skyler Cruz out of the Lake Havasu City,
2  Arizona office for Arnold & Arnold.
3        Do you see that, sir?
4        A.   Yes, I have that.  I can't see it on
5  there, it's totally unclear, but I have it in my
6  file.  This is addressed to Mark Thomas, and it's
7  headed "First Report."
8        Q.   Okay.  Did you say that the share
9  screen document is illegible for you?
10       A.   Yes.
11       Q.   That's interesting.
12            Does everyone else see it?
13       A.   I see it, but it's in a tiny screen in
14  the bottom right-hand corner.  As I say, I've got
15  the document on my screen here --
16       Q.   Okay.
17       A.   -- on my computer.
18       Q.   Yeah, I don't know how to fix it that
19  it's tiny on yours because it should -- it should
20  take up the whole screen.
21       A.   It's not -- it's not doing that.  All
22  I've got -- at the moment, all I'm looking at is my
23  own face in large and that document in small.
24       Q.   Maybe there's something with the view
25  that you have to...

70

1        A.   I'm looking.
2            VIDEOGRAPHER:  On the top -- on the
3        top of the screen where it says "View
4        Options," you can change that to a
5        different mode if that gets you a better
6        view.
7            THE WITNESS:  I don't have anything
8        off on -- I know, let's try "More."  No,
9        minimize, disconnect from the chat -- no.
10       I don't have a view options.  I will switch
11       camera.
12  BY MR. SALAS:
13       Q.   Okay.  Well, in the interest of time,
14  I just want to confirm that the document you have
15  is 11 pages in length, and that on the last page,
16  page 11 as reflected on the upper left-hand corner,
17  it is -- it is signed by Mr. Cruz.
18       A.   That's correct.
19       Q.   With enclosures of a hundred photos
20  and Iriarte e-mail of person on board reflected on
21  page 11.  Okay.
22            So back to the -- what is the third
23  page, it says here, "On July 25th, 2019, we
24  surveyed and obtained permission to power up the
25  vessel to inspect for recommendation compliance."

71

1  You see that?
2        A.   I'm just going to -- on which page,
3  sorry?
4        Q.   Page 3.
5        A.   Page 3; right.
6        Q.   Under heading "Survey."
7        A.   Correct.
8        Q.   So was there a second survey done on
9  July 25th, 2019?
10       A.   Almost certainly, yes.
11       Q.   Okay.  And here Mr. Cruz writes "we
12  surveyed."
13            Do you know who was in attendance on
14  July 25th for the second survey?
15       A.   It would -- well, Ian -- Captain Ian
16  Allen certainly would have been there.
17       Q.   Okay.
18       A.   But I don't know if the owner was
19  present.
20       Q.   Okay.  So you're certain that Ian
21  Allen, and what about Mr. Cruz; do you know if he
22  was there?
23       A.   No, Mr. Cruz almost certainly was not
24  there.
25       Q.   Mr. Cruz --

72

1        A.   He's in -- no, he's using the
2  collective "we," i.e., Arnold & Arnold.
3        Q.   Okay.  So you're certain that
4  Mr. Allen was there on both the 22nd and the 25th,
5  correct?
6        A.   I can't be absolutely certain, I just
7  believe that's the case.
8        Q.   Okay.  Are you certain that Mr. Cruz
9  was not there on July 25th?
10       A.   I can't be certain, but I believe
11  that's the case since he's based in Arizona.
12       Q.   Okay.  And you mentioned earlier
13  that -- and you mentioned earlier that you believe
14  that Mr. Allen was senior in position at Arnold &
15  Arnold to Mr. Cruz; is that an accurate statement?
16       A.   No, I don't think it is, now on
17  reflection.  I had thought that because I've met
18  Ian Allen in Fort Lauderdale and assumed he was the
19  senior person, but it would appear now that Ian
20  Allen is the surveyor and Mr. Cruz is the adjuster,
21  which would make him more senior, I guess.  You'd
22  have to check with Arnold & Arnold.
23       Q.   Okay.
24            And Mr. Cruz, again here, he writes
25  that the yacht appeared to be in well maintained

73

1  condition, do you see that?
2      A.   Yes, I do.
3      Q.   And any reason to disagree with that
4  statement?
5      A.   No.
6      Q.   And he talks about the damage in
7  connection with the accident that occurred while
8  the boat was in the Bahamas, correct?
9      A.   Correct.
10     Q.   And similar to Mr. Allen's -- similar
11  to Mr. Allen's initial report, he goes into detail
12  regarding pre-purchase compliance.  And there are
13  additional findings, but they are pretty much
14  in conjunction with what Mr. Allen said, with the
15  exception of a few things.
16          For example, not noted in Mr. Allen's
17  survey report is B.32, "Two of the four your
18  mounted transom underwater lights are not working."
19  Here he says, "No power.  Unable to verify."  And
20  on Mr. Cruz's report he says, "Not repaired.  Two
21  still inoperative."
22     A.   Correct.
23     Q.   Okay.
24     A.   Yeah, basically what Captain Allen is
25  saying is that on 22nd of July they couldn't power

74

1  up the boat.  So, therefore, he was unable to check
2  on the underwater lights and the stern lights.
3      Q.   Okay.  So the conclusion that it was
4  not repaired is based on the finding a year and
5  three months earlier with regard to the
6  Pre-Purchase Survey, correct?
7      A.   Sorry.  Could you repeat that?
8      Q.   Sure.
9          The conclusion here on B.3 that the
10  underwater transom lights were not repaired, as it
11  states right here, is based on what was -- what was
12  on the Pre-Purchase Survey, that these lights were
13  not working a year before, a year and three months
14  before.
15     A.   Correct.  Yes.  That was on the
16  original surveyor's recommendation, and they had
17  not been repaired and they were -- the two were
18  still -- or two of them were still inoperative.
19     Q.   Okay.
20     A.   And the stern light was inoperable and
21  continued to be inoperable.
22     Q.   Okay.  We'll get to the stern light in
23  a minute.  I'm kind of focusing on the two of the
24  four mounted transom underwater lights.
25          Now, you mentioned earlier that Great

75

1  takes insurance didn't ask for any maintenance or
2  repair records.  Just in your opinion, is it
3  possible for a bulb to be replaced and not work a
4  year and a half later?
5      A.   It's possible, yes.
6      Q.   Okay.
7      A.   It would be quite a coincidence that
8  two of the four didn't work and still two of the
9  four didn't work.
10     Q.   Do you know if it's the same two of
11  the four?
12     A.   No.
13     Q.   Okay.
14          And with respect to B.18, it looks
15  like nothing has changed from Mr. Allen's original
16  survey.
17     A.   Yeah, it would appear that Mr. Skyler
18  has used the same language.
19     Q.   Now we get to B.22, which now says
20  "not secured as recommended," but if we look at the
21  initial survey on B.22, it says "secured."  You see
22  that?
23     A.   Well, yes, that was the first time I'd
24  seen that other document.
25     Q.   Okay.

76

1      A.   I can't open both documents at the
2  same time, but if it said it was secured, you'll
3  have to inquire of Mr. Cruz as to why he's now
4  saying it was unsecured.
5      Q.   Okay.  But you agree that from
6  July 22nd to July 25th, that changed from
7  Mr. Allen's initial inspection, correct?
8      A.   Yes.  I'd not seen Mr. Allen's
9  inspection previously.  I only have this one to go
10  by.
11     Q.   Okay.
12     A.   And clearly there were two
13  inspections.  I don't know what other conversations
14  occurred between Skyler Cruz and Ian Allen.
15     Q.   Okay.  B.24, again, if we look at
16  Mr. Allen's initial survey, B.24 says that it was
17  repaired.  But, again, somehow on July 25th it was
18  not repaired.  You see that?
19     A.   Yes.
20     Q.   Okay.  So you'd agree that there's a
21  difference -- there's a divergence here between
22  Mr. Allen's initial report and Mr. Cruz's
23  subsequent report, correct?
24     A.   Correct.  Yes.
25     Q.   And the next one, I believe, is B.26

77

1    where it says something about the hot water heater
2    showing rusting and corrosion; also noted corrosion
3    on pressure relief valve.
4           "This appeared in serviceable
5    condition; however, conditions mentions photo as
6    Pre-Purchase Survey." You see that?
7           A.    Yes.
8           Q.    And B.26, it just says "it appears in
9    serviceable condition;" you see that?
10          A.    Yes.
11          Q.    So there was an addition here
12   regarding how it looks with respect to the
13   Pre-Purchase Survey and how it looked a year and
14   three months later, and the condition apparently is
15   the same. You see that?
16          A.    Yes.
17          Q.    All right. So back to the B.26, the
18   condition -- the recommendation was to "treat
19   rusting and keep protected with anticorrosive
20   coatings."
21          You'd agree with me if nothing changed
22   from a year and three months earlier, that that
23   condition was treated and not worsening a year and
24   three months later --
25          MR. GOLDMAN: Object to the form.

78

1    BY MR. SALAS:
2           Q.    -- correct?
3           A.    I can't. I have no basis to agree
4    with that. I think you would have to make
5    inquiries of Mr. Cruz. Presumably what he did was
6    the Pre-Purchase Survey contained various
7    photographs, and he's compared the photographs that
8    were taken by Ian Allen, and in his opinion, they
9    looked identical.
10          Q.    Okay. But you'd agree with me that
11   the -- with regard to the Pre-Purchase Survey, the
12   recommendation was not to completely replace the
13   water heater, correct? It was to treat it and
14   protect it, correct?
15          A.    Correct.
16          Q.    So I know you're -- I know this is I'm
17   kind of beating a dead horse here; and so you'd
18   agree that if something remains in the same
19   condition over a year and three months, that it has
20   been treated and protected?
21          MR. GOLDMAN: Object to the form.
22          THE WITNESS: No.
23   BY MR. SALAS:
24          Q.    You wouldn't agree with that. Why
25   not?

79

1           A.    Because it might just be that it
2    hadn't deteriorated.
3           Q.    Okay. But Mr. Cruz/Allen's opinion
4    here is not that it wasn't -- it hadn't -- strike
5    that.
6           Mr. Cruz and Mr. Allen's opinion is
7    not that it worsened, the condition of the water
8    heater, as it relates to B.26 on Exhibit 6.
9           A.    Their opinion appears to be that it's
10   identical.
11          Q.    Right.
12          So it had not worsened, correct?
13          MR. GOLDMAN: Object to the form.
14          THE WITNESS: Correct.
15   BY MR. SALAS:
16          Q.    What was your answer, sir?
17          A.    I said correct.
18          Q.    Thank you. I didn't hear you because
19   your counsel was talking.
20          The next one is B.31 in reference to
21   the stern light, which I think you mentioned
22   before. It looks like it was inoperable on the
23   Pre-Purchase Survey, and I guess now that they were
24   able to put power to the boat, it was tested, and
25   the representation is that it's still inoperable.

80

1           So the assumption here is that it was
2    never replaced between April of 2018 and July 25th,
3    2019, correct?
4           A.    Correct.
5           Q.    Do you know that -- that to be true,
6    whether or not the stern light was replaced between
7    that year and three months?
8           MR. GOLDMAN: Object to the form.
9           THE WITNESS: I have no idea.
10   BY MR. SALAS:
11          Q.    Okay.
12          The next one is B.34, and I promise
13   we're almost done with this. It says, "Underwater
14   machinery and swim platform machinery needs
15   repainting with anti-marine growth and
16   anticorrosion coatings."
17          And the conclusion here is that there
18   is "no evidence of anti-marine growth," which I'm
19   not sure what that is, "or anticorrosion coating."
20   You see that?
21          A.    Yes. I mean, what he's saying is that
22   on the recommendation it said it needs repainting
23   with anti-marine growth and anticorrosion coatings,
24   and he's saying that there is no evidence of
25   anti-marine growth or anticorrosion coating.

1      Q.  Okay.  Do you know if, particularly,
2  if there was any damage to the swim platform with
3  regard to this loss?
4      A.  No.  I believe, did he not use the
5  swim platform to release the vessel?  Didn't he use
6  the swim platform as access to the water or
7  whatever?
8      Q.  My question is, do you know if there
9  was any damage with relation to this loss to the
10  swim platform specifically?
11      A.  I don't recall.
12      Q.  Okay.  And you referred to the
13  Pre-Purchase Survey, which we have here.  It says,
14  "Clean and paint underwater machinery with proper
15  coatings to" help -- "to prevent marine growth and
16  prevent corrosion."
17      Do you see that?
18      A.  Are you looking at 34?
19      Q.  I'm looking at B.34 on the
20  Pre-Purchase Survey and the recommendation made by
21  the surveyor on April 22nd, 2018.
22      A.  Okay.  I'd have to go back into the
23  other file to do that.  I can't remember exactly
24  the words the surveyor used.  The person inspecting
25  it referred to or paraphrased what the

82

1  recommendation was, which was "underwater machinery
2  and swim platform machinery/structure needs
3  repainting with anti-marine growth and
4  anticorrosion coatings."
5      Q.  All right.  And I have the document in
6  front of me right now, which was Exhibit 2, which
7  was marked in this deposition, and the
8  recommendation says, "Clean and paint underwater
9  machine with proper coatings to prevent marine
10  growth and help prevent corrosion."
11      Do you see that?
12      A.  I don't -- I can't put two things on
13  the screen at the same time.  But I got it --
14  because you didn't supply me documents, I can't
15  immediately just refer to it.  I have to stop, go
16  back into the underwriting file, pull up the
17  survey, read that, write it down; now then open
18  this file to compare if it's identical words.
19      But let's assume for the moment that
20  the paraphrasing is reasonably accurate.
21      Q.  Well, I'm not -- I don't -- I don't
22  necessarily want to paraphrase.  I want you to see
23  the document that's on the screen, and I'll be
24  happy to send it to you.
25      MR. GOLDMAN:  It's up on my screen

83

1  right now.
2      MR. SALAS:  Okay.
3      MR. GOLDMAN:  What are you asking him?
4      MR. SALAS:  I'm not asking you the
5  questions.  I'm asking Mr. Usher the
6  questions, and I just want him to confirm
7  that the recommendation on the survey
8  document is to "clean and paint underwater
9  machinery with proper coatings to prevent
10  marine growth and help prevent corrosion."
11      THE WITNESS:  I'm going to stipulate,
12  since you've read it out from the document,
13  that that must be true.
14  BY MR. SALAS:
15      Q.  Okay.  I am reading it verbatim from
16  the document, and I appreciate the stipulation.
17  Okay?
18      A.  Yeah.
19      Q.  Okay.  So the conclusion here by
20  Mr. Skyler Cruz and -- or Captain Ian Allen, is
21  that there was no evidence of anti-marine growth or
22  anticorrosion coating.  You see that?
23      A.  Yes.  Yes.
24      Q.  Did they -- did they mention that the
25  underwater machinery or swim platform had any

84

1  indicia of marine growth or corrosion when they
2  inspected the vessel?
3      A.  I have nothing...
4      COURT REPORTER:  I'm sorry.  Can you
5  repeat your answer?  It broke up on me.
6      THE WITNESS:  Sure.
7      I have nothing other than what they
8  say.
9      COURT REPORTER:  Thank you.
10  BY MR. SALAS:
11      Q.  Well, Mr. Usher, you don't know -- you
12  don't know for certain whether or not the owners of
13  the vessel in question applied anti-marine growth
14  or anticorrosion coating in between the
15  Pre-Purchase Survey and the date that Mr. Cruz and
16  Allen inspected this vessel, do you?
17      MR. GOLDMAN:  Object to the form.  He
18  knows what he's reading right in front him.
19      THE WITNESS:  Yes.  As far as I'm
20  concerned, what I'm reading and what the
21  inspection surveyor determined was that
22  there was no evidence that any
23  anti-corrosion coating had been applied.
24  BY MR. SALAS:
25      Q.  Okay.

85

1      MR. SALAS: Mr. Goldman, I've been
2  pretty patient and ask that you please
3  refrain from testifying for the witness.
4      You know it's improper. So if you have an
5  objection, please note it on the record and
6  we'll just continue. Okay?
7  BY MR. SALAS:
8      Q.   Now, there's some new material here
9  under C-1 through C-5 that upon subsequent
10  inspection -- upon subsequent inspection were added
11  in terms of deficiencies, and they consist of C-1
12  through C-5 as I've -- as I've pointed out. Okay?
13      A.   Yes.
14      Q.   C-1 deals with "Starboard side of swim
15  platform has Paint deficiency patch roughly 6
16  inches diameter. Also gel coat chips along aft
17  [of] edge of swim platform." But it says that the
18  "paint deficiency is repaired but gel coat chips
19  still noted."
20      And I guess they are pointing this out
21  as a deficiency from the Pre-Purchase Survey,
22  correct?
23      A.   Yes.
24      Q.   And, again, you agree that this is a
25  year and three months after the Pre-Purchase Survey

86

1  that they found gel coat chips?
2      A.   That's correct.
3      Q.   Okay. And the marine survey,
4  Pre-Purchase Survey, with respect to this -- these
5  issues are Surveyor's Notes and Observations. And
6  C-1 says exactly what it says on the left side of
7  the document that you have in front of you, and the
8  recommendation, and I hope you stipulate to this,
9  is "Fill and touch up as desired."
10      I think Mr. Goldman agrees and
11  everyone agrees that that is what it says. Is
12  that -- do you agree with that?
13      A.   Yeah. Yeah, that's fine.
14      Q.   Okay. So what I'm trying to figure
15  out is if they note gel coat chips, correct --
16      A.   Yes.
17      Q.   -- and the recommendation was to paint
18  and fill as desired, how could it be that if they
19  noticed gel coat chips a year and a half later,
20  that that's some sort of deficiency or
21  misrepresentation as to what my client agreed to
22  do?
23      MR. GOLDMAN: Object to the form.
24      THE WITNESS: They've just listed what
25  they noted.

87

1  BY MR. SALAS:
2      Q.   Okay. But you've also testified that
3  based on this investigation, that the decision was
4  made to deny the claim. So I'm just wondering if
5  this had any bearing on your decision to deny the
6  claim, particularly what's in C-1?
7      A.   No.
8      Q.   Okay.
9      A.   We would not have proceeded down this
10  road if the issue was C-1.
11      Q.   Okay. What about the issue in C-4?
12      A.   Well, there is a fire hazard with the
13  bilges being dirty. But beyond that, no. Again,
14  if we were looking at purely and simply cosmetic C
15  recommendations, then we probably would not have
16  gone down this road.
17      Q.   Okay. So the recommendations -- okay.
18  Well, let me just ask you this: With regard to
19  C-5, "Underside of bow deck as seen from chain
20  locker is dirty," the observation is that the chain
21  locker is clean, but continued mold on deck
22  underneath. Did that have any bearing on the
23  decision to deny this claim?
24      A.   No.
25      Q.   Okay.

88

1      Can you tell me with respect to the
2  items listed on A.1 and A.2, if any of those
3  observations had any bearing on the decision to
4  deny this claim?
5      A.   No, the A.1, right, they were supplied
6  and in compliance anyway. And A.2, right, they
7  were unable to verify. So since we were unable to
8  verify, then those would not be issues.
9      Q.   Okay. What about anything from B.1
10  all the way down to B -- I believe it's, 36, but I
11  want to be sure -- I'm sorry, B.35. Is there
12  anything --
13      A.   Anything not complied with on B.1
14  through B.35 would be.
15      Q.   Okay. So it's Great Lakes' position
16  that -- can you tell me which -- it's Great Lakes'
17  position that B.3, B.18, B.22, 24, 26 --
18      A.   Yes, everything in red.
19      Q.   Well, I don't have it in color.
20      A.   Oh.
21      Q.   -- 31; so those issues -- those --
22  those you relied on in your decision to deny this
23  claim?
24      A.   Yes.
25      Q.   And you agree with me, and we just

89

1  pointed out, that there are some divergences
2  between the original survey and the subsequent
3  survey that were done roughly three days apart,
4  correct?
5       A.   Yes.
6       (Thereupon, Plaintiff's Exhibit No.
7       6A was marked for identification.)
8  BY MR. SALAS:
9       Q.   What I've marked as Exhibit 6A are
10  photographs that are dated, if you can see,
11  July 19th -- I'm sorry -- July 25th, 2019.  And
12  there's 87 photographs here.
13       Do you agree that it was Mr. Allen,
14  the person who took these photographs?
15       A.   Almost certain.
16       Q.   Okay.  On the issues that we discussed
17  that there's a divergence in terms of the
18  observations, do you know why that divergence
19  exists?
20       A.   The divergence between the 22nd and
21  the 25th?
22       Q.   Yes.
23       A.   The 25th was a subsequent visit where
24  they powered up the vessel as well.
25       Q.   Okay.  And the only thing that they --

90

1  the only thing that they needed to power up the
2  vessel -- to power up the vessel for was for the
3  issue with the transom lights and the stern lights,
4  correct?
5       A.   I don't know that is correct.  You'd
6  have to inquire of the surveyor as to what the
7  purpose of the second visit was.  Maybe there was
8  more than he had time for on the 22nd.  Maybe it
9  was purely and simple -- but, you know, it's
10  conjecture on my part.  I wasn't there.
11       Q.   All right.  Well, I don't want -- I
12  don't want -- I don't want you to guess, and I am
13  sure your attorney doesn't want you to guess
14  either.
15       But whether the water heater shows
16  rust or the -- there's anticorrosive coating on the
17  swim platform, you'd agree with me that those
18  aren't issues that require electrical power to
19  observe, correct?
20       MR. GOLDMAN:  Object to the form.
21       THE WITNESS:  As far as I'm aware.
22  BY MR. SALAS:
23       Q.   So is that a "no"?
24       MR. GOLDMAN:  Object to the form.
25       THE WITNESS:  Well, I -- you know, I'm

91

1  not sure what the difference between the
2  two inspections were.  On the face of it,
3  it would appear that you would not need
4  power to inspect and determine the
5  condition of those items.
6       (Thereupon, Plaintiff's Exhibit No.
7       6B was marked for identification.)
8  BY MR. SALAS:
9       Q.   Okay.  The next exhibit is Exhibit 6B,
10  which are more photographs, but these are undated,
11  and I am wondering if you have these or if you know
12  who took these photographs?
13       A.   No, you'll have to check with Captain
14  Allen.  I'm sure he did, but...
15       Q.   Okay.  But you don't know for sure,
16  and you don't know whether or not you have these
17  photographs in your file, correct?
18       A.   I have a large number of photographs;
19  about a hundred of them.
20       Q.   Okay.  Again, these were produced by
21  your counsel in response -- as part of the
22  disclosures in this case, so I just wanted to know
23  if you have them.
24       A.   I have -- I'm just checking the dates.
25  Yeah, some of them were taken on the 22nd of July,

92

1  and some were taken on the 25th of July.  There's a
2  hundred photographs in total.
3       Q.   Sorry.  All right.  You have a hundred
4  photographs.  I have several more than that, so...
5       A.   Okay.  They are all numbered.  I can
6  see -- I'm just going through to see how many were
7  done on the 22nd and how many were done on the
8  25th.  Ah, I see what you -- your point there.
9  Some of them don't have dates on them.
10       Q.   Okay.
11       A.   For example, but they follow -- oh,
12  yes, they do have dates on them.  From 25th --
13  yeah.
14       Q.   So just to be clear, Mr. Usher, and I
15  am not trying to -- I'm not trying to confuse
16  anybody; I have one, two, three, four sets of
17  photographs that were produced to me totalling
18  several hundred.  So I'm just trying to figure
19  out -- and then two of those sets, the first one is
20  Exhibit 5A, which are dated July 22nd.  The second
21  of those sets is 87 photographs dated July 25th,
22  which is Exhibit 6A.  Exhibit 6B is a set of 21
23  photographs without a date.  And Exhibit 6C is a
24  set of five photographs without a date.
25       And I am just trying to ascertain if

93

1   you know when these undated sets of photographs
2   were taken and who took them.
3        A.   Okay.  Well, I've got 76 photographs
4   dated the 22nd of July, but I don't know.  Because
5   you've got Arnold & Arnold's file as well, I don't
6   know if you got duplicates or whatever.  I have 76,
7   and the last one is of the EPIRB dated the 22nd of
8   July and, therefore, the remaining number of
9   photographs were all dated the 25th of July.
10       Q.   You don't have any of these undated
11  photographs?
12       A.   No.  All my photographs have dates on
13  them.
14       Q.   Okay.  Fair enough.
15            So we didn't safely make the
16  conclusion that there are some photographs that are
17  in Arnold & Arnold's file that you do not -- that
18  you do not have, correct?
19       A.   No, we can't safely do that.  You
20  might have photographs that are duplicates.
21       Q.   Okay.
22            (Off the record.)
23            (Thereupon, Plaintiff's Exhibit No.
24       7 was marked for identification.)
25  BY MR. SALAS:

94

1        Q.   Okay.  Onto the next exhibit.  Here we
2   have a document from Mr. Gilhooly to Mr. Thomas and
3   Ms. Thomas and Ms. Delacey-Simms.  You see that?
4        A.   I'm looking for it on my file because
5   yours are illegible.  I recall seeing it earlier,
6   so...
7        Q.   It's an e-mail dated August 5th, 2019.
8   And, again, I don't know --
9        A.   Yeah, I've located it.  It was an
10  e-mail from Mark Thomas to Liam Gilhooly, copy to
11  Samantha Thomas and Sarah Delacey-Simms, and the
12  response to Mark, Liam Gilhooly to Mark Thomas,
13  same day.
14       Q.   So it says, "Morning Mark, It appears
15  that the operator failed to comply with the
16  requirement placed upon the policy."
17            And I am assuming that that's the
18  requirement of full supervision or fully
19  supervised?
20       A.   That's correct.
21       Q.   Okay.  That's what he's referring to
22  there?
23       A.   Yes.
24       Q.   It says, "If the broker had asked at
25  renewal whether we would be willing to remove that

95

1   requirement, given that there is evidence of some
2   experience on broadly similar types of vessel, I
3   would have wanted to see the experience gained on
4   the [this] vessel, given the difference in size
5   from those vessels previously operated."
6            You see that?
7        A.   Yes.
8        Q.   Okay.  Do you know if there -- and I
9   think we've established this; there was a policy
10  that was issued prior to the effective date of the
11  policy that is the subject of this lawsuit.  There
12  was a year before in 2018 from April of 2018 to
13  April of 2019 --
14       A.   Yes.
15       Q.   -- there was an initial -- what we can
16  call the initial policy, correct?
17       A.   Correct.
18       Q.   Okay.  Do you know if that policy,
19  which I don't have a copy of in the totality, do
20  you know if that policy contained the full
21  supervision requirement?
22       A.   Yes, it did.
23       Q.   Okay.  If -- and I ask this to your
24  counsel.
25            MR. SALAS:  If possible, can you --

96

1   can you produce the prior policy to us so
2   we can compare it.
3            That's a question for you, Steven.
4            MR. GOLDMAN:  Mr. Usher, can send it
5   to me.  I'll see that it gets sent on to
6   you.
7            THE WITNESS:  I'll ask Sam, because I
8   don't know how to do zip files.  I'll ask
9   Sam to send it to you in the morning.
10           MR. GOLDMAN:  That's fine.  All we'll
11  need, of course, is the dec pages.
12           MR. SALAS:  John, I'd ask that you
13  produce a full copy of the policy, please.
14           MR. GOLDMAN:  It's the same policy
15  language.
16           MR. SALAS:  I'd love to take your word
17  for it, Steven, but I'd like to see the
18  full policy.
19           MR. GOLDMAN:  No, I'm producing the
20  dec pages.
21           MR. SALAS:  Okay.  So you're not going
22  to produce the full policy, is that --
23           MR. GOLDMAN:  I am not.
24           MR. SALAS:  Okay.
25           MR. GOLDMAN:  You didn't ask for it.

97

1  You've asked for it now. So I'm totally
2  prepared to give it informally, but all you
3  need is the dec page. The policy language
4  is the same.
5      MR. SALAS: Okay. I'll note that
6  you're only go to produce the dec pages,
7  and that you don't want to produce the
8  remainder of the policy. That's fine.
9      MR. GOLDMAN: We'll see if we need to
10  deal with it later. Okay?
11  BY MR. SALAS:
12     Q.  So the full supervision warranty is --
13  based on what you know, is on the initial policy
14  that was issued for this vessel, correct,
15  Mr. Usher?
16     A.  That's correct.
17     Q.  Okay.
18         (Thereupon, Plaintiff's Exhibit No.
19     7A was marked for identification.)
20  BY MR. SALAS:
21     Q.  Now, I think you mentioned this
22  earlier in your chronology, this is Exhibit 7A. I
23  don't know if you're able to see it, but it's an
24  e-mail from Samantha Thomas to Mr. Cruz with a copy
25  to Sarah Delacey-Simms, Mark Thomas, and several

98

1  people at Arnold & Arnold.
2      A.  I'm almost there. When is it dated?
3      Q.  It's dated August 8th, 2019. I'm
4  sorry, sir.
5      A.  August 8th.
6      Q.  2:28 a.m. is the time stamp on it.
7      A.  And it's from Sam- -- Samantha Thomas?
8      Q.  Yes, to Skyler Cruz. It should be on
9  your screen, but there's some sort of issue going
10  on that you're not able to see it, so if you have
11  it...
12     A.  I will have it somewhere if we've
13  presented it to you.
14         Okay. Well, of course, the time is
15  going to be different, but that would make sense.
16  Ours is 10:27 in the morning. Does it say, "Would
17  you be kind enough to advise the following"?
18     Q.  Yes. "Dear Skyler, Would you be kind
19  enough to advise the following."
20         Okay. And this an e-mail you were
21  referring to earlier from your staff member,
22  Ms. Thomas, to Skyler Cruz regarding specific
23  questions that you had for Mr. Iriarte concerning
24  the vessel and the history of his operation of
25  same, correct?

99

1      Q.  That's correct.
2      Q.  Okay. And if I am not mistaken, I
3  think you testified earlier that Mr. Iriarte
4  provided you with answers to those queries,
5  correct?
6      A.  Yes, he did.
7         (Thereupon, Plaintiff's Exhibit No.
8      7B was marked for identification.)
9  BY MR. SALAS:
10     Q.  And moving on -- wait. Oh, 7B is Amy
11  Jamieson, who I think is Mr. Iriarte, sending him
12  the information requested letters. You see that?
13  It's dated August 8th. We have it at 11:43 a.m.
14  We have a different time.
15     A.  Sorry on 8? Which e-mail is this?
16     Q.  It's an e-mail dated August 8th, 2019.
17  It just simply says from Amy Jamieson;
18  Amy@Arnoldoffice.com. It just simply says, "Dear
19  Mr. Iriarte: Please see the attached information
20  Request."
21     A.  No, that's an internal document in
22  Arnold & Arnold's form.
23     Q.  Okay. I'm just trying to establish
24  that that's the date that the information request
25  was sent to Mr. Iriarte. And I think you'll agree

100

1  that, based on what you testified to earlier, that
2  it was on August 8th, correct?
3      A.  Yes, because I was sent a copy of a
4  letter that they sent.
5      Q.  Okay.
6      A.  They sent a letter and an e-mail. I
7  don't have the e-mail.
8         (Thereupon, Plaintiff's Exhibit
9      No. 8 was marked for identification.)
10  BY MR. SALAS:
11     Q.  Okay.
12         Now on my screen is what we have
13  marked as Exhibit 8. And it's the letter dated
14  August 8th, addressed to Mr. Iriarte from Skyler
15  Cruz the Arnold & Arnold's -- Arizona office?
16     A.  Correct.
17     Q.  And do you have a copy of that
18  document, sir? Can you see the one that's on the
19  screen?
20     A.  I can't see the one on the screen, but
21  I have it on my computer.
22     Q.  Okay. It's a two-page document that
23  starts with "Dear Mr. Iriarte: As you are aware,
24  we have been assigned to handle this matter by your
25  Underwriters." You see that?

101

1      A.   Yes.
2      Q.   And it says, "Please provide your
3   explanation, and there's a list of four questions,
4   and then the issues with regard to the Pre-Purchase
5   Survey on page 2. It says, "It appears the
6   following items were not complied with."
7           And then there's a list of ten items
8   under there, correct?
9      A.   Correct.
10     Q.   Okay. Can you explain to me, from
11  Great Lakes Insurance's perspective, what the
12  purpose of this request is?
13     A.   Yes. The request is to establish if
14  there's any information that Mr. Iriarte can
15  provide to explain what we believe we ascertained
16  by virtue of our investigation.
17     Q.   And did Mr. Iriarte comply with your
18  request?
19     A.   Yes.
20     Q.   And just to rephrase, the insured,
21  Rental Boat Corp. complied with your request?
22     A.   Yes, there was an undated response.
23     Q.   But we know from your prior testimony,
24  that the response was received sometime after you
25  made the request, but before you formally denied

102

1   the claim, correct?
2      A.   Yes.
3           (Thereupon, Plaintiff's Exhibit
4           No. 9 was marked for identification.)
5   BY MR. SALAS:
6      Q.   And now I'm going to show you what
7   I've marked as Exhibit 9, which is 14 page -- 14
8   pages of Mr. Iriarte's response.
9      A.   Again, yours is illegible, but if it
10  starts with "Dear Skyler," please -- or "Find below
11  the answers to your questions," then that's the
12  document I'm looking at.
13     Q.   Right, it's 14 pages in length, and it
14  contains on pages 5 through 14, it contains various
15  screenshots of text messages, voice recordings, and
16  videos. You see that?
17     A.   I don't have all that in a single
18  document.
19     Q.   Okay.
20     A.   I have this document, which is there
21  are no page numbers, so I'll count them. So it's
22  one, two, three, four -- I have a four-page
23  document which is the letter from, I presume,
24  Mr. Iriarte, but it just says -- it's unsigned,
25  undated.

103

1   Let me check. And it's unsigned,
2   undated, so I don't know who it's from. But I'm
3   assuming it's from Mr. Iriarte.
4      Q.   Okay.
5      A.   And then subsequently, I also have
6   further attachments which includes screenshots of
7   WhatsApp messages and videos all with translations.
8      Q.   So you'd agree with me there's
9   about -- let me just make sure here. So we have --
10  you have the four-page letter in one document, and
11  then you have a separate document which contains
12  about ten pages of WhatsApp messages, videos, and
13  voice texts, correct?
14     A.   I don't know. But I'm assuming --
15  it's not in that format. I've got the -- because
16  I've got the -- they've been combined together with
17  the translation because I don't speak Spanish.
18     Q.   Okay.
19     A.   So I don't -- I can't tell you the
20  page numbers or -- but I have a bunch of
21  screenshots -- well, not screen- -- I have been
22  sent screenshots in Spanish, which mean nothing to
23  me, and then I have translations.
24          Likewise, I have videos, but I have
25  the video translations. So for the sake, let's

104

1   stipulate it's the same stuff.
2      Q.   Okay. So we'll stipulate that you
3   have Mr. Iriarte's submission of WhatsApp messages,
4   voice texts, and videos, and you also have what
5   appears to be a translation of those same messages.
6      A.   Yes.
7      Q.   Okay. Do you know -- and I think -- I
8   believe I have the translations -- let me see --
9   oops. Something just went terribly wrong. Hold on
10  one second. Let me make sure I get this right.
11          And I have the translations as well,
12  which is nine pages, and it's my Exhibit 11. Do
13  you happen to know who -- who performed this
14  translation?
15     A.   No.
16     Q.   Okay. And on the last page -- on the
17  last two pages, actually, there's a 6:38 a.m. video
18  that's translated and a 6:40 a.m. video that's
19  translated, correct?
20     A.   I've got the original video. I -- no,
21  hang on. Can't "play, this item is missing." Hang
22  on. Videos translations.
23          Yeah, I can see the translations.
24  6:38 a.m. video from Fernando Campoo, and then
25  6:40 a.m. total fuel -- look, total fuel 5.4 on the

105

1 three motors.
2 **Q.** So my question to you is, do you know
3 who translated this? Was it somebody from your
4 office, or...
5 **A.** No. It was somebody from Arnold &
6 Arnold's office, or an independent translator. I
7 don't know.
8 **Q.** Okay. Do you know if this translation
9 was certified as accurate?
10 **A.** No.
11 **Q.** Okay. It wasn't, or you don't know?
12 **A.** I don't know.
13 **Q.** Okay. Do you know if every single one
14 of the videos, text messages, and voice messages
15 that were exchanged between Mr. Campoo and
16 Mr. Iriarte that were submitted to you were
17 translated, or was it just a portion of it?
18 **A.** I don't know.
19 **Q.** Okay. So do you have his -- you're
20 not sure if it's the full extent of the
21 communications that Mr. Iriarte and Mr. Campoo had
22 during this time, correct?
23 **A.** That's correct.
24 (Thereupon, Plaintiff's.
25 Exhibit No. 11A was marked for

106

1 identification.)
2 BY MR. SALAS:
3 **Q.** And now I have Exhibit 11A up on the
4 screen, which is an e-mail from Skyler to Samantha
5 Thomas.
6 **A.** Dated?
7 **Q.** Dated August 21, 2019.
8 **A.** Oh, the e-mail -- that's the e-mail
9 with the enclosures. It says, "Hello Samantha:
10 Hope all is well. Per your instructions..."
11 **Q.** That's the one.
12 **A.** Okay. That's it. Yes, I've got it
13 up.
14 **Q.** Okay. And on this e-mail he's
15 providing your office with Mr. Iriarte's responses
16 to your queries, and it's dated, like I said,
17 August 21st, correct?
18 **A.** That's correct.
19 **Q.** Okay. And it says on the last --
20 second to last paragraph, it says, "Mr. Iriarte
21 provided two videos and nineteen WhatsApp
22 screenshots of text messages with Fernando (Luis)
23 Campoo."
24 You see that?
25 **A.** Yeah. Yes.

107

1 **Q.** Did you verify if, in fact, there were
2 only 19 -- if there were only 19 screenshots and
3 text messages?
4 **A.** No.
5 **Q.** Okay. And you didn't -- you didn't
6 verify either if the translation that was provided
7 by Arnold & Arnold was accurate in terms of it
8 reflecting the full exchange of information between
9 Mr. Iriarte and Campoo, correct?
10 **A.** Correct.
11 **Q.** Okay.
12 Mr. Cruz closes here with saying,
13 "It's our opinion Iriarte is not sufficiently
14 experienced with the operation of the insured
15 vessel."
16 Is that -- is that what Great Lakes
17 Insurance relied on in part to deny Rental Boat
18 Corp's claim?
19 **A.** Yes.
20 **Q.** Mr. Cruz's opinion?
21 **A.** Yes.
22 **Q.** Okay. Do you know what credentials
23 Mr. Cruz has to make that opinion?
24 **A.** No, he's just an experienced
25 adjuster, so I don't know what his qualifications

108

1 are.
2 **Q.** Okay. How many -- how many -- how
3 many years of experience do you know Mr. Cruz to
4 have?
5 **A.** I don't know personally.
6 **Q.** Okay. And so based on -- strike that.
7 Great Lakes Insurance denied Rental
8 Boat Corp's claim, at least in part, based on
9 Mr. Cruz's opinion which is based on his review of
10 incomplete text messages, a translation of
11 incomplete text messages, and Mr. Allen's two
12 inspections of the vessel, correct?
13 MR. GOLDMAN: Object to the form.
14 THE WITNESS: How do we know that they
15 are incomplete? As far as Arnold & Arnold
16 is concerned, they sent us everything that
17 they believe that we require. If they had
18 other text messages that were irrelevant
19 and they didn't send them, then that's
20 quite possible. But we wouldn't know that
21 they were incomplete.
22 BY MR. SALAS:
23 **Q.** Okay. But he relied on -- Great Lakes
24 Insurance relied on Arnold & Arnold's
25 recommendation, correct?

109

1          A.    Correct.

2          Q.    Okay.

3          A.    Let me just change that on the

4    comment.  Arnold & Arnold didn't recommend we deny.

5    That was our determination.  But we relied on the

6    comments they made in determining whether we were

7    going to deny, just for clarity.

8          Q.    Now, we were talking about, earlier

9    about a previous policy that was issued prior to

10   the one that was in effect on the date of loss; do

11   you recall that?

12         A.    Yes.

13         Q.    Okay.  This document is from the

14   underwriting file that was produced to me in

15   discovery.  Okay?

16         A.    Yeah.

17         Q.    And it's a quotation.  Again, I said I

18   didn't have a copy of the full policy.  And I just

19   want you to review that and see if you recognize

20   this document.

21         A.    One moment.

22               MR. GOLDMAN:  While Mr. Usher is

23         looking; John, look at the bottom of the

24         page that's showing agreement wording; do

25         you see that?

110

1                MR. SALAS:  Sir, I'm asking -- I'm

2          asking -- I'm asking the witness.

3                MR. GOLDMAN:  I'm just saying

4          something to you off the record.

5                MR. SALAS:  Well, it's not off the

6          record.

7                MR. GOLDMAN:  Never mind.

8                THE WITNESS:  What's the date of that

9          document, since I can't read it?  It's

10         illegible there.

11   BY MR. SALAS:

12         Q.    It's dated Thursday, April 12th, 2018,

13   and it's entitled "Quotation."

14         A.    April 12th, 2019?

15               MR. GOLDMAN:  '18.

16   BY MR. SALAS:

17         Q.    2018.

18         A.    Oh, 2018?

19         Q.    Yes.  Well --

20         A.    The previous year's policy.  Okay.

21         Q.    Yes.  Quote number 384532B.

22         A.    All right.  I just have to go into the

23   previous year's policy.

24         Q.    Well, it was produced as part of your

25   underwriting file.

111

1          A.    I thought you said you didn't have the

2    previous year's policy.

3          Q.    All I have is this quotation, sir.

4          A.    Okay.

5          Q.    And that's what I'm asking you about.

6          A.    One moment.  I'm trying to find -- I

7    have to go in through a different route to look at

8    the previous policy number.  167562.

9          Q.    I'll be happy to e-mail it to you if

10   it makes it easier.

11         A.    I'll be able to locate it.  Give me a

12   second.

13         Q.    Okay.  While you're locating that, I

14   need to go to the restroom, So I'll be right back.

15   Okay.

16               VIDEOGRAPHER:  We're going off the

17         record at 1:07 p.m.

18             (At this time, a recess was taken.)

19               VIDEOGRAPHER:  We're back on the

20         record at 1:10 p.m.

21               THE WITNESS:  So the document is dated

22         Thursday, April 12th, 2018?

23   BY MR. SALAS:

24         Q.    Yes, sir.

25         A.    And it was prepared by Liam Gilhooly?

112

1          Q.    Yes.

2          A.    Yeah, I'm looking at it.

3          Q.    Quote number 384532B?

4          A.    Correct.

5          Q.    Two pages in length?

6          A.    Yes.

7          Q.    Okay.  And this was the quote for the

8    initial -- what we've termed the initial policy

9    that was issued to Rental Boat Corp for this

10   vessel, correct?

11         A.    Correct.

12         Q.    Okay.  And as you see there, there's a

13   total premium of $7,759, and there is a section

14   under here that's additional warranty terms --

15   "Additional Warranties, Terms and Conditions."

16               I just want you to answer this:  Do

17   these additional warranties, terms, and conditions

18   include the warranty that Mr. Iriarte be fully

19   supervised by Mr. Campoo while operating the

20   vessel?

21         A.    No.  It says, "Indication only subject

22   to details of operator's experience in similar

23   sized and/or type of vessels, including vessel

24   lengths and manufacturers."

25         Q.    Okay.  Was --

113

1    **A.**   This was an indication of the terms if
2    the operators had adequate experience.
3    **Q.**   Okay.  So what does it mean when you
4    say it's an "indication of the terms"?
5    **A.**   It's telling you what the policy form
6    will be and what the premium will be and the
7    deductible will be.
8    **Q.**   Okay.  So was -- so you'd agree that
9    there was no full -- fully -- full supervision
10   warranty on this document under heading "Additional
11   Warranties, Terms, and Conditions," correct?
12         MR. GOLDMAN:  Form.
13         THE WITNESS:  No, because we're still
14         awaiting the information about the
15         operator's experience.
16   BY MR. SALAS:
17   **Q.**   Do you know if you ever received that
18   information regarding the operator's experience?
19   **A.**   Yes, we did, and that's why we put on
20   the warranty that it required supervision.
21   **Q.**   And are you certain that that warranty
22   was included within the policy that was issued in
23   2018?
24   **A.**   Absolutely positive.
25   **Q.**   Absolutely positive.  Okay.

114

1         And, of course, you guys will provide
2    that to me in the coming days?
3    **A.**   You bet.
4         MR. GOLDMAN:  I told you I'd get it to
5         you after Mr. Usher can get it to me.
6         MR. SALAS:  Thank you.
7         MR. GOLDMAN:  I tried to cut you off
8         earlier to tell you that the policy forms
9         for the --
10        THE COURT REPORTER:  I'm sorry.  I
11        cannot hear you well, Mr. Goldman.
12        MR. SALAS:  All right, Mr. Goldman.
13        If you have question for your witness, you
14        can ask after I'm done.  Okay?  Thank you.
15        THE WITNESS:  Let me mention, Steve,
16        incidentally, just getting across, that the
17        document is going to be in a PDF format,
18        which includes the whole of the policy.
19        You can't separate the declaration form or
20        the policy schedule from the policy.
21        Sorry.
22        MR. GOLDMAN:  Counsel, just asked me
23        to be quiet.  I'm not going to help him.
24        MR. SALAS:  Thank you.
25        (Thereupon, Plaintiff's Exhibit

115

1         No. 13 was marked for identification.)
2    BY MR. SALAS:
3    **Q.**   The next exhibit is Exhibit No. 13,
4    which is dated 12 September, 2019.  It's a letter
5    addressed to Mr. Iriarte.  Under the Re line it
6    says, "Breach of Warranty Denial of Claim."
7         Do you see that?
8    **A.**   I will be able to see it when I come
9    out of the database and go back into the claim
10   file.
11        Okay.  12 September, 2019?
12   **Q.**   Yes, sir.
13   **A.**   Arnold & Arnold's letter of denial.
14   **Q.**   Okay.  So Arnold & Arnold drafted this
15   letter; Mr. Skyler Cruz drafted this letter,
16   correct?
17   **A.**   Correct.  Sent it to us.  We approved
18   it, so he issued it.
19   **Q.**   Okay.
20        Now, this -- I guess it's the fourth
21   paragraph down in quotations (as read):  "Warranted
22   that Esteban Iriarte is fully supervised by Luis
23   Campoo at all times while operating the Scheduled
24   Vessel."
25        Do you see that?

116

1    **A.**   That's correct.
2    **Q.**   And the conclusion was that "the
3    practice of being supervised by a person on the
4    55th floor of a building is not being fully
5    supervised while operating a vessel."
6         Is it Great Lakes Insurance's position
7    that in order to -- or interpretation, better
8    said -- that in order to be fully supervised, the
9    supervisor has to be in the physical presence of
10   the supervisee?
11   **A.**   He has to be in a position to prevent
12   a noncompetent operator from making a mistake.
13   Don't think he can do that from the 55th floor.
14   **Q.**   But the policy and the warranty
15   language itself doesn't say anything about physical
16   presence, correct?
17   **A.**   No, it just says "fully supervised."
18   **Q.**   Okay.  So you don't interpret that
19   statement, "Warranted that Esteban Iriarte is fully
20   supervised by Luis Campoo at all times whilst
21   operating the subject (sic) vessel," you don't
22   interpret that to mean physical presence, correct?
23   **A.**   He would have to be in a position to
24   prevent Mr. Iriarte making a mistake.
25   **Q.**   And your position is that Mr. Campoo

117

1  cannot prevent Mr. Iriarte from making a mistake
2  from his home.
3      A.    No, he can watch the mistake being
4  made.
5      Q.    Okay.  But he can't prevent it?
6      A.    Correct.
7      Q.    Okay.  Where would he need to be in
8  order to prevent it?
9      A.    Probably on board.
10      Q.    "Probably"?
11      A.    Yeah, I think he has to be on board.
12      Q.    And that's your opinion, sir, correct?
13      A.    And to assist him in the navigation of
14  the vessel.
15      Q.    What was that term, "assisting"?
16      A.    Assist him in the navigation of the
17  vessel.
18      Q.    Does the rear admiral of the Navy
19  assist every single captain on every single vessel
20  that's afloat in the water?
21          MR. GOLDMAN:  Objection --
22          THE WITNESS:  Absolutely not.
23          (Simultaneous speaking.)
24          THE COURT REPORTER:  I'm sorry; you
25      both spoke at the same time.  There was an

118

1  objection?
2          MR. GOLDMAN:  Objection to the form.
3          THE WITNESS:  I said, no, an admiral
4      would not have to be on board the vessel
5      because his captains are fully qualified.
6  BY MR. SALAS:
7      Q.    The opinion that Mr. Iriarte wasn't
8  fully qualified by the investigation that was
9  conducted by Mr. Cruz and Captain Allen, correct?
10          MR. GOLDMAN:  Object to the form.
11          THE WITNESS:  We determined that Mr.
12      Iriarte had inadequate experience to
13      operate a vessel of this size when we made
14      an inquiry on the previous policy as to
15      what his experience was.
16  BY MR. SALAS:
17      Q.    Okay.  What do you know his experience
18  to have been?
19      A.    I have to go back to the underwriting
20  file.
21          All right.  Luis Campoo's experience
22  extended to 12 days on 51-foot Leopard powered
23  Catamaran in the British Virgin Islands, presumably
24  under charter; 50 days on 50-foot Ocean Sedan
25  Bridge in Puerto Rico; 15 days on a 48-foot

119

1  sailboat -- I type; 16 days on a 62-foot Bluewater
2  motor yacht; and a 50 days on 50-foot Beneteau
3  sailboat.
4      Q.    And in Great Lakes insurance's
5  estimation that was not sufficient experience?
6      A.    Oh, sorry; that's Luis Campoo.  My
7  apologies.  Let's go back.
8          "Esteban Iriarte, the largest vessel
9  listed as operated is a 36-foot Sea Ray.  He has
10  operated" -- I don't know what he -- I think "he
11  hasn't operated any vessels of similar size and
12  type to this 50-foot Marquis."
13          And then it goes on to say (as read):
14  "Will he only operate under supervision of Luis
15  Campoo?"  "Yes.  He will not be permitted to
16  operate -- and he will not be permitted to operate
17  under charter."
18      Q.    And that's from -- where are you
19  reading from, sir.
20      A.    I'm reading from the e-mail of Emily
21  Lippman of Hull and Co, addressed to Kathy Smith in
22  my administration department.
23      Q.    Okay.  And what's the date of that
24  e-mail?
25      A.    It's the 15th of May 2018.

120

1          Let me read again for clarity because
2  I misread the second section.  "Esteban Iriarte -
3  The largest vessel listed as operated is 36-foot
4  Sea Ray.  Has he already operated any vessels of
5  similar size and type to this 50-foot Marquis?
6  Answer:  "No."
7      Q.    Okay.  So you based it off -- you
8  based the denial decision off the answers to those
9  questions?
10      A.    No, we based the denial decision on
11  the basis that we would only underwrite the risk,
12  right, for Mr. Esteban Iriarte to operate the
13  vessel under the direct and full -- under the full
14  supervision of Luis Campoo.
15      Q.    Okay.
16      A.    Because Mr. Campoo had adequate
17  experience on similar size vessels.
18      Q.    Okay.
19      A.    Whereas Mr. Iriarte didn't.
20      Q.    Okay.  And if I understand you
21  correctly, the manner in which Mr. Campoo was
22  supervising Mr. Iriarte, from your perspective, was
23  that he couldn't prevent a mistake, correct?
24      A.    Correct.
25      Q.    Okay.  Is it possible that a mistake

121

1  could occur with Mr. Campoo and Mr. Iriarte on
2  board?
3       A.   Of course it could happen.
4       Q.   And just so I'm clear, you do not
5  interpret the warranty language on the policy
6  that's quoted on this letter, to require
7  Mr. Campoo's physical -- I mean, Mr. Campoo's
8  physical presence on the vessel while Mr. Iriarte
9  is -- is captaining the vessel.
10           MR. GOLDMAN:  Object to the form, and
11       asked and answered.
12           THE WITNESS:  Yeah, I said he does
13       need to be there.
14  BY MR. SALAS:
15       Q.   Okay.  So you interpret it to mean
16  that he does need to be on board the vessel,
17  correct?
18       A.   Correct, yes.  I can't tell of another
19  way he could do it.
20       Q.   Would you agree with me that the
21  language that's quoted does not state that Esteban
22  -- that Luis Campoo must be physically present on
23  the vessel?
24       A.   It doesn't specifically state that.
25  It states "fully supervised."

122

1       Q.   Sir, you mentioned that you have a
2  staff under you at your company.  Are you
3  physically present while you are supervising them?
4       A.   Most of the time, yes.  Except during
5  this COVID pandemic.
6       Q.   But you've been able to supervise them
7  while you're not physically present, correct?
8       A.   Yes, because they ask me questions
9  before they do something.
10       Q.   And is it your position that Mr.
11  Iriarte didn't ask Mr. Campoo any questions before
12  operating the vessel in this instance?
13       A.   I don't think he did ask questions.
14  He may very well have discussed things with him,
15  but it's a somewhat different scenario.
16           For example, when I was teaching my
17  daughter how to drive, I didn't say "Take your cell
18  phone and just let me know if anything goes wrong."
19  That would be pointless.
20       Q.   Is that what you --
21       A.   When I'm supervising my staff, if they
22  come to me in e-mail or phone me and say, "I've
23  received this.  Is it okay if I do this, or what
24  should I do," then I am supervising them before
25  they do something.  They can't make a mistake if

123

1  I've told them what to do beforehand.
2       A.   Okay.  So it's your position, based on
3  the information that you have, that Mr. Iriarte and
4  Mr. Campoo didn't have similar discussions like
5  what you've just described prior to Mr. Iriarte's
6  operation of the vessel?
7       A.   No, I'm not saying they didn't have
8  discussions.  I said it would be ineffective.
9       Q.   And that's your --
10       A.   It wouldn't be fully supervising
11  because --
12       Q.   Is that your --
13       A.   -- because you're supervising the
14  operation of something.  For example, if you were
15  operating a piece of machinery, you couldn't be
16  supervised without the person being present there.
17       Q.   All right.
18       A.   Because you're operating something.
19  You're not sending e-mails or letters.  You're
20  actually operating a piece of machinery; in this
21  instance, a yacht.  In my daughter's instance, a
22  car.
23       Q.   Okay.  So --
24       A.   So you would need to physically be
25  there to monitor and assist them with the operation

124

1  of the vehicle or vessel.
2       Q.   Based on your -- based on your
3  understanding, and you're here as a corporate
4  representative of Great Lakes Insurance, based on
5  Great Lakes's insurance's understanding of this
6  provision that is in the denial letter regarding
7  full supervision, is that in the event that
8  somebody is operating machinery of any kind, okay,
9  they can only be fully supervised operating that
10  machinery if the supervisor is physically present
11  while they are operating that machine; is that your
12  position?
13       A.   Pretty much.  Certainly if it has to
14  do with a vessel, or a vehicle or a moving thing.
15  I don't see how you can fully supervise someone
16  from a remote location.
17       Q.   So to further -- to further your
18  position, if the machinery is a moving object and
19  the only way that anybody can be fully supervised
20  while operating that moving object is if somebody
21  is physically present with them while they are
22  doing it; is that your --
23       A.   As much as I'm concerned -- as much as
24  I'm concerned, yes.
25       Q.   Okay.  And when you say?

125

1      A.    Whether you are driving a car or a
2  motor bike or --
3      Q.    When you say --
4      A.    -- whatever.  Anything where you're
5  driving something or operating something of that
6  nature, the only way you can be supervised is if
7  they are with you.
8      Q.    Okay.  So when you say "I", you mean
9  Great Lakes Insurance, correct, 'cause you're --
10     A.    Yes.
11     Q.    -- their corporate representative.
12           Okay.  So you would agree with me
13  that, as far as our lawsuit is concerned and our
14  complaint is concerned, that there is a factual
15  dispute as to whether or not your interpretation of
16  fully supervised is the correct interpretation of
17  how somebody should be fully supervised in this
18  situation?
19           MR. GOLDMAN:  Object to form.
20           THE WITNESS:  Yes.
21           MR. SALAS: Excuse me?
22           MR. GOLDMAN:  I said, object to the
23     form.
24  BY MR. SALAS:
25     Q.    What was your answer, sir?

126

1      A.    Yes, as far as I'm concerned.  Yes,
2  it's my opinion and, therefore, Great Lakes's
3  opinion.
4      Q.    Okay, but that's not my question.  My
5  question is, would you agree with me that there is
6  a factual dispute as set forth in our Complaint as
7  to what the proper interpretation of "fully
8  supervised" means with regard to this particular
9  claim?
10           MR. GOLDMAN:  Object to the form.
11           THE WITNESS:  Well, obviously I'm not
12     here to make a legal conclusion, but it
13     would certainly appear so.
14  BY MR. SALAS:
15     Q.    Okay.  Fair enough.
16           So I'm going to show you what we have
17  as Exhibit 15, and this is going to wrap this up.
18  Hopefully we can do this quickly.  Okay?
19           And I don't know if you have a copy of
20  it.  I'll be happy to send it to you.  It's
21  Defendant's Answers to Plaintiff's First Set of
22  Interrogatories.
23           (Thereupon, Plaintiff's Exhibit
24     No. 15 was marked for identification.)
25  BY MR. SALAS:

127

1      Q.    Do you see that, sir?
2      A.    I'll have to go back in the claim file
3  to find it.  (Pause.)
4           It might be better if you send it to
5  me because this file is enormous.
6      Q.    Will do, sir.
7           MR. GOLDMAN:  Counselor, are you
8     sending it to me or directly to Mr. Usher?
9     You may send it directly to Mr. Usher.
10           MR. SALAS:  I am sending it to both of
11     you.  Is that okay?
12           MR. GOLDMAN:  Fine.  I can see your
13     document.  I don't know why Mr. Usher
14     can't.
15           MR. SALAS:  Okay, I just sent it in
16     the abundance of caution.  You can delete
17     the e-mail.
18           MR. GOLDMAN:  That's fine.  Thank you,
19     counsel.
20           THE WITNESS:  Okay.  Give me a second.
21     Yes, I remember seeing this before.
22  BY MR. SALAS:
23     Q.    And on the last page, page 9,
24  typically here in the U.S. we have a notarial
25  certificate, but I understand it's a little bit

128

1  more difficult, given the current situation.  So I
2  just want to confirm that that signature on page 9
3  is your signature.
4      A.    Yes, it is.
5      Q.    Okay.  So you reviewed the answers to
6  these interrogatories and signed your name to that
7  attestation, correct?
8      A.    That's correct.
9      Q.    Okay.  Let me see if I have any
10  specific questions about this.
11           All right.  I have a quick question
12  about interrogatory number 12.  Okay?
13           Interrogatory number 12 reads:
14  "Please state all facts and identify all documents
15  that support your allegation in Paragraph 38 of
16  your counterclaim for declaratory judgment, which
17  states 'The plaintiff/counter-defendant
18  misrepresented and failed to disclose material
19  facts with regard to work and/or repairs and/or
20  maintenance alleged to have been completed.'"
21           It says, "Specifically state with
22  specificity what material facts were misrepresented
23  and/or not disclosed, and which repairs and/or
24  maintenance items were required to have been
25  completed which you contend were not completed."

129

1  The response here is "See reports from Arnold &
2  Arnold," which we have gone over in pretty much
3  detail.
4         With regard to any misrepresentation
5  or undisclosed facts, as you sit here today, do you
6  have any amendment to this answer?
7         A.   Not as we sit here today, no.
8         Q.   Okay.
9              MR. SALAS:  Now, if you do have an
10       amendment to this answer, you understand
11       that -- and I think your client
12       understands, that there's a duty to
13       supplement your answers, correct.
14             MR. GOLDMAN:  Are you referring to me
15       or to Mr. Usher?
16             MR. SALAS:  I'm referring to you,
17       Mr. Goldman.
18             MR. GOLDMAN:  I'm not here to answer
19       questions, counsel.
20             MR. SALAS:  Okay, but do you --
21  BY MR. SALAS:
22       Q.   Mr. Usher, if there is any other
23  information that you have other than the reports
24  that you have from Arnold & Arnold with regard to
25  interrogatory number 12, would you agree to

130

1  supplement the record with those documents?
2             MR. GOLDMAN:  Object to the form.
3             THE WITNESS:  If something else comes
4        out in the process of discovery, then
5        certainly we will; yes.
6  BY MR. SALAS:
7        Q.   As you sit here today, you don't have
8  any other documents in response to this
9  interrogatory other than what has been produced by
10 your counsel in terms of the reports that we have
11 gone over from Arnold & Arnold, correct?
12       A.   Correct.
13       Q.   And the same thing goes for
14 interrogatory number 13 which asks to, "State all
15 facts and identify all documents on which defendant
16 is relying for each affirmative defense in
17 defendant's answers to plaintiffs' Complaint."
18            It says, "Documents responsive to this
19 interrogatory have been produced.  See reports from
20 Arnold & Arnold."  You see that?
21       A.   Yes.
22       Q.   Okay.  And if there's anything else
23 besides the reports that have been produced from
24 Arnold & Arnold in support of your affirmative
25 defenses, you will agree to produce those documents

131

1  to us, correct?
2             MR. GOLDMAN:  Object to the form.
3             THE WITNESS:  Absolutely.
4  BY MR. SALAS:
5        Q.   Now, with regard to interrogatory
6  number 14, there's a question here about, "Please
7  state the names and addresses and telephone numbers
8  of all persons who are believed or known by
9  defendant, defendant's agents, that have knowledge
10 concerning any of the issues in this lawsuit, and
11 specify the subject matter about which the witness
12 has knowledge."
13            Obviously, sir, you're here as a
14 corporate representative.  You are somebody who's
15 named in defendant's -- and the answer is, you are
16 somebody who's named in defendant's Rule 26
17 disclosures, okay; and we've also discussed Captain
18 Ian Allen, and we've also discussed Mr. Skyler
19 Cruz, and we've also discussed the three other
20 individuals which you claim -- which you have
21 testified are staff, which are Mr. Mark Thomas, Ms.
22 Samantha Thomas and Ms. Simms; correct?
23       A.   Correct.
24       Q.   Okay.  To your knowledge, is there
25 anybody else who you know who would have knowledge

132

1  about the issues in this lawsuit besides those
2  persons which I just named?
3        A.   I'm not aware of anybody, no.  Well,
4  Liam GilHooly we mentioned as well.
5        Q.   Okay.
6        A.   But none of those people would know
7  anything that I don't know.
8        Q.   When you say "none of those people,"
9  you're referring to which people?
10       A.   I'm referring to my staff.
11       Q.   Okay.  And those -- that is
12 comprised -- just to be sure, that is comprised of
13 Mr. Mark Thomas, Ms. Samantha Thomas, Mr. GilHooly
14 and Ms. Sarah Delacey-Simms, correct?
15       A.   That's correct.
16       Q.   Okay.  Is there anybody else who you
17 would like to identify?
18       A.   No.
19       Q.   All right, sir.  At this time we don't
20 have any other questions.  I think we have another
21 deposition starting in 20 minutes, I think, with a
22 different court reporting firm.  But from my end,
23 that concludes my deposition.  I don't know if Mr.
24 Goldman has any followup questions for you, sir.
25            MR. GOLDMAN:  I have no follow-up

1  questions, and he waives.
2       MR. SALAS:  All right.  So what your
3  attorney has just mentioned, is that you
4  have waived the reading of your deposition,
5  which means that you have the opportunity
6  to read your deposition and if the copy of
7  the deposition is ordered, you can make
8  changes to your testimony, but under the
9  caveat that if you do make those changes,
10  we reserve the right to re-depose you and
11  ask you about those changes.
12       Do you understand?
13       THE WITNESS:  Yes, I do.
14       MR. SALAS:  Okay.  And with that
15  understanding, do you waive reading of your
16  deposition?
17       THE WITNESS:  Yes, I do.
18       MR. SALAS:  Okay.  At this time,
19  Elena, we will not be ordering a copy, but
20  I may order a copy in the next couple of
21  days.
22       VIDEOGRAPHER:  We're going off the
23  record at 1:41 p.m.
24       (Thereupon, the deposition was
25  concluded at 1:41 p.m.)

134

1       CERTIFICATE OF OATH
2
3  STATE OF FLORIDA    )
4  COUNTY OF MIAMI-DADE)
5
6
7       I, the undersigned authority, certify that
8  B.A. (TONY) USHER personally appeared before me and
9  was duly sworn.
10       WITNESS my hand and official seal this
11  October 15, 2020.
12
13
14
   _____
16  ELENA ROBAINA, FPR
   Notary Public - State of Florida
17
18
19
20
21  My Commission Expires:  4/17/2024
   My Commission #: GG971350
22
23
24
25

2
3  STATE OF FLORIDA    )
4  COUNTY OF MIAMI-DADE)
5
6
7       I, ELENA ROBAINA, Stenographer and Notary
8  Public, certify that I was authorized to and did
9  stenographically report the foregoing proceedings,
10  and that the transcript is a true and accurate
11  record.
12       I further certify that I am not an
13  attorney or counsel of any of the parties, nor a
14  relative or employee of any attorney or counsel
15  connected with the action, nor financially
16  interested in the action.
17       Dated this 30th day of September, 2020.
18
19
   _____
21  ELENA ROBAINA, FPR
   Stenographer
22
23
24
25

## $

**$7,759** [1] - 112:13

## '

**'18** [1] - 110:15
**'A** [1] - 60:6
**'B** [1] - 60:6
**'The** [1] - 128:17

## 0

**000012** [1] - 46:2
**000045** [1] - 46:3
**01** [1] - 59:18

## 1

**1** [3] - 3:3, 37:20, 37:25
**10** [1] - 119:1
**100** [2] - 3:10, 5:23
**102** [1] - 3:11
**106** [1] - 3:11
**10:06** [2] - 1:15, 4:5
**10:27** [1] - 98:16
**11** [5] - 51:15, 70:15, 70:16, 70:21, 104:12
**112** [1] - 68:6
**115** [1] - 3:12
**11:12** [1] - 45:21
**11:43** [1] - 99:13
**11:47** [1] - 67:19
**11A** [3] - 3:11, 105:25, 106:3
**11th** [3] - 39:21, 51:17, 51:22
**12** [7] - 3:12, 115:4, 115:11, 118:22, 128:12, 128:13, 129:25
**126** [1] - 3:13
**12:00** [1] - 67:23
**12th** [5] - 33:6, 34:12, 110:12, 110:14, 111:22
**13** [4] - 3:12, 115:1, 115:3, 130:14
**13:26** [1] - 24:2
**13th** [6] - 26:11, 27:19, 44:4, 44:5, 46:10
**14** [7] - 8:13, 102:7, 102:13, 102:14, 131:6, 134:11
**15** [4] - 3:13, 118:25, 126:17, 126:24

**150** [1] - 5:19
**15:55** [1] - 24:2
**15th** [1] - 119:25
**167562** [1] - 111:8
**17** [4] - 18:9, 18:16, 18:17
**175020** [1] - 23:3
**17th** [2] - 20:19, 21:3
**18** [1] - 51:18
**18th** [1] - 21:3
**19** [4] - 18:16, 29:4, 107:2
**1993** [1] - 15:18
**19th** [1] - 89:11
**1:07** [1] - 111:17
**1:10** [1] - 111:20
**1:41** [3] - 1:15, 133:23, 133:25
**1s** [1] - 51:15
**1st** [4] - 24:7, 43:6, 48:14

## 2

**2** [7] - 3:3, 37:22, 38:1, 59:14, 60:15, 82:6, 101:5
**20** [1] - 132:21
**20-60352 -CIV-ALTONAGA** [1] - 1:2
**20-CV-60352** [1] - 5:7
**2005** [2] - 16:19, 16:21
**2018** [15] - 39:22, 40:7, 43:6, 51:22, 59:18, 80:2, 81:21, 95:12, 110:12, 110:17, 110:18, 111:22, 113:23, 119:25
**2019** [25] - 20:3, 20:5, 20:19, 24:6, 40:2, 44:4, 46:10, 52:23, 59:25, 60:23, 68:11, 68:12, 68:25, 70:23, 71:9, 80:3, 89:11, 94:7, 95:13, 98:3, 99:16, 106:7, 110:14, 115:4, 115:11
**2020** [6] - 1:14, 4:4, 44:5, 46:10, 134:11, 135:17
**21** [2] - 92:22, 106:7
**21st** [7] - 25:24, 29:23, 29:25, 30:1, 30:15, 30:25, 106:17
**22nd** [23] - 23:25, 24:2, 24:3, 33:24, 56:15, 56:16, 59:24, 60:23, 65:18, 66:16,

**66:23, 68:11, 72:4, 73:25, 76:6, 81:21, 89:20, 90:8, 91:25, 92:7, 92:20, 93:4, 93:7**
**23rd** [7] - 27:20, 30:3, 30:5, 30:16, 30:18, 30:21, 31:1
**24** [1] - 88:17
**24th** [3] - 54:2, 54:22, 56:12
**25th** [16] - 70:23, 71:9, 71:14, 72:4, 72:9, 76:6, 76:17, 80:2, 89:11, 89:21, 89:23, 92:1, 92:8, 92:12, 92:21, 93:9
**26** [2] - 88:17, 131:16
**28th** [2] - 56:19, 66:25
**29** [1] - 61:17
**2:28** [1] - 98:6
**2s** [1] - 51:14

## 3

**3** [6] - 3:5, 43:25, 45:25, 63:3, 71:4, 71:5
**30** [1] - 1:14
**300** [1] - 2:3
**30th** [4] - 4:4, 54:6, 68:25, 135:17
**31** [2] - 33:25, 88:21
**31st** [1] - 24:6
**32** [2] - 46:22, 47:7
**32-page** [1] - 44:2
**33322** [1] - 2:4
**33324** [1] - 2:8
**34** [2] - 39:16, 81:18
**36** [1] - 88:10
**36-foot** [2] - 119:9, 120:3
**37** [3] - 3:3, 3:3, 39:13
**38** [1] - 128:15
**384532 B** [2] - 110:21, 112:3

## 4

**4** [3] - 3:5, 51:5, 51:9
**4/17/2024** [1] - 134:21
**4/22** [1] - 51:12
**4/22/2018** [1] - 51:11
**404** [1] - 2:7
**43** [1] - 3:5
**48-foot** [1] - 118:25
**4th** [4] - 31:8, 31:9, 34:11, 52:23

## 5

**5** [5] - 2:16, 3:6, 53:6, 53:9, 102:14
**5.4** [1] - 104:25
**50** [2] - 118:24, 119:2
**50-foot** [4] - 118:24, 119:2, 119:12, 120:5
**51** [1] - 3:5
**51-foot** [1] - 118:22
**53** [1] - 3:6
**55th** [2] - 116:4, 116:13
**5A** [4] - 3:6, 68:1, 68:4, 92:20
**5th** [1] - 94:7

## 6

**6** [4] - 3:7, 68:22, 79:8, 85:15
**61-page** [1] - 38:1
**62-foot** [1] - 119:1
**68** [2] - 3:6, 3:7
**6:38** [2] - 104:17, 104:24
**6:40** [2] - 104:18, 104:25
**6A** [4] - 3:7, 89:7, 89:9, 92:22
**6B** [4] - 3:8, 91:7, 91:9, 92:22
**6C** [1] - 92:23

## 7

**7** [2] - 3:8, 93:24
**7/30/19** [1] - 3:7
**76** [2] - 93:3, 93:6
**7A** [3] - 3:9, 97:19, 97:22
**7B** [3] - 3:10, 99:8, 99:10

## 8

**8** [6] - 3:10, 51:19, 53:11, 99:15, 100:9, 100:13
**8/21/19** [1] - 3:11
**8/8/2019** [1] - 3:10
**8/8/2019 .** [1] - 3:9
**8551** [1] - 2:3
**87** [2] - 89:12, 92:21
**8751** [1] - 2:7
**89** [1] - 3:7
**8th** [14] - 25:14, 25:23,

**25:25, 26:1, 29:22, 29:25, 30:13, 33:25, 98:3, 98:5, 99:13, 99:16, 100:2, 100:14**

## 9

**9** [5] - 3:11, 102:4, 102:7, 127:23, 128:2
**9/12/2019** [1] - 3:12
**91** [1] - 3:8
**93** [1] - 3:8
**97** [1] - 3:9
**99** [1] - 3:10

## A

**A&A** [1] - 53:10
**A-S** [1] - 16:2
**A.1** [4] - 60:13, 60:17, 88:2, 88:5
**A.2** [4] - 60:13, 88:2, 88:6
**a.m** [10] - 1:15, 4:5, 45:21, 67:19, 98:6, 99:13, 104:17, 104:18, 104:24, 104:25
**able** [8] - 33:21, 60:21, 79:24, 97:23, 98:10, 111:11, 115:8, 122:6
**absolutely** [6] - 5:22, 72:6, 113:24, 113:25, 117:22, 131:3
**abundance** [1] - 127:16
**ABYC** [1] - 61:1
**accept** [1] - 62:11
**access** [1] - 81:6
**accident** [3] - 39:25, 52:3, 73:7
**accommodate** [1] - 7:2
**account** [1] - 25:1
**accounting** [1] - 15:12
**accurate** [17] - 8:18, 12:3, 18:19, 34:16, 37:10, 40:23, 46:14, 46:23, 50:10, 52:18, 62:2, 66:6, 72:15, 82:20, 105:9, 107:7, 135:10
**accurately** [1] - 6:23
**action** [2] - 135:15, 135:16
**actual** [4] - 31:17, 31:18, 31:20, 33:14
**add** [2] - 34:18, 56:18

**added** [1] - 85:10
**addition** [2] - 8:20, 77:11
**Additional** [2] - 112:15, 113:10
**additional** [3] - 73:13, 112:14, 112:17
**address** [4] - 21:11, 21:21, 33:2
**addressed** [8] - 53:21, 54:10, 63:9, 63:12, 69:6, 100:14, 115:5, 119:21
**addresses** [2] - 21:6, 131:7
**adequate** [7] - 31:16, 32:13, 32:17, 34:9, 50:1, 113:2, 120:16
**adjuster** [2] - 72:20, 107:25
**adjusters** [1] - 24:4
**administration** [1] - 119:22
**Administrative** [1] - 1:13
**admiral** [2] - 117:18, 118:3
**advise** [3] - 26:3, 98:17, 98:19
**afloat** [1] - 117:20
**aft** [1] - 85:16
**agency** [3] - 13:9, 15:10, 16:11
**agent** [8] - 13:17, 14:2, 14:6, 15:8, 22:7, 26:13, 35:9, 35:14
**agents** [1] - 131:9
**agree** [26] - 20:20, 40:11, 41:5, 41:21, 42:2, 59:22, 76:5, 76:20, 77:21, 78:3, 78:10, 78:18, 78:24, 85:24, 86:12, 88:25, 89:13, 90:17, 99:25, 103:8, 113:8, 121:20, 125:12, 126:5, 129:25, 130:25
**agreed** [3] - 20:12, 47:13, 86:21
**agreement** [2] - 13:10, 109:24
**agrees** [2] - 86:10, 86:11
**ahead** [1] - 38:19
**air** [4] - 63:22, 65:7, 65:8
**alcohol** [1] - 7:12
**Alexander** [1] - 31:10

**ALL** [1] - 2:1
**allegation** [1] - 128:15
**allege** [1] - 50:20
**alleged** [2] - 41:6, 128:20
**Allen** [39] - 36:8, 36:17, 36:22, 36:24, 53:13, 53:15, 54:11, 54:16, 54:24, 56:9, 60:2, 60:21, 62:2, 62:18, 62:24, 64:7, 65:23, 66:4, 66:7, 66:14, 66:19, 68:14, 71:16, 71:21, 72:4, 72:14, 72:18, 72:20, 73:14, 73:24, 76:14, 78:8, 83:20, 84:16, 89:13, 91:14, 118:9, 131:18
**Allen 's** [13] - 59:23, 63:8, 65:17, 73:10, 73:11, 73:16, 75:15, 76:7, 76:8, 76:16, 76:22, 79:6, 108:11
**almost** [5] - 71:10, 71:23, 80:13, 89:15, 98:2
**ALSO** [1] - 2:10
**Alternator** [1] - 62:23
**alternator** [2] - 63:3, 63:6
**Altonaga** [1] - 5:8
**amendment** [2] - 129:6, 129:10
**Amy** [3] - 3:10, 99:10, 99:17
**Amy @Arnoldoffice . com** [1] - 99:18
**analyze** [1] - 15:14
**Angeline** [1] - 33:1
**answer** [15] - 6:13, 7:4, 34:3, 47:5, 54:8, 66:2, 79:16, 84:5, 112:16, 120:6, 125:25, 129:6, 129:10, 129:18, 131:15
**Answer 's** [1] - 3:13
**answered** [2] - 66:13, 121:11
**answering** [2] - 6:19, 8:16
**Answers** [1] - 126:21
**answers** [10] - 6:6, 7:18, 28:16, 34:6, 99:4, 102:11, 120:8, 128:5, 129:13, 130:17
**Anthony** [1] - 5:11
**anti** [8] - 80:15, 80:18,

80:23, 80:25, 82:3, 83:21, 84:13, 84:23
**anti-corrosion** [1] - 84:23
**anti-marine** [7] - 80:15, 80:18, 80:23, 80:25, 82:3, 83:21, 84:13
**anticorrosion** [8] - 63:5, 80:16, 80:19, 80:23, 80:25, 82:4, 83:22, 84:14
**anticorrosive** [2] - 77:19, 90:16
**anyway** [3] - 21:4, 66:9, 88:6
**AOSC 20-23** [1] - 1:13
**apart** [1] - 89:3
**apologies** [1] - 119:7
**apologize** [1] - 45:16
**appear** [9] - 54:15, 57:3, 61:2, 62:19, 72:19, 75:17, 91:3, 126:13
**APPEARANCES** [1] - 2:1
**appearances** [1] - 4:7
**appeared** [4] - 59:20, 72:25, 77:4, 134:8
**application** [9] - 27:13, 46:16, 46:18, 46:22, 46:24, 46:25, 47:7, 48:3, 48:11
**applied** [2] - 84:13, 84:23
**applies** [1] - 49:23
**appreciate** [4] - 38:12, 42:18, 58:17, 83:16
**approved** [5] - 16:9, 16:20, 25:11, 26:21, 115:17
**approximation** [1] - 5:21
**April** [18] - 39:22, 40:7, 43:6, 44:4, 44:5, 46:10, 48:14, 51:17, 51:22, 59:18, 80:2, 81:21, 95:12, 95:13, 110:12, 110:14, 111:22
**areas** [5] - 8:13, 8:16, 9:1, 56:4, 56:5
**Arizona** [3] - 69:2, 72:11, 100:15
**Arnold** [113] - 24:3, 24:6, 24:10, 24:13, 24:23, 25:15, 25:20, 25:21, 26:1, 26:25, 27:22, 27:23, 28:9, 30:7, 30:13, 31:11,

31:14, 31:15, 32:12, 32:19, 32:20, 32:21, 33:25, 35:8, 35:13, 35:14, 35:22, 35:25, 36:12, 36:19, 36:22, 37:5, 37:9, 39:17, 39:18, 47:20, 54:16, 54:17, 55:5, 55:10, 55:21, 57:6, 57:16, 64:10, 66:9, 68:5, 69:2, 72:2, 72:14, 72:15, 72:22, 93:5, 93:17, 98:1, 99:22, 100:15, 105:5, 107:7, 108:15, 108:24, 109:4, 115:13, 115:14, 129:1, 129:2, 129:24, 130:11, 130:20, 130:24
**Arnold 's** [9] - 37:9, 55:10, 93:5, 93:17, 99:22, 100:15, 105:6, 108:24, 115:13
**arrive** [1] - 37:10
**AS** [1] - 1:18
**ascertain** [1] - 92:25
**ascertained** [1] - 101:15
**aside** [2] - 41:25, 50:8
**aspects** [2] - 39:7, 48:7
**assert** [1] - 11:23
**asserted** [1] - 12:4
**assigned** [2] - 22:15, 100:24
**assigning** [1] - 49:25
**assist** [4] - 117:13, 117:16, 117:19, 123:25
**assistance** [1] - 31:23
**assistant** [1] - 11:8
**assisting** [1] - 117:15
**assume** [5] - 6:14, 42:16, 43:3, 68:13, 82:19
**assumed** [1] - 72:18
**assuming** [4] - 64:5, 94:17, 103:3, 103:14
**assumption** [1] - 80:1
**attach** [1] - 46:18
**attached** [6] - 8:12, 28:19, 28:21, 29:3, 44:21, 99:19
**attachments** [1] - 103:6
**attendance** [1] - 71:13
**attended** [1] - 66:22
**attention** [1] - 61:21

**Attention '** [1] - 60:7
**attest** [1] - 41:11
**attestation** [1] - 128:7
**attestations** [1] - 53:2
**attesting** [1] - 27:11
**attorney** [4] - 90:13, 133:3, 135:13, 135:14
**Audio** [1] - 1:12
**Audio -Video** [1] - 1:12
**August** [33] - 20:15, 24:7, 25:14, 25:23, 25:24, 25:25, 26:1, 26:11, 27:19, 27:20, 29:22, 29:23, 30:4, 30:5, 30:13, 30:16, 30:17, 30:19, 30:22, 33:25, 56:19, 66:17, 66:25, 94:7, 98:3, 98:5, 99:13, 99:16, 100:2, 100:14, 106:7, 106:17
**authored** [1] - 68:25
**Authority** [4] - 16:10, 16:16, 16:19, 17:10
**authority** [4] - 13:9, 13:12, 16:14, 134:7
**authorized** [1] - 135:8
**available** [2] - 20:12, 38:14
**avoided** [1] - 58:12
**awaiting** [1] - 113:14
**aware** [10] - 12:8, 12:9, 20:25, 32:25, 43:10, 43:17, 55:21, 90:21, 100:23, 132:3

## B

**B.1** [3] - 60:17, 88:9, 88:13
**B.18** [4] - 61:24, 62:13, 75:14, 88:17
**B.22** [2] - 75:19, 75:21, 88:17
**B.23** [5] - 61:5, 61:11, 61:24, 62:23, 63:2
**B.24** [2] - 76:15, 76:16
**B.26** [4] - 76:25, 77:8, 77:17, 79:8
**B.29** [5] - 61:24, 63:15, 63:18, 64:4, 64:14
**B.3** [2] - 74:9, 88:17
**B.31** [1] - 79:20
**B.32** [1] - 73:17
**B.34** [2] - 80:12, 81:19
**B.35** [2] - 88:11, 88:14
**B.A** [4] - 1:17, 2:15,

4:22, 134:8
**background** [1] - 17:16
**bad** [3] - 61:6, 61:12, 62:25
**Bahamas** [1] - 73:8
**ballpark** [1] - 5:16
**Barrett** [1] - 5:11
**based** [18] - 59:10, 65:17, 72:11, 74:4, 74:11, 87:3, 97:13, 100:1, 108:6, 108:8, 108:9, 120:7, 120:8, 120:10, 123:2, 124:2, 124:4
**basis** [8] - 24:21, 41:18, 48:20, 48:25, 49:8, 50:16, 78:3, 120:11
**Bates** [2] - 46:1, 53:11
**bathroom** [1] - 67:5
**Bear** [1] - 68:19
**bearing** [3] - 87:5, 87:22, 88:3
**beating** [1] - 78:17
**beforehand** [1] - 123:1
**beg** [1] - 24:11
**behalf** [2] - 4:8, 18:8
**BEHALF** [2] - 2:2, 2:6
**bell** [2] - 36:6, 36:7
**below** [2] - 28:16, 102:10
**Beneteau** [1] - 119:2
**best** [1] - 6:10
**bet** [1] - 114:3
**better** [4] - 60:12, 70:5, 116:7, 127:4
**between** [22] - 29:20, 29:21, 29:25, 30:9, 32:16, 48:4, 52:2, 52:5, 55:4, 64:6, 64:10, 67:16, 76:14, 76:21, 80:2, 80:6, 84:14, 89:2, 89:20, 91:1, 105:15, 107:8
**beyond** [2] - 66:21, 87:13
**bike** [1] - 125:2
**bilges** [1] - 87:13
**binding** [2] - 13:9, 13:12
**Bingo** [1] - 57:7
**bit** [8] - 13:5, 14:4, 14:7, 16:25, 37:14, 44:16, 44:18, 127:25
**black** [1] - 14:17
**Bluewater** [1] - 119:1
**Blvd** [2] - 2:3, 2:7
**board** [8] - 49:18,

59:18, 70:20, 117:9, 117:11, 118:4, 121:2, 121:16
**BOAT** [1] - 1:4
**boat** [8] - 31:16, 54:12, 54:14, 54:17, 56:10, 73:8, 74:1, 79:24
**Boat** [18] - 4:2, 4:9, 5:4, 22:6, 34:24, 35:5, 41:22, 41:25, 42:2, 42:7, 42:15, 42:24, 44:11, 46:8, 101:21, 107:17, 108:8, 112:9
**body** [1] - 46:17
**book** [1] - 66:11
**bottom** [5] - 29:18, 36:23, 57:9, 69:14, 109:23
**bow** [1] - 87:19
**Brandon** [1] - 2:10
**Breach** [1] - 115:6
**break** [3] - 7:5, 67:5, 67:8
**breaking** [1] - 50:10
**breaks** [1] - 7:1
**brevity** [1] - 58:2
**Bridge** [1] - 118:25
**brief** [1] - 67:4
**bring** [2] - 9:3, 9:11
**British** [1] - 118:23
**broadly** [1] - 95:2
**broke** [1] - 84:5
**broker** [3] - 22:11, 26:21, 94:24
**Broward** [1] - 2:7
**building** [1] - 116:4
**bulb** [1] - 75:3
**bunch** [1] - 103:20
**Bureau** [2] - 3:4, 38:2
**business** [5] - 13:11, 15:10, 15:12, 15:13, 17:12
**but..** [1] - 91:14
**butt** [1] - 60:19
**BY** [63] - 2:4, 2:8, 2:16, 5:2, 8:4, 9:10, 10:4, 12:2, 14:24, 37:23, 42:11, 43:1, 43:12, 44:1, 45:8, 45:23, 53:7, 56:2, 57:10, 57:19, 59:5, 61:15, 64:24, 65:14, 66:1, 68:2, 68:23, 70:12, 78:1, 78:23, 79:15, 80:10, 83:14, 84:10, 84:24, 85:7, 87:1, 89:8, 90:22, 91:8, 93:25, 97:11, 97:20,

99:9, 100:10, 102:5, 106:2, 108:22, 110:11, 110:16, 111:23, 113:16, 115:2, 118:6, 118:16, 121:14, 125:24, 126:14, 126:25, 127:22, 129:21, 130:6, 131:4

---

## C

**C-1** [6] - 85:9, 85:11, 85:14, 86:6, 87:6, 87:10
**C-4** [1] - 87:11
**C-5** [3] - 85:9, 85:12, 87:19
**camera** [2] - 14:20, 70:11
**Campoo** [23] - 26:18, 28:6, 28:24, 29:5, 32:16, 104:24, 105:15, 105:21, 106:23, 107:9, 112:19, 115:23, 116:20, 116:25, 119:6, 119:15, 120:14, 120:16, 120:21, 121:1, 121:22, 122:11, 123:4
**Campoo 's** [3] - 118:21, 121:7
**cannot** [2] - 114:11, 117:1
**capacity** [2] - 18:4, 18:18
**Captain** [13] - 36:8, 53:12, 54:24, 60:21, 62:1, 62:18, 68:13, 71:15, 73:24, 83:20, 91:13, 118:9, 131:17
**captain** [2] - 26:16, 117:19
**captaining** [1] - 121:9
**captains** [1] - 118:5
**car** [2] - 123:22, 125:1
**CASE** [1] - 1:2
**Case** [1] - 5:7
**case** [14] - 1:25, 4:1, 6:5, 12:7, 18:22, 34:24, 35:12, 46:1, 49:1, 51:3, 64:19, 72:7, 72:11, 91:22
**cases** [1] - 19:6
**Catamaran** [1] - 118:23
**categories** [1] - 60:12

**caused** [2] - 63:21, 65:7
**caution** [1] - 127:16
**caveat** [1] - 133:9
**Cecilia** [1] - 5:8
**cell** [1] - 122:17
**certain** [10] - 5:23, 52:15, 71:20, 72:3, 72:6, 72:8, 72:10, 84:12, 89:15, 113:21
**certainly** [11] - 7:1, 44:13, 44:20, 65:20, 66:19, 71:10, 71:16, 71:23, 124:13, 126:13, 130:5
**CERTIFICATE** [2] - 134:1, 135:1
**certificate** [1] - 127:25
**certified** [1] - 105:9
**certify** [3] - 134:7, 135:8, 135:12
**cetera** [1] - 3:9
**chain** [2] - 87:19, 87:20
**chance** [2] - 46:3, 59:7
**change** [2] - 70:4, 109:3
**changed** [3] - 75:15, 76:6, 77:21
**changes** [3] - 133:8, 133:9, 133:11
**charter** [2] - 26:17, 118:24, 119:17
**chat** [1] - 70:9
**chats** [2] - 28:24, 29:12
**check** [5] - 60:8, 72:22, 74:1, 91:13, 103:1
**checked** [1] - 25:9
**checking** [1] - 91:24
**checks** [1] - 21:14
**chips** [5] - 85:16, 85:18, 86:1, 86:15, 86:19
**chronological** [3] - 30:20, 31:19, 32:2
**chronologically** [2] - 23:15, 23:17
**chronology** [2] - 34:19, 97:22
**City** [1] - 69:1
**claim** [50] - 9:20, 10:6, 20:1, 20:8, 20:18, 21:2, 22:8, 22:15, 22:21, 23:5, 23:15, 23:17, 23:19, 31:5, 33:8, 33:10, 33:23, 34:12, 34:18, 35:20, 36:2, 36:10, 40:1,

40:11, 47:14, 47:18, 48:1, 48:8, 49:9, 49:11, 50:16, 51:3, 52:7, 52:23, 53:16, 68:6, 87:4, 87:6, 87:23, 88:4, 88:23, 102:1, 107:18, 108:8, 115:9, 126:9, 127:2, 131:20
**Claim** [1] - 115:6
**Claim @Special** [1] - 21:8
**Claim @Special - Risks** [1] - 21:8
**claims** [8] - 11:8, 11:10, 11:12, 15:13, 15:14, 20:6, 21:20, 24:17
**claims @special** [1] - 21:11
**Claims @Special** [1] - 21:12
**Claims @Special - Risks .Co.uk** [1] - 21:12
**clamp** [2] - 60:24, 60:25
**clamps** [4] - 61:2, 62:14, 62:15, 62:19
**clarify** [1] - 10:5
**clarity** [2] - 109:7, 120:1
**clause** [2] - 49:15, 50:14
**Clean** [2] - 81:14, 82:8
**clean** [3] - 6:17, 83:8, 87:21
**cleaned** [4] - 24:15, 49:6, 92:14, 121:4
**clear** [4] - 44:11, 46:8, 86:21, 129:11
**clearly** [2] - 29:17, 76:12
**client** [4] - 44:11, 46:8, 86:21, 129:11
**close** [2] - 66:10, 66:11
**closes** [1] - 107:12
**Co** [5] - 22:11, 26:12, 26:24, 63:24, 119:21
**coat** [5] - 85:16, 85:18, 86:1, 86:15, 86:19
**coating** [6] - 80:19, 80:25, 83:22, 84:14, 84:23, 90:16
**coatings** [8] - 63:5, 77:20, 80:16, 80:23, 81:15, 82:4, 82:9, 83:9
**coincidence** [1] - 75:7

**collars** [1] - 65:10
**collective** [1] - 72:2
**color** [1] - 88:19
**combined** [1] - 103:16
**coming** [2] - 27:22, 114:2
**comment** [2] - 61:22, 109:4
**comments** [1] - 109:6
**Commission** [2] - 134:21, 134:21
**common** [3] - 61:18, 62:8, 63:16
**Communication** [1] - 1:12
**communications** [1] - 105:21
**Company** [1] - 5:7
**company** [6] - 11:7, 13:16, 15:20, 17:12, 18:13, 122:2
**compare** [2] - 82:18, 96:2
**compared** [2] - 59:16, 78:7
**comparing** [1] - 59:19
**competency** [1] - 49:14
**competent** [4] - 48:16, 49:18, 50:5, 50:18
**compiled** [1] - 13:2
**complaint** [1] - 125:14
**Complaint** [2] - 126:6, 130:17
**complete** [4] - 44:10, 57:16
**completed** [4] - 33:11, 128:20, 128:25
**completely** [1] - 78:12
**compliance** [5] - 27:11, 66:5, 70:25, 73:12, 88:6
**Compliance** [2] - 3:5, 59:15
**complied** [20] - 27:10, 27:12, 28:10, 28:19, 29:1, 34:24, 41:9, 41:13, 41:14, 41:16, 48:13, 48:20, 50:21, 52:15, 52:22, 53:3, 65:16, 88:13, 101:6, 101:21
**comply** [5] - 50:22, 64:19, 65:24, 94:15, 101:17
**components** [2] - 63:20, 65:5
**comprise** [1] - 47:8
**comprised** [2] - 132:12

**compromised** [2] - 63:20, 65:6
**computer** [3] - 9:14, 69:17, 100:21
**Concept** [6] - 13:13, 13:19, 14:5, 15:2, 15:7, 15:23
**concerned** [10] - 37:1, 42:14, 48:8, 84:20, 108:16, 124:23, 124:24, 125:13, 125:14, 126:1
**concerning** [2] - 98:23, 131:10
**concluded** [1] - 133:25
**concludes** [1] - 132:23
**conclusion** [9] - 34:10, 64:18, 74:3, 74:9, 80:17, 83:19, 93:16, 116:2, 126:12
**condition** [12] - 38:25, 49:23, 65:12, 73:1, 77:5, 77:9, 77:14, 77:18, 77:23, 78:19, 79:7, 91:5
**conditioner** [4] - 63:22, 65:7, 65:8
**conditions** [5] - 59:18, 59:20, 63:25, 77:5, 112:17
**Conditions** [2] - 112:15, 113:11
**conduct** [1] - 13:11
**Conduct** [3] - 16:10, 16:16, 17:10
**conducted** [1] - 118:9
**CONFERENCE** [2] - 1:20, 2:1
**confirm** [7] - 8:15, 10:19, 10:24, 44:14, 70:14, 83:6, 128:2
**confirming** [1] - 48:12
**confuse** [1] - 92:15
**confusion** [1] - 56:18
**conjecture** [1] - 90:10
**conjunction** [2] - 37:5, 73:14
**connected** [1] - 135:15
**connection** [4] - 33:15, 62:23, 63:3, 73:7
**considerable** [2] - 59:20, 60:4
**considering** [1] - 27:11
**consist** [1] - 85:11
**consists** [1] - 46:21

**contact** [2] - 25:15, 33:4
**contacted** [1] - 34:1
**contained** [2] - 78:6, 95:20
**containing** [1] - 34:6
**contains** [3] - 102:14, 103:11
**contend** [2] - 47:25, 128:25
**contention** [1] - 50:9
**continue** [2] - 55:25, 85:6
**continued** [2] - 74:21, 87:21
**continuing** [1] - 31:6
**contract** [1] - 48:4
**contractor** [2] - 35:15, 47:20
**control** [3] - 13:8, 15:11, 16:9
**controlled** [1] - 17:9
**conversation** [2] - 25:16, 64:6
**conversations** [1] - 76:13
**convicted** [1] - 7:14
**copied** [2] - 21:19, 21:23
**copies** [2] - 9:13, 27:21
**copy** [22] - 24:18, 38:7, 44:6, 44:8, 44:10, 53:23, 55:1, 55:4, 56:22, 58:25, 94:10, 95:19, 96:13, 97:24, 100:3, 100:17, 109:18, 126:19, 133:6, 133:19, 133:20
**corner** [3] - 68:11, 69:14, 70:16
**CORP** [1] - 1:4
**Corp** [13] - 4:2, 4:9, 5:4, 34:24, 35:5, 41:22, 41:25, 42:3, 42:15, 42:24, 44:11, 101:21, 112:9
**Corp 's** [3] - 22:7, 107:18, 108:8
**corporate** [7] - 5:5, 7:21, 18:23, 43:18, 124:3, 125:11, 131:14
**CORPORATE** [1] - 1:18
**Corps** [1] - 46:8
**correct** [3] - 5:21, 7:22, 7:23, 8:19, 10:9, 10:17, 10:18,

12:11, 13:23, 16:12, 18:20, 19:19, 21:25, 24:14, 34:15, 37:11, 39:6, 39:12, 39:16, 39:24, 40:2, 40:7, 40:8, 40:24, 42:20, 43:2, 43:16, 46:11, 47:11, 47:12, 47:15, 47:16, 47:21, 47:22, 49:12, 50:25, 51:11, 51:24, 51:25, 52:19, 55:1, 55:3, 57:12, 59:12, 59:13, 59:25, 60:10, 60:15, 62:20, 62:21, 63:7, 63:12, 64:20, 68:17, 70:18, 71:7, 72:5, 73:8, 73:9, 73:22, 74:6, 74:15, 76:7, 76:23, 76:24, 78:2, 78:13, 78:14, 78:15, 79:12, 79:14, 79:17, 80:3, 80:4, 85:22, 86:2, 86:15, 89:4, 90:4, 90:5, 90:19, 91:17, 93:18, 94:20, 95:16, 95:17, 97:14, 97:16, 98:25, 99:1, 99:5, 100:2, 100:16, 101:8, 101:9, 102:1, 103:13, 104:19, 105:22, 105:23, 106:17, 106:18, 107:9, 107:10, 108:12, 108:25, 109:1, 112:4, 112:10, 112:11, 113:11, 115:16, 115:17, 116:1, 116:16, 116:22, 117:6, 117:12, 118:9, 120:23, 120:24, 121:17, 121:18, 122:7, 125:9, 125:16, 128:7, 128:8, 129:13, 130:11, 130:12, 131:1, 131:22, 131:23, 132:14, 132:15
**correctly** [3] - 8:2, 66:3, 120:21
**correspond** [1] - 60:14
**correspondence** [1] - 55:16
**corrosion** [8] - 62:16, 77:2, 81:16, 82:10, 83:10, 84:1, 84:23
**cosmetic** [1] - 87:14

**counsel** [23] - 4:6, 9:6, 11:16, 12:19, 12:20, 12:21, 12:24, 13:1, 15:15, 42:10, 53:24, 55:8, 56:24, 56:25, 79:19, 91:21, 95:24, 114:22, 127:19, 129:19, 130:10, 135:13, 135:14
**counselor** [3] - 11:21, 57:15, 127:7
**count** [1] - 102:21
**counterclaim** [1] - 128:16
**COUNTY** [2] - 134:4, 135:4
**couple** [3] - 29:3, 32:24, 133:20
**course** [5] - 19:18, 96:11, 98:14, 114:1, 121:3
**court** [4] - 6:6, 6:22, 7:7, 132:22
**COURT** [8] - 1:1, 4:13, 4:20, 61:8, 84:4, 84:9, 114:10, 117:24
**Court** [2] - 1:12, 2:10
**cover** [1] - 37:14
**coverage** [2] - 23:19, 36:25, 49:1
**covering** [2] - 14:20, 28:14
**COVID** [1] - 122:5
**credentials** [1] - 107:22
**crew** [3] - 49:18, 50:1, 50:2
**crime** [1] - 7:15
**CROSS** [1] - 2:15
**Cruz** [35] - 36:5, 36:14, 53:20, 53:22, 54:10, 54:13, 54:17, 64:6, 66:7, 69:1, 70:17, 71:11, 71:21, 71:23, 71:25, 72:8, 72:15, 72:20, 72:24, 76:3, 76:14, 78:5, 79:6, 83:20, 84:15, 97:24, 98:8, 98:22, 100:15, 107:12, 107:23, 108:3, 115:15, 118:9, 131:19
**Cruz 's** [4] - 73:20, 76:22, 107:20, 108:9
**Cruz/Allen 's** [1] - 79:3
**Cryan** [3] - 26:19, 26:20, 27:15
**curiosity** [1] - 22:1
**current** [3] - 13:6, 20:24, 128:1

**cut** [2] - 61:9, 114:7

## D

**DADE** [2] - 134:4, 135:4
**daily** [1] - 14:8
**Dallas** [3] - 15:24, 16:2, 16:4
**damage** [3] - 73:6, 81:2, 81:9
**database** [2] - 22:17, 115:9
**DATE** [1] - 1:14
**date** [28] - 20:17, 20:21, 20:24, 21:1, 23:24, 24:16, 29:6, 29:14, 29:18, 29:22, 32:8, 43:5, 44:4, 52:5, 54:2, 56:12, 56:13, 66:13, 66:25, 84:15, 92:23, 92:24, 95:10, 99:24, 109:10, 110:8, 119:23
**dated** [24] - 3:9, 51:11, 54:22, 59:18, 68:10, 68:24, 89:10, 92:20, 92:21, 93:4, 93:7, 93:9, 94:7, 98:2, 98:3, 99:13, 99:16, 100:13, 106:6, 106:7, 106:16, 110:12, 111:21, 115:4
**Dated** [1] - 135:17
**dates** [13] - 23:21, 30:22, 31:18, 31:20, 32:3, 44:12, 46:9, 47:15, 56:10, 91:24, 92:9, 92:12, 93:12
**daughter** [1] - 122:17
**daughter 's** [1] - 123:21
**days** [8] - 89:3, 114:2, 118:22, 118:24, 118:25, 119:1, 119:2, 133:21
**dead** [1] - 78:17
**deal** [3] - 10:16, 15:15, 97:10
**deals** [1] - 85:14
**dealt** [2] - 10:15, 22:11
**Dear** [4] - 98:18, 99:18, 100:23, 102:10
**dec** [4] - 96:11, 96:20, 97:3, 97:6
**decision** [13] - 34:11,

39:5, 39:10, 40:22, 42:1, 42:3, 87:3, 87:5, 87:23, 88:3, 88:22, 120:8, 120:10
**deck** [2] - 87:19, 87:21
**declaration** [1] - 114:19
**declaratory** [1] - 128:16
**deductible** [1] - 113:7
**DEFENDANT** [1] - 2:6
**defendant** [5] - 4:12, 5:6, 128:17, 130:15, 131:9
**Defendant** [1] - 1:8
**Defendant 's** [1] - 126:21
**defendant 's** [4] - 130:17, 131:9, 131:15, 131:16
**defense** [1] - 130:16
**defenses** [1] - 130:25
**deferring** [1] - 66:3
**deficiencies** [9] - 41:6, 41:20, 43:4, 43:7, 43:15, 60:22, 61:4, 61:25, 85:11
**Deficiencies** [1] - 60:7
**Deficiencies '** [1] - 60:6
**deficiency** [6] - 64:3, 64:14, 85:15, 85:18, 85:21, 86:20
**definition** [2] - 49:17, 49:19
**degree** [2] - 61:20, 63:18
**degrees** [1] - 16:6
**Delacey** [8] - 11:1, 21:16, 21:23, 35:21, 94:3, 94:11, 97:25, 132:14
**Delacey -Simms** [8] - 11:1, 21:16, 21:23, 35:21, 94:3, 94:11, 97:25, 132:14
**delete** [1] - 127:16
**denial** [18] - 32:20, 32:21, 32:22, 33:5, 33:11, 34:12, 48:21, 49:1, 49:8, 49:11, 50:16, 51:2, 52:3, 52:7, 115:13, 120:8, 120:10, 124:6
**Denial** [2] - 3:12, 115:6
**denied** [3] - 47:18, 101:25, 108:7
**deny** [10] - 20:13, 34:11, 87:4, 87:5,

87:23, 88:4, 88:22, 107:17, 109:4, 109:7
**denying** [3] - 20:7, 47:25, 52:22
**department** [1] - 119:22
**depo** [1] - 37:25
**depose** [2] - 55:9, 133:10
**DEPOSITION** [1] - 1:17
**deposition** [27] - 4:3, 5:6, 5:13, 5:25, 7:25, 8:1, 8:14, 8:17, 8:25, 9:2, 9:17, 10:8, 10:13, 12:16, 13:3, 51:10, 55:8, 55:18, 58:11, 82:7, 132:21, 132:23, 133:4, 133:6, 133:7, 133:16, 133:24
**Deposition** [2] - 1:25, 3:3
**deprivation** [1] - 65:11
**describe** [1] - 20:4
**described** [3] - 44:12, 48:25, 123:5
**design** [2] - 61:2, 62:6
**designated** [1] - 7:21
**designation** [1] - 16:17
**designed** [1] - 62:10
**desired** [2] - 86:9, 86:18
**despite** [1] - 41:6
**detail** [3] - 14:7, 73:11, 129:3
**detailed** [4] - 27:10, 41:13, 43:14, 46:16
**details** [2] - 15:6, 112:22
**deteriorated** [1] - 79:2
**determination** [9] - 23:16, 23:19, 37:1, 37:2, 37:4, 37:6, 37:10, 109:5
**determine** [1] - 91:4
**determined** [2] - 84:21, 118:11
**determining** [1] - 109:6
**diameter** [1] - 85:16
**difference** [3] - 76:21, 91:1, 95:4
**different** [9] - 38:8, 41:18, 54:21, 70:5, 98:15, 99:14, 111:7, 122:15, 132:22
**difficult** [2] - 6:22, 128:1

**digits** [1] - 23:7
**DIRECT** [2] - 2:15, 5:1
**direct** [1] - 120:13
**directly** [5] - 10:16, 56:24, 58:22, 127:8, 127:9
**director** [6] - 11:10, 13:7, 14:5, 15:22, 20:6, 24:17
**dirty** [2] - 87:13, 87:20
**disagree** [1] - 73:3
**disclose** [1] - 128:18
**disclosed** [1] - 128:23
**disclosures** [2] - 91:22, 131:17
**disconnect** [1] - 70:9
**discovery** [8] - 8:23, 10:7, 10:21, 12:6, 46:1, 68:5, 109:15, 130:4
**discussed** [5] - 89:16, 122:14, 131:17, 131:18, 131:19
**discussing** [1] - 20:7
**discussion** [1] - 20:10
**discussions** [2] - 123:4, 123:8
**dispense** [1] - 47:5
**dispute** [2] - 125:15, 126:6
**District** [3] - 19:6, 19:10, 19:15
**DISTRICT** [2] - 1:1, 1:1
**divergence** [4] - 76:21, 89:17, 89:18, 89:20
**divergences** [1] - 89:1
**Document** [1] - 3:7
**document** [70] - 3:3, 8:6, 8:9, 8:13, 9:16, 37:24, 38:1, 38:4, 38:7, 38:21, 39:14, 44:3, 46:2, 46:4, 47:1, 47:2, 51:10, 51:22, 52:2, 52:6, 52:17, 53:8, 53:10, 53:17, 53:23, 54:4, 54:5, 54:9, 54:22, 56:6, 56:22, 57:2, 57:21, 58:19, 59:7, 59:11, 59:15, 60:3, 64:11, 66:11, 68:24, 69:9, 69:15, 69:23, 70:14, 75:24, 82:5, 82:23, 83:8, 83:12, 83:16, 86:7, 94:2, 99:21, 100:18, 100:22, 102:12, 102:18, 102:20, 102:23, 103:10,

103:11, 109:13, 109:20, 110:9, 111:21, 113:10, 114:17, 127:13
**Documents** [1] - 130:18
**documents** [29] - 8:21, 8:24, 8:25, 9:3, 9:6, 9:12, 9:19, 10:6, 10:12, 10:13, 10:20, 11:15, 12:5, 12:10, 12:14, 13:2, 31:13, 32:5, 37:14, 54:21, 56:6, 64:9, 76:1, 82:14, 128:14, 130:1, 130:8, 130:15, 130:25
**done** [14] - 43:5, 59:24, 60:4, 64:22, 65:13, 65:21, 65:24, 67:10, 71:8, 80:13, 89:3, 92:7, 114:14
**double** [1] - 16:2
**down** [9] - 6:23, 44:16, 44:17, 58:22, 82:17, 87:9, 87:16, 88:10, 115:21
**draft** [1] - 32:20
**drafted** [3] - 34:13, 115:14, 115:15
**drain** [2] - 61:18, 63:16
**drive** [1] - 122:17
**driving** [2] - 125:1, 125:5
**drugs** [1] - 7:12
**ducks** [1] - 37:13
**duly** [2] - 4:23, 134:9
**duplicates** [2] - 93:6, 93:20
**during** [9] - 34:22, 34:25, 35:3, 47:15, 48:11, 64:17, 68:6, 105:22, 122:4
**duties** [5] - 14:4, 14:8, 15:4, 15:7, 15:11
**duty** [1] - 129:12

## E

**e-mail** [34] - 21:6, 21:11, 21:21, 21:24, 24:1, 28:14, 28:16, 28:20, 28:21, 30:25, 33:1, 33:4, 57:24, 58:4, 58:6, 70:20, 94:7, 94:10, 97:24, 98:20, 99:15, 99:16, 100:6, 100:7, 106:4,

106:8, 106:14,
111:9, 119:20,
119:24, 122:22,
127:17
**E-mail** [5] - 3:8, 3:9,
3:10, 3:11, 3:12
**e-mailed** [1] - 58:19
**e-mails** [2] - 21:14,
123:19
**ease** [1] - 21:8
**easier** [4] - 38:11,
38:12, 56:23, 111:10
**edge** [1] - 85:17
**effect** [3] - 20:21,
40:10, 109:10
**effective** [4] - 44:4,
46:8, 47:15, 95:10
**effectively** [1] - 25:2
**either** [6] - 10:7, 21:3,
41:12, 58:8, 90:14,
107:6
**electrical** [2] - 60:8,
90:18
**electronic** [1] - 9:13
**ELENA** [3] - 134:16,
135:7, 135:21
**Elena** [2] - 1:22,
133:19
**embodied** [1] - 47:1
**Emily** [1] - 119:20
**employed** [2] - 13:19,
13:22
**employee** [1] - 135:14
**enclosures** [2] -
70:19, 106:9
**end** [3] - 33:9, 51:18,
132:22
**ended** [1] - 23:11
**ends** [1] - 62:15
**enormous** [1] - 127:5
**ensure** [1] - 52:21
**entirety** [2] - 46:7,
46:21
**entitled** [3] - 3:3, 38:2,
110:13
**entity** [1] - 13:13
**EPIRB** [1] - 93:7
**equipment** [1] - 49:24
**error** [1] - 67:1
**ESQ** [2] - 2:4, 2:8
**establish** [3] - 38:25,
99:23, 101:13
**established** [3] - 28:9,
39:25, 95:9
**Esteban** [11] - 26:4,
26:17, 27:3, 27:23,
28:20, 115:22,
116:19, 119:8,
120:2, 120:12,
121:21

**estimation** [1] - 119:5
**et** [1] - 3:9
**event** [1] - 124:7
**evidence** [6] - 17:11,
80:18, 80:24, 83:21,
84:22, 95:1
**exact** [1] - 32:3
**exactly** [6] - 21:9,
31:18, 32:1, 56:9,
81:23, 86:6
**EXAMINATION** [1] -
5:1
**examined** [1] - 4:24
**example** [6] - 32:25,
41:18, 73:16, 92:11,
122:16, 123:14
**except** [1] - 122:4
**exception** [1] - 73:15
**exchange** [1] - 107:8
**exchanged** [1] -
105:15
**exclusive** [1] - 15:9
**excuse** [3] - 17:20,
23:2, 125:21
**exhaust** [2] - 60:25,
62:14
**exhibit** [5] - 68:3,
68:24, 91:9, 94:1,
115:3
**Exhibit** [41] - 8:12,
37:19, 37:21, 37:25,
38:1, 43:24, 44:2,
45:25, 51:5, 51:9,
53:5, 53:9, 60:15,
67:25, 68:4, 68:21,
79:8, 82:6, 89:6,
89:9, 91:6, 91:9,
92:20, 92:22, 92:23,
93:23, 97:18, 97:22,
99:7, 100:8, 100:13,
102:3, 102:7,
104:12, 105:25,
106:3, 114:25,
115:3, 126:17,
126:23
**EXHIBITS** [1] - 3:1
**exhibits** [2] - 58:10,
58:13
**existing** [2] - 63:25,
65:12
**exists** [1] - 89:19
**expecting** [1] - 45:14
**experience** [22] - 17:3,
17:11, 25:13, 26:8,
27:16, 31:16, 32:13,
32:17, 34:9, 95:2,
95:3, 108:3, 112:22,
113:2, 113:15,
113:18, 118:12,
118:15, 118:17,

118:21, 119:5,
120:17
**experienced** [2] -
107:14, 107:24
**expired** [1] - 40:17
**Expires** [1] - 134:21
**explain** [3] - 38:22,
101:10, 101:15
**explanation** [5] - 26:6,
27:6, 27:9, 28:2,
101:3
**explanations** [1] -
28:17
**express** [1] - 23:17
**expressed** [1] - 37:8
**extended** [1] - 118:22
**extent** [2] - 61:22,
105:20

## F

**face** [2] - 69:23, 91:2
**fact** [10] - 27:12,
46:15, 50:4, 52:24,
57:8, 62:18, 64:15,
64:19, 66:22, 107:1
**facts** [5] - 128:14,
128:19, 128:22,
129:5, 130:15
**factual** [2] - 125:14,
126:6
**failed** [2] - 94:15,
128:18
**fair** [4] - 32:10, 51:21,
93:14, 126:15
**fairly** [2] - 21:4, 55:12
**familiar** [2] - 5:24,
45:11
**far** [9] - 12:8, 20:25,
42:14, 48:7, 84:19,
90:21, 108:15,
125:13, 126:1
**fasteners** [2] - 61:19,
63:17
**fax** [2] - 33:2, 33:3
**Fernando** [3] - 29:5,
104:24, 106:22
**few** [3] - 18:25, 35:18,
73:15
**field** [2] - 37:9, 54:11
**fifth** [1] - 11:21
**fifty** [1] - 5:18
**figure** [7] - 8:1, 32:3,
54:20, 56:7, 64:1,
86:14, 92:18
**file** [41] - 22:18, 23:3,
23:4, 24:18, 24:25,
25:9, 25:19, 29:17,
30:6, 30:11, 30:16,

31:1, 31:23, 32:9,
38:7, 38:8, 38:10,
53:19, 55:1, 55:4,
57:2, 57:3, 57:6,
57:11, 57:16, 66:12,
68:5, 69:6, 81:23,
82:16, 82:18, 91:17,
93:5, 93:17, 94:4,
109:14, 110:25,
115:10, 118:20,
127:2, 127:5
**filed** [4] - 1:25, 8:23,
30:23, 32:9
**files** [3] - 31:17, 31:21,
96:8
**Fill** [1] - 86:9
**fill** [1] - 86:18
**final** [1] - 23:16
**Financial** [4] - 16:10,
16:16, 16:18, 17:10
**financial** [3] - 16:13,
17:13
**financially** [1] - 135:15
**Findings** [1] - 39:15
**findings** [5] - 40:25,
41:2, 60:14, 60:20,
73:13
**fine** [6] - 67:12, 86:13,
96:10, 97:8, 127:12,
127:18
**finish** [1] - 6:19
**fire** [1] - 87:12
**firm** [3] - 4:11, 24:4,
132:22
**FIRM** [1] - 2:2
**first** [13] - 4:23, 19:25,
24:5, 24:22, 33:24,
38:20, 40:6, 46:9,
54:6, 59:11, 61:9,
75:23, 92:19
**First** [3] - 54:7, 69:7,
126:21
**fit** [1] - 49:21
**five** [3] - 67:5, 67:16,
92:24
**five-minute** [1] - 67:5
**fix** [1] - 69:18
**FI** [2] - 2:4, 2:8
**floor** [2] - 116:4,
116:13
**FLORIDA** [3] - 1:1,
134:3, 135:3
**Florida** [4] - 1:12,
1:22, 1:24, 19:6,
19:10, 19:16, 134:16
**focusing** [1] - 74:23
**follow** [2] - 92:11,
132:25
**follow -up** [1] - 132:25
**following** [4] - 26:3,

98:17, 98:19, 101:6
**follows** [2] - 4:24, 27:2
**followup** [1] - 132:24
**FOR** [1] - 3:1
**force** [1] - 16:20
**foregoing** [1] - 135:9
**form** [33] - 9:21, 42:5,
43:9, 46:16, 46:18,
46:22, 52:25, 53:16,
55:2, 64:21, 65:3,
65:19, 77:25, 78:21,
79:13, 80:8, 84:17,
86:23, 90:20, 90:24,
99:22, 108:13,
113:5, 113:12,
114:19, 118:2,
118:10, 121:10,
125:19, 125:23,
126:10, 130:2, 131:2
**formal** [1] - 17:1
**formally** [1] - 101:25
**format** [2] - 103:15,
114:17
**formed** [1] - 16:19
**formerly** [2] - 15:23,
15:24
**forms** [1] - 114:8
**Fort** [1] - 72:18
**forth** [1] - 126:6
**forward** [3] - 57:25,
63:21, 65:6
**forwarded** [1] - 22:10
**four** [11] - 52:24,
73:17, 74:24, 75:8,
75:9, 75:11, 92:16,
101:3, 102:22,
103:10
**four-page** [2] -
102:22, 103:10
**fourth** [1] - 115:20
**FPR** [2] - 134:16,
135:21
**Francais** [1] - 18:14
**Frances** [4] - 19:2,
19:13, 19:14
**Frank** [2] - 19:3, 19:14
**front** [6] - 5:8, 23:12,
51:19, 82:6, 84:18,
86:7
**Ft** [1] - 2:8
**fuel** [2] - 104:25
**full** [18] - 5:11, 26:6,
27:5, 44:9, 94:18,
95:20, 96:13, 96:18,
96:22, 97:12,
105:20, 107:8,
109:18, 113:9,
120:13, 124:7
**fully** [23] - 26:18,
48:10, 48:17, 50:17,

50:18, 94:18,
112:18, 113:9,
115:22, 116:4,
116:8, 116:17,
116:19, 118:5,
118:8, 121:25,
123:10, 124:9,
124:15, 124:19,
125:16, 125:17,
126:7
**fundamental** [1] - 29:2
**furthermore** [1] - 27:8

## G

**gained** [1] - 95:3
**game** [1] - 19:3
**gear** [1] - 49:24
**gel** [5] - 85:16, 85:18,
86:1, 86:15, 86:19
**general** [3] - 13:9,
13:17, 22:20
**generally** [1] - 58:9
**generated** [1] - 22:21
**generic** [2] - 21:6,
21:11
**gentlemen** [1] - 55:10
**GG 971350** [1] - 134:21
**Gilhooly** [12] - 3:8,
24:19, 24:25, 25:12,
35:23, 44:25, 94:2,
94:10, 94:12,
111:25, 132:4,
132:13
**Gilhooly 's** [1] - 25:5
**given** [4] - 17:20, 95:1,
95:4, 128:1
**GLI** [7] - 19:13, 41:5,
43:6, 43:14, 43:19,
50:15, 53:25
**GLI's** [1] - 43:19
**God** [2] - 4:18, 25:18
**GOLDMAN** [67] - 2:6,
2:8, 4:10, 9:5, 9:21,
10:1, 11:20, 42:5,
42:21, 43:9, 45:5,
45:13, 52:25, 55:2,
55:6, 55:20, 57:7,
57:14, 58:2, 58:21,
59:3, 64:21, 65:3,
65:19, 67:12, 67:14,
77:25, 78:21, 79:13,
80:8, 82:25, 83:3,
84:17, 86:23, 90:20,
90:24, 96:4, 96:10,
96:14, 96:19, 96:23,
96:25, 97:9, 108:13,
109:22, 110:3,
110:7, 110:15,

113:12, 114:4,
114:7, 114:22,
117:21, 118:2,
118:10, 121:10,
125:19, 125:22,
126:10, 127:7,
127:12, 127:18,
129:14, 129:18,
130:2, 131:2, 132:25
**goldman** [2] - 114:11,
129:17
**Goldman** [7] - 4:10,
4:11, 55:17, 85:1,
86:10, 114:12,
132:24
**gray** [1] - 14:18
**Great** [48] - 4:2, 4:12,
5:6, 7:21, 9:15,
11:13, 12:3, 13:6,
13:10, 13:14, 13:22,
14:6, 15:8, 15:10,
18:5, 18:8, 18:10,
18:18, 18:23, 18:25,
23:18, 38:23, 39:4,
39:10, 39:18, 42:8,
43:14, 47:9, 48:4,
49:10, 50:15, 52:6,
52:7, 52:20, 66:3,
74:25, 88:15, 88:16,
101:11, 107:16,
108:7, 108:23,
116:6, 119:4, 124:4,
124:5, 125:9, 126:2
**GREAT** [2] - 1:7, 1:19
**ground** [1] - 5:24
**growth** [11] - 80:15,
80:18, 80:23, 80:25,
81:15, 82:3, 82:10,
83:10, 83:21, 84:1,
84:13
**guess** [7] - 19:5,
72:21, 79:23, 85:20,
90:12, 90:13, 115:20
**guessing** [1] - 66:24
**guys** [2] - 53:25, 114:1

## H

**half** [4] - 19:21, 47:19,
75:4, 86:19
**hand** [4] - 4:14, 69:14,
70:16, 134:10
**handle** [1] - 100:24
**handling** [1] - 15:13
**hang** [4] - 29:16,
43:22, 104:21
**happy** [6] - 7:2, 53:23,
56:23, 82:24, 111:9,
126:20

**hard** [2] - 17:5, 57:22
**Havasu** [1] - 69:1
**hazard** [1] - 87:12
**headed** [2] - 54:7,
69:7
**header** [1] - 56:19
**heading** [2] - 71:6,
113:10
**hear** [5] - 9:8, 9:24,
11:25, 79:18, 114:11
**heard** [1] - 5:4
**heater** [4] - 77:1,
78:13, 79:8, 90:15
**Heavy** [2] - 61:18,
63:16
**held** [2] - 15:16, 15:19
**Hellman** [1] - 4:11
**HELLMAN** [1] - 2:6
**Hello** [1] - 106:9
**help** [5] - 4:18, 81:15,
82:10, 83:10, 114:23
**himself** [1] - 32:16
**history** [1] - 98:24
**hold** [4] - 16:6, 44:17,
60:18, 104:9
**home** [1] - 117:2
**hope** [2] - 86:8,
106:10
**hopefully** [1] - 126:18
**horse** [1] - 78:17
**hose** [6] - 60:25, 61:2,
62:14, 62:15, 62:19
**hot** [1] - 77:1
**hour** [4] - 19:21, 67:6,
67:9
**housings** [3] - 62:23,
63:3, 63:6
**hull** [2] - 49:24, 65:10
**Hull** [5] - 22:10, 26:12,
26:24, 63:24, 119:21
**hundred** [6] - 5:18,
70:19, 91:19, 92:2,
92:3, 92:18

## I

**i.e** [2] - 41:18, 72:2
**Ian** [23] - 36:8, 36:17,
36:22, 36:23, 53:12,
54:11, 54:16, 54:24,
56:9, 64:6, 65:23,
66:4, 66:7, 68:13,
71:15, 71:20, 72:18,
72:19, 76:14, 78:8,
83:20, 131:18
**idea** [2] - 42:15, 80:9
**identical** [4] - 54:5,
78:9, 79:10, 82:18
**IDENTIFICATION** [1] -

3:1
**identification** [17] -
37:20, 37:22, 43:25,
51:6, 53:6, 68:1,
68:22, 89:7, 91:7,
93:24, 97:19, 99:8,
100:9, 102:4, 106:1,
115:1, 126:24
**identified** [5] - 12:14,
12:15, 19:13, 35:18,
64:14
**identify** [3] - 128:14,
130:15, 132:17
**illegible** [4] - 69:9,
94:5, 102:9, 110:10
**image** [1] - 14:8
**immediately** [1] -
82:15
**impeding** [1] - 7:17
**important** [1] - 45:15
**improper** [1] - 85:4
**inadequate** [1] -
118:12
**inasmuch** [2] - 20:11,
40:18
**Inc** [1] - 22:13
**inches** [1] - 85:16
**incident** [1] - 33:19
**incidentally** [1] -
114:16
**include** [1] - 112:18
**included** [3] - 27:25,
28:12, 113:22
**includes** [3] - 49:25,
103:6, 114:18
**including** [1] - 112:23
**incomplete** [4] -
108:10, 108:11,
108:15, 108:21
**incorporated** [2] -
48:3, 51:23
**incorporates** [1] -
46:16
**independent** [4] -
13:16, 35:14, 47:20,
105:6
**indicates** [1] - 28:23
**indication** [2] - 113:1,
113:4
**Indication** [1] - 112:21
**indicia** [2] - 66:16,
84:1
**individuals** [3] - 35:5,
35:19, 131:20
**indulgence** [1] - 45:17
**industry** [3] - 17:2,
17:13, 17:14
**ineffective** [1] - 123:8
**influence** [1] - 7:12
**inform** [1] - 9:22

**informally** [1] - 97:2
**information** [18] -
10:12, 20:12, 25:12,
27:1, 29:21, 30:10,
30:12, 35:2, 55:15,
99:12, 99:19, 99:24,
101:14, 107:8,
113:14, 113:18,
123:3, 129:23
**initial** [12] - 40:17,
40:23, 73:11, 75:21,
76:7, 76:16, 76:22,
95:15, 95:16, 97:13,
112:8
**inoperable** [4] - 74:20,
74:21, 79:22, 79:25
**inoperative** [2] -
73:21, 74:18
**inquire** [4] - 26:2,
27:25, 76:3, 90:6
**inquired** [1] - 32:12
**inquiries** [2] - 8:17,
78:5
**inquiring** [1] - 24:20
**inquiry** [6] - 8:14, 9:1,
27:14, 56:5, 118:14
**insofar** [1] - 36:25
**inspect** [3] - 62:15,
70:25, 91:4
**inspected** [9] - 33:15,
52:21, 54:12, 54:14,
54:17, 56:9, 56:10,
84:2, 84:16
**inspecting** [1] - 81:24
**inspection** [7] - 52:16,
60:5, 76:7, 76:9,
84:21, 85:10
**inspections** [3] -
76:13, 91:2, 108:12
**instance** [3] - 122:12,
123:21
**instead** [1] - 20:15
**instructions** [2] -
26:25, 28:15
**instructions ..** [1] -
106:10
**Insurance** [32] - 3:5,
4:3, 4:12, 5:7, 7:22,
11:13, 12:4, 13:6,
13:15, 13:23, 14:6,
15:8, 18:5, 18:19,
18:24, 22:13, 38:23,
39:4, 39:18, 43:14,
47:9, 50:16, 52:6,
52:8, 52:20, 66:3,
75:1, 107:17, 108:7,
108:24, 124:4, 125:9
**INSURANCE** [2] - 1:7,
1:19
**insurance** [7] - 17:1,

22:7, 39:3, 39:20,
44:3, 44:10, 52:7
**insurance 's** [2] -
119:4, 124:5
**Insurance 's** [3] - 9:16,
101:11, 116:6
**insure** [8] - 39:6,
39:11, 40:21, 41:6,
41:17, 42:1
**insured** [8] - 27:2,
34:23, 35:1, 40:6,
40:15, 41:11,
101:20, 107:14
**insured 's** [1] - 53:2
**insureds** [1] - 50:22
**insurer** [1] - 15:15
**intended** [2] - 49:22,
50:3
**interest** [1] - 70:13
**interested** [1] - 135:16
**interesting** [1] - 69:11
**interject** [1] - 55:6
**internal** [1] - 99:21
**interpret** [4] - 116:18,
116:22, 121:5,
121:15
**interpretation** [4] -
116:7, 125:15,
125:16, 126:7
**interrogatories** [1] -
128:6
**Interrogatories** [2] -
3:13, 126:22
**interrogatory** [7] -
128:12, 128:13,
129:25, 130:9,
130:14, 130:19,
131:5
**investigate** [1] - 23:18
**investigation** [19] -
31:5, 33:8, 33:10,
33:12, 33:16, 34:18,
34:22, 34:25, 35:4,
35:20, 36:2, 36:9,
37:9, 47:19, 48:23,
68:6, 87:3, 101:16,
118:8
**investigations** [1] -
48:15
**invited** [1] - 32:19
**invoice** [1] - 24:8
**involved** [5] - 10:11,
20:1, 36:9, 36:24,
53:15
**involvement** [2] -
20:5, 22:7
**involves** [1] - 42:23
**Iriarte** [62] - 3:10, 3:11,
25:6, 25:10, 26:4,
26:8, 26:17, 27:3,

27:21, 27:23, 29:1,
29:8, 30:14, 31:4,
31:15, 32:13, 32:22,
33:6, 34:2, 34:7,
34:9, 34:13, 48:9,
48:12, 48:16, 49:15,
50:5, 50:17, 70:20,
98:23, 99:3, 99:11,
99:19, 99:25,
100:14, 100:23,
101:14, 101:17,
102:24, 103:3,
105:16, 105:21,
106:20, 107:9,
107:13, 112:18,
115:5, 115:22,
116:19, 116:24,
117:1, 118:7,
118:12, 119:8,
120:2, 120:12,
120:19, 120:22,
121:1, 121:8,
122:11, 123:3
**Iriarte 's** [6] - 28:20,
28:22, 102:8, 104:3,
106:15, 123:5
**irrelevant** [1] - 108:18
**Islands** [1] - 118:23
**issue** [12] - 14:14,
35:11, 40:10, 42:7,
49:13, 50:6, 63:9,
63:12, 87:10, 87:11,
90:3, 98:9
**issued** [11] - 32:22,
44:11, 46:7, 46:20,
47:3, 95:10, 97:14,
109:9, 112:9,
113:22, 115:18
**issues** [18] - 25:4,
25:6, 49:3, 49:4,
49:7, 50:8, 50:15,
50:24, 51:1, 56:21,
86:5, 88:8, 88:21,
89:16, 90:18, 101:4,
131:10, 132:1
**it..** [1] - 98:11
**Item** [1] - 64:13
**item** [2] - 61:24,
104:21
**items** [10] - 28:8,
48:24, 60:6, 60:8,
88:2, 91:5, 101:6,
101:7, 128:24
**itself** [1] - 116:15
**IV** [1] - 39:14

## J

**Jamieson** [2] - 99:11,
99:17

**JOHN** [1] - 2:4
**John** [5] - 4:8, 5:3,
59:4, 96:12, 109:23
**Judge** [1] - 5:8
**judgment** [1] - 128:16
**July** [39] - 20:19, 21:3,
23:25, 24:6, 33:24,
33:25, 40:1, 52:3,
54:2, 54:6, 54:22,
56:12, 56:15, 56:17,
59:24, 60:23, 65:18,
66:16, 66:23, 68:11,
68:25, 70:23, 71:9,
71:14, 72:9, 73:25,
76:6, 76:17, 80:2,
89:11, 91:25, 92:1,
92:20, 92:21, 93:4,
93:8, 93:9
**jurisdictions** [2] -
19:7, 19:8

## K

**Kathy** [1] - 119:21
**keep** [2] - 6:17, 77:19
**Kelly** [1] - 26:24
**kicked** [1] - 25:18
**kind** [11] - 23:11, 26:2,
33:9, 57:21, 58:12,
66:10, 74:23, 78:17,
98:17, 98:18, 124:8
**Kingdom** [2] - 13:18,
16:12
**knocks** [1] - 17:5
**knowledge** [6] -
17:11, 43:15, 131:9,
131:12, 131:24,
131:25
**known** [1] - 131:8
**knows** [1] - 84:18

## L

**lack** [1] - 60:12
**Lake** [1] - 69:1
**Lakes** [43] - 4:2, 4:12,
5:7, 7:21, 9:15,
11:13, 12:3, 13:6,
13:10, 13:14, 13:23,
14:6, 15:8, 15:10,
18:5, 18:9, 18:10,
18:19, 18:23, 19:1,
23:18, 38:23, 39:4,
39:18, 42:8, 43:14,
47:9, 48:4, 49:10,
50:15, 52:6, 52:8,
52:20, 66:3, 75:1,
101:11, 107:16,
108:7, 108:23,

116:6, 119:4, 124:4,
125:9
**LAKES** [2] - 1:7, 1:19
**Lakes '** [2] - 88:15,
88:16
**Lakes 's** [3] - 39:10,
124:5, 126:2
**language** [10] - 44:19,
44:21, 45:12, 49:16,
75:18, 96:15, 97:3,
116:15, 121:5,
121:21
**Large** [1] - 1:24
**large** [3] - 60:25,
69:23, 91:18
**largest** [2] - 119:8,
120:3
**LaRue** [4] - 19:2,
19:13, 19:14
**LaRuela** [1] - 18:13
**last** [17] - 16:1, 18:9,
18:16, 18:17, 23:7,
26:5, 27:1, 27:4,
28:2, 36:5, 70:15,
93:7, 104:16,
104:17, 106:19,
106:20, 127:23
**Lauderdale** [2] - 2:8,
72:18
**law** [2] - 4:11, 58:8
**LAW** [1] - 2:2
**lawsuit** [7] - 9:19,
20:2, 49:12, 95:11,
125:13, 131:10,
132:1
**lead** [1] - 64:17
**learning** [1] - 17:5
**least** [5] - 18:17, 32:8,
63:8, 64:15, 108:8
**left** [2] - 70:16, 86:6
**left-hand** [1] - 70:16
**legal** [1] - 126:12
**length** [3] - 70:15,
102:13, 112:5
**lengths** [1] - 112:24
**Leopard** [1] - 118:22
**less** [1] - 64:16
**lesser** [2] - 61:20,
63:17
**Lessers** [1] - 16:4
**letter** [26] - 27:11,
27:21, 27:23, 28:19,
29:20, 32:20, 32:21,
32:22, 33:5, 33:11,
34:13, 48:12, 56:13,
66:15, 66:22, 100:4,
100:6, 100:13,
102:23, 103:10,
115:4, 115:13,
115:15, 121:6, 124:6

**Letter** [3] - 3:5, 3:10,
3:12
**letters** [2] - 99:12,
123:19
**Liam** [7] - 24:18,
24:25, 44:25, 94:10,
94:12, 111:25, 132:4
**licensed** [1] - 26:16
**licenses** [3] - 16:8,
17:7, 17:9
**licensing** [1] - 16:22
**licensure** [1] - 16:16
**light** [4] - 74:20,
74:22, 79:21, 80:6
**lights** [3] - 73:18,
74:2, 74:10, 74:12,
74:24, 90:3
**likely** [4] - 61:13, 63:1,
63:9, 67:10
**likewise** [1] - 103:24
**limited** [2] - 41:18,
60:5
**line** [2] - 22:11, 115:5
**Lippman** [1] - 119:21
**list** [4] - 28:7, 41:15,
101:3, 101:7
**listed** [8] - 46:9, 48:14,
48:19, 60:6, 86:24,
88:2, 119:9, 120:3
**litany** [1] - 60:12
**litigation** [1] - 47:10
**Lloyd 's** [1] - 18:15
**locate** [2] - 22:17,
111:11
**located** [1] - 94:9
**locating** [1] - 111:13
**LOCATION** [1] - 1:12
**location** [1] - 124:16
**locker** [2] - 87:20,
87:21
**Log** [3] - 11:14, 11:18,
11:23
**look** [16] - 24:22, 25:3,
45:10, 49:16, 53:9,
54:24, 59:14, 62:4,
62:5, 63:2, 63:18,
75:20, 76:15,
104:25, 109:23,
111:7
**looked** [4] - 20:11,
53:19, 77:13, 78:9
**looking** [17] - 30:22,
38:11, 49:14, 53:18,
54:15, 57:2, 58:21,
60:4, 69:22, 70:1,
81:18, 81:19, 87:14,
94:4, 102:12,
109:23, 112:2
**looks** [10] - 44:13,
51:13, 51:15, 51:19,

53:21, 54:23, 68:25, 75:14, 77:12, 79:22
**Looks** [1] - 61:6
**loss** [11] - 20:17, 20:21, 20:24, 22:10, 23:24, 35:6, 35:11, 47:14, 81:3, 81:9, 109:10
**lost** [1] - 14:8
**love** [1] - 96:16
**Luis** [11] - 26:18, 28:6, 29:5, 106:22, 115:22, 116:20, 118:21, 119:6, 119:14, 120:14, 121:22

## M

**machine** [2] - 82:9, 124:11
**machinery** [11] - 80:14, 81:14, 82:1, 83:9, 83:25, 123:15, 123:20, 124:8, 124:10, 124:18
**machinery /structure** [1] - 82:2
**mail** [39] - 3:8, 3:9, 3:10, 3:11, 3:12, 21:6, 21:11, 21:21, 21:24, 24:1, 28:14, 28:16, 28:20, 28:21, 30:25, 33:1, 33:4, 57:24, 58:4, 58:6, 70:20, 94:7, 94:10, 97:24, 98:20, 99:15, 99:16, 100:6, 100:7, 106:4, 106:8, 106:14, 111:9, 119:20, 119:24, 122:22, 127:17
**mailed** [1] - 58:19
**mails** [2] - 21:14, 123:19
**maintained** [1] - 72:25
**maintaining** [1] - 50:5
**maintenance** [4] - 52:8, 75:1, 128:20, 128:24
**manager** [1] - 11:12
**managing** [5] - 13:7, 13:9, 13:17, 14:5, 15:21
**manner** [1] - 120:21
**manufacturers** [1] - 112:24
**Marine** [3] - 3:3, 38:2, 38:3

**marine** [13] - 17:7, 80:15, 80:18, 80:23, 80:25, 81:15, 82:3, 82:9, 83:10, 83:21, 84:1, 84:13, 86:3
**marine -related** [1] - 17:7
**mark** [4] - 25:20, 32:19, 131:21, 132:13
**Mark** [14] - 10:25, 11:9, 21:16, 21:22, 22:2, 24:17, 24:24, 32:11, 69:6, 94:10, 94:12, 94:14, 97:25
**marked** [23] - 37:20, 37:22, 37:25, 43:25, 51:6, 51:9, 53:6, 68:1, 68:22, 82:7, 89:7, 89:9, 91:7, 93:24, 97:19, 99:8, 100:9, 100:13, 102:4, 102:7, 105:25, 115:1, 126:24
**Marquis** [2] - 119:12, 120:5
**material** [3] - 85:8, 128:18, 128:22
**matter** [4] - 5:5, 24:3, 100:24, 131:11
**mean** [14] - 33:17, 36:11, 42:14, 57:1, 65:21, 65:22, 80:21, 103:22, 113:3, 116:22, 121:7, 121:15, 125:8
**means** [4] - 49:21, 57:23, 126:8, 133:5
**meant** [1] - 42:8
**member** [1] - 98:21
**memory** [3] - 19:3, 19:4, 32:2
**Mendiola** [1] - 2:10
**mention** [2] - 83:24, 114:15
**mentioned** [15] - 35:23, 45:14, 48:2, 50:13, 50:14, 53:14, 54:25, 72:12, 72:13, 74:25, 79:21, 97:21, 122:1, 132:4, 133:3
**mentions** [1] - 77:5
**messages** [15] - 29:5, 32:15, 102:15, 103:7, 103:12, 104:3, 104:5, 105:14, 106:22, 107:3, 108:10, 108:11, 108:18

**met** [1] - 72:17
**MIAMI** [2] - 134:4, 135:4
**MIAMI -DADE** [2] - 134:4, 135:4
**might** [10] - 11:1, 20:15, 31:12, 42:6, 43:23, 63:20, 65:5, 79:1, 93:20, 127:4
**military** [2] - 17:15, 17:17
**mind** [5] - 42:17, 49:13, 57:20, 67:3, 110:7
**minimize** [1] - 70:9
**minute** [4] - 43:23, 67:5, 67:8, 74:23
**minutes** [2] - 67:16, 132:21
**misread** [1] - 120:2
**misrepresentation** [2] - 86:21, 129:4
**misrepresented** [2] - 128:18, 128:22
**Miss** [1] - 21:25
**missing** [1] - 104:21
**mistake** [7] - 116:12, 116:24, 117:1, 117:3, 120:23, 120:25, 122:25
**mistaken** [2] - 39:23, 99:2
**mode** [1] - 70:5
**mold** [1] - 87:21
**moment** [10] - 16:20, 22:17, 23:15, 45:6, 45:18, 54:1, 69:22, 82:19, 109:21, 111:6
**monitor** [2] - 63:23, 123:25
**monitored** [1] - 65:10
**month** [1] - 47:19
**months** [10] - 52:24, 74:5, 74:13, 77:14, 77:22, 77:24, 78:19, 80:7, 85:25
**Morning** [1] - 94:14
**morning** [3] - 5:3, 96:9, 98:16
**most** [4] - 61:13, 62:25, 67:10, 122:4
**motor** [2] - 119:2, 125:2
**motors** [1] - 105:1
**mounted** [2] - 73:18, 74:24
**mouth** [1] - 55:9
**moving** [4] - 99:10, 124:14, 124:18, 124:20

**MR** [164] - 2:16, 4:8, 4:10, 5:2, 8:4, 9:5, 9:8, 9:10, 9:21, 9:24, 10:1, 10:4, 11:20, 11:25, 12:2, 14:23, 14:24, 37:23, 42:5, 42:11, 42:21, 43:1, 43:9, 43:12, 44:1, 45:5, 45:8, 45:13, 45:22, 45:23, 51:7, 52:25, 53:7, 55:2, 55:6, 55:17, 55:20, 55:23, 56:2, 57:7, 57:10, 57:14, 57:17, 57:19, 58:2, 58:17, 58:21, 58:24, 59:3, 59:5, 61:15, 64:21, 64:24, 65:3, 65:14, 65:19, 66:1, 67:12, 67:13, 67:14, 67:15, 67:24, 68:2, 68:23, 70:12, 77:25, 78:1, 78:21, 78:23, 79:13, 79:15, 80:8, 80:10, 82:25, 83:2, 83:3, 83:4, 83:14, 84:10, 84:17, 84:24, 85:1, 85:7, 86:23, 87:1, 89:8, 90:20, 90:22, 90:24, 91:8, 93:25, 95:25, 96:4, 96:10, 96:12, 96:14, 96:16, 96:19, 96:21, 96:23, 96:24, 96:25, 97:5, 97:9, 97:11, 97:20, 99:9, 100:10, 102:5, 106:2, 108:13, 108:22, 109:22, 110:1, 110:3, 110:5, 110:7, 110:11, 110:15, 110:16, 111:23, 113:12, 113:16, 114:4, 114:6, 114:7, 114:12, 114:22, 114:24, 115:2, 117:21, 118:2, 118:6, 118:10, 118:16, 121:10, 121:14, 125:19, 125:21, 125:22, 125:24, 126:10, 126:14, 126:25, 127:7, 127:10, 127:12, 127:15, 127:18, 127:22, 129:9, 129:14, 129:16, 129:18, 129:20, 129:21, 130:2, 130:6, 131:2, 131:4, 132:25,

133:2, 133:14, 133:18
**multiple** [1] - 28:16
**must** [5] - 29:19, 50:2, 64:5, 83:13, 121:22

## N

**name** [10] - 5:3, 5:9, 5:11, 16:1, 16:3, 18:21, 19:21, 36:4, 36:5, 128:6
**named** [4] - 48:10, 131:15, 131:16, 132:2
**namely** [1] - 35:20
**names** [1] - 131:7
**nature** [1] - 125:6
**Navarro** [1] - 33:1
**navigation** [3] - 41:19, 117:13, 117:16
**Navy** [1] - 117:18
**necessarily** [1] - 82:22
**need** [17] - 7:1, 9:20, 26:19, 31:22, 42:12, 58:5, 67:4, 67:7, 91:3, 96:11, 97:3, 97:9, 111:14, 117:7, 121:13, 121:16, 123:24
**needed** [1] - 90:1
**Needing** [1] - 60:7
**needs** [3] - 80:14, 80:22, 82:2
**Network** [1] - 22:13
**never** [4] - 25:10, 52:20, 80:2, 110:7
**new** [1] - 85:8
**next** [12] - 44:2, 53:8, 62:22, 68:3, 68:24, 76:25, 79:20, 80:12, 91:9, 94:1, 115:3, 133:20
**niece** [1] - 22:4
**nine** [1] - 104:12
**nineteen** [3] - 18:2, 18:3, 106:21
**NO** [1] - 1:2
**noncompetent** [1] - 116:12
**none** [3] - 29:1, 132:6, 132:8
**normally** [1] - 52:13
**notarial** [1] - 127:24
**Notary** [3] - 1:23, 134:16, 135:7
**note** [4] - 60:22, 85:5, 86:15, 97:5
**notebooks** [1] - 37:15

10

noted [14] - 26:14, 41:21, 43:5, 43:7, 60:24, 61:5, 62:1, 62:22, 63:16, 63:17, 73:16, 77:2, 85:19, 86:25
Noted [2] - 61:11, 61:19
notes [1] - 62:24
Notes [1] - 86:5
nothing [7] - 4:17, 16:3, 47:11, 75:15, 77:21, 84:7, 103:22
nothing .. [1] - 84:3
notice [6] - 7:25, 9:2, 10:8, 12:16, 22:10, 38:1
Notice [2] - 1:24, 3:3
noticed [1] - 86:19
number [7] - 22:15, 22:21, 22:25, 23:3, 23:4, 23:5, 23:8, 25:21, 33:2, 91:18, 93:8, 110:21, 111:8, 112:3, 128:12, 128:13, 129:25, 130:14, 131:6
Number [1] - 5:7
numbered [1] - 92:5
numbers [6] - 46:2, 51:20, 60:13, 102:21, 103:20, 131:7

## O

OATH [1] - 134:1
oath [1] - 7:8
object [26] - 9:21, 35:13, 42:5, 43:9, 52:25, 64:21, 65:3, 65:19, 77:25, 78:21, 79:13, 80:8, 84:17, 86:23, 90:20, 90:24, 108:13, 118:10, 121:10, 124:18, 124:20, 125:19, 125:22, 126:10, 130:2, 131:2
objection [6] - 42:21, 55:2, 85:5, 117:21, 118:1, 118:2
observation [1] - 87:20
Observations [1] - 86:5
observations [2] - 88:3, 89:18
observe [1] - 90:19

obtain [3] - 16:15, 35:4, 35:9
obtained [1] - 16:23, 70:24
obviously [8] - 33:17, 46:15, 56:4, 61:21, 64:11, 65:13, 126:11, 131:13
occasionally [1] - 15:15
Occidental [1] - 18:12
occur [3] - 30:18, 31:4, 121:1
occurred [7] - 30:4, 30:5, 40:1, 47:14, 52:3, 73:7, 76:14
Ocean [1] - 118:24
October [4] - 20:3, 20:5, 20:16, 134:11
OF [11] - 1:1, 1:17, 1:18, 2:2, 2:6, 134:1, 134:3, 134:4, 135:1, 135:3, 135:4
office [13] - 33:1, 35:19, 36:13, 36:18, 37:2, 37:5, 37:6, 37:7, 69:2, 100:15, 105:4, 105:6, 106:15
official [1] - 134:10
ON [2] - 2:2, 2:6
once [1] - 33:17
one [33] - 7:1, 24:18, 37:12, 37:17, 39:7, 44:14, 48:8, 50:16, 51:18, 54:17, 55:13, 55:14, 56:5, 62:22, 68:8, 76:9, 76:25, 79:20, 80:12, 92:16, 92:19, 93:7, 100:18, 100:20, 102:22, 103:10, 104:10, 105:13, 106:11, 109:10, 109:21, 111:6
ones [1] - 19:12
oops [1] - 104:9
open [9] - 22:18, 23:11, 29:16, 30:11, 31:6, 31:12, 31:20, 76:1, 82:17
open-ended [1] - 23:11
opening [1] - 31:17
operate [14] - 13:17, 26:9, 26:20, 31:16, 32:14, 32:17, 48:16, 50:6, 55:22, 118:13, 119:14, 119:16, 120:12
operated [15] - 26:4,

26:5, 26:15, 27:3, 27:5, 28:1, 28:2, 28:4, 28:5, 95:5, 119:9, 119:10, 119:11, 120:3, 120:4
operating [18] - 26:7, 26:16, 27:6, 27:17, 48:9, 112:19, 115:23, 116:5, 116:21, 122:12, 123:15, 123:18, 123:20, 124:8, 124:9, 124:11, 124:20, 125:5
operation [6] - 29:2, 98:24, 107:14, 123:6, 123:14, 123:25
operator [5] - 25:11, 26:22, 48:11, 94:15, 116:12
operator 's [3] - 112:22, 113:15, 113:18
operators [1] - 113:2
opinion [20] - 26:7, 31:15, 32:13, 34:8, 36:17, 50:17, 75:2, 78:8, 79:3, 79:6, 79:9, 107:13, 107:20, 107:23, 108:9, 117:12, 118:7, 126:2, 126:3
opportunity [2] - 12:13, 133:5
Options [1] - 70:4
options [1] - 70:10
or.. [1] - 105:4
order [8] - 6:17, 31:19, 32:2, 37:9, 116:7, 116:8, 117:8, 133:20
Order [1] - 1:13
ordered [1] - 133:7
ordering [1] - 133:19
original [4] - 74:16, 75:15, 89:2, 104:20
originally [3] - 16:18, 21:7, 25:1
Osprey [1] - 15:23
otherwise [1] - 6:13
ourselves [1] - 48:4
outlets [2] - 61:18, 63:16
outlines [1] - 8:13
overall [1] - 59:20
overseeing [1] - 15:13
own [1] - 69:23
owner [1] - 71:18
owners [2] - 64:18, 84:12

## P

P.A [1] - 2:2
p.m [8] - 1:15, 24:2, 67:23, 111:17, 111:20, 133:23, 133:25
page [24] - 39:13, 39:16, 46:9, 59:14, 70:15, 70:16, 70:21, 70:23, 71:2, 71:4, 71:5, 97:3, 100:22, 101:5, 102:7, 102:21, 102:22, 103:10, 103:20, 104:16, 109:24, 127:23, 128:2
PAGE [1] - 3:2
pages [14] - 46:12, 46:22, 47:7, 70:15, 96:11, 96:20, 97:6, 102:8, 102:13, 102:14, 103:12, 104:12, 104:17, 112:5
pain [1] - 60:19
paint [5] - 81:14, 82:8, 83:8, 85:18, 86:17
Paint [1] - 85:15
pandemic [1] - 122:5
paperless [1] - 22:18
Paragraph [1] - 128:15
paragraph [3] - 59:16, 106:20, 115:21
paraphrase [1] - 82:22
paraphrased [1] - 81:25
paraphrasing [1] - 82:20
pardon [2] - 21:11, 24:11
part [8] - 38:6, 39:9, 39:19, 90:10, 91:21, 107:17, 108:8, 110:24
participated [2] - 35:19, 36:1
particular [7] - 20:8, 20:18, 21:13, 35:22, 39:20, 66:11, 126:8
particular .. [1] - 68:19
particularly [3] - 19:15, 81:1, 87:6
parties [2] - 35:10, 135:13
parts [1] - 49:24
past [1] - 49:19
patch [1] - 85:15

patient [1] - 85:2
Pause [1] - 23:20
pause [1] - 127:3
payments [1] - 20:24
PDF [2] - 39:13, 114:17
pending [1] - 7:4
people [8] - 21:19, 55:4, 58:7, 64:10, 98:1, 132:6, 132:8, 132:9
per [1] - 106:10
Per [1] - 28:14
percent [1] - 5:23
perfect [1] - 57:13
performed [3] - 54:11, 59:21, 104:13
perhaps [5] - 7:1, 66:17, 67:1
permission [1] - 70:24
permitted [2] - 119:15, 119:16
person [12] - 13:8, 16:9, 25:7, 35:24, 36:12, 36:18, 70:20, 72:19, 81:24, 89:14, 116:3, 123:16
personally [3] - 7:11, 108:5, 134:8
persons [2] - 131:8, 132:2
perspective [9] - 25:4, 59:24, 61:24, 61:25, 62:8, 63:9, 64:15, 101:11, 120:22
ph [3] - 16:4, 26:19, 27:15
ph ) [1] - 18:14
phone [3] - 33:2, 122:18, 122:22
photo [1] - 77:5
Photographs [3] - 3:6, 3:7, 3:8
photographs [25] - 68:7, 68:10, 68:12, 78:7, 89:10, 89:12, 89:14, 91:10, 91:12, 91:17, 91:18, 92:2, 92:4, 92:17, 92:21, 92:23, 92:24, 93:1, 93:3, 93:9, 93:11, 93:12, 93:16, 93:20
photos [1] - 70:19
physical [6] - 49:23, 116:9, 116:15, 116:22, 121:7, 121:8
physically [7] - 54:12, 121:22, 122:3, 122:7, 123:24, 124:10, 124:21

**piece** [2] - 123:15, 123:20
**Pierre** [2] - 19:3, 19:14
**place** [1] - 52:16
**placed** [1] - 94:16
**plaintiff** [1] - 4:9
**PLAINTIFF** [1] - 2:2
**Plaintiff** [1] - 1:5
**plaintiff 's** [1] - 20:23
**Plaintiff 's** [19] - 3:13, 37:19, 37:21, 43:24, 51:5, 53:5, 67:25, 68:21, 89:6, 91:6, 93:23, 97:18, 99:7, 100:8, 102:3, 105:24, 114:25, 126:21, 126:23
**PLAINTIFF 'S** [1] - 3:2
**plaintiff /counter** [1] - 128:17
**plaintiff /counter -defendant** [1] - 128:17
**plaintiffs 's** [1] - 130:17
**Plantation** [1] - 2:4
**platform** [10] - 80:14, 81:2, 81:5, 81:6, 81:10, 82:2, 83:25, 85:15, 85:17, 90:17
**play** [1] - 104:21
**plus** [1] - 47:7
**point** [8] - 31:8, 34:22, 47:24, 51:8, 52:1, 55:7, 66:17, 92:8
**pointed** [3] - 49:8, 85:12, 89:1
**pointing** [1] - 85:20
**pointless** [1] - 122:19
**Policy** [1] - 3:5
**policy** [61] - 20:20, 22:25, 23:5, 23:6, 23:7, 26:14, 27:14, 39:20, 40:9, 40:10, 40:16, 40:17, 40:23, 42:8, 44:3, 44:10, 44:19, 44:21, 45:11, 46:7, 46:13, 46:17, 46:21, 47:1, 47:9, 47:15, 47:24, 48:8, 49:10, 49:16, 51:23, 94:16, 95:9, 95:11, 95:16, 95:18, 95:20, 96:1, 96:13, 96:14, 96:18, 96:22, 97:3, 97:8, 97:13, 109:9, 109:18, 110:20, 110:23, 111:2, 111:8, 112:8, 113:5, 113:22, 114:8,
114:18, 114:20, 116:14, 118:14, 121:5
**portion** [1] - 105:17
**position** [18] - 9:16, 11:7, 13:6, 15:16, 43:20, 47:25, 50:9, 72:14, 88:15, 88:17, 116:6, 116:11, 116:23, 116:25, 122:10, 123:2, 124:12, 124:18
**positions** [1] - 15:20
**positive** [2] - 113:24, 113:25
**possibility** [1] - 20:7
**possible** [7] - 33:22, 51:16, 75:3, 75:5, 95:25, 108:20, 120:25
**post** [1] - 33:19
**post -incident** [1] - 33:19
**power** [9] - 60:8, 70:24, 73:19, 73:25, 79:24, 90:1, 90:2, 90:18, 91:4
**powered** [2] - 89:24, 118:22
**practice** [2] - 58:8, 116:3
**Pre** [26] - 28:18, 33:18, 38:2, 50:20, 59:17, 59:19, 61:12, 61:20, 62:1, 62:5, 62:25, 64:17, 74:6, 74:12, 77:6, 77:13, 78:6, 78:11, 79:23, 81:13, 81:20, 84:15, 85:21, 85:25, 86:4, 101:4
**pre** [2] - 52:9, 73:12
**pre-purchase** [1] - 73:12
**Pre-Purchase** [26] - 28:18, 33:18, 38:2, 50:20, 59:17, 59:19, 61:12, 61:20, 62:1, 62:5, 62:25, 64:17, 74:6, 74:12, 77:6, 77:13, 78:6, 78:11, 79:23, 81:13, 81:20, 84:15, 85:21, 85:25, 86:4, 101:4
**pre-survey** [1] - 52:9
**precisely** [1] - 47:2
**preface** [1] - 56:11
**preferable** [1] - 58:9
**Preferred** [1] - 22:12
**premium** [3] - 20:23, 112:13, 113:6
**preparation** [2] - 8:24, 13:3
**prepare** [1] - 32:20
**prepared** [4] - 23:12, 65:16, 97:2, 111:25
**Prepurchase** [1] - 59:15
**prepurchase** [1] - 41:22
**Prepurchase ..** [1] - 3:4
**presence** [4] - 116:9, 116:16, 116:22, 121:8
**present** [8] - 64:17, 71:19, 121:22, 122:3, 122:7, 123:16, 124:10, 124:21
**PRESENT** [1] - 2:10
**presented** [4] - 46:23, 47:2, 47:8, 98:13
**pressure** [1] - 77:3
**presumably** [2] - 78:5, 118:23
**presume** [1] - 102:23
**pretend** [1] - 68:7
**pretty** [4] - 73:13, 85:2, 124:13, 129:2
**prevent** [12] - 81:15, 81:16, 82:9, 82:10, 83:9, 83:10, 116:11, 116:24, 117:1, 117:5, 117:8, 120:23
**previous** [7] - 40:9, 109:9, 110:20, 110:23, 111:2, 111:8, 118:14
**previously** [5] - 8:23, 9:18, 18:22, 76:9, 95:5
**primarily** [1] - 22:24
**prime** [1] - 49:2
**principal** [2] - 15:22, 16:13
**Privilege** [3] - 11:14, 11:18, 11:23
**privilege** [3] - 11:24, 12:4, 12:9
**privy** [1] - 64:9
**problem** [2] - 10:1, 31:17
**procedure** [1] - 58:9
**procedures** [1] - 22:20
**proceed** [1] - 20:13
**proceeded** [1] - 87:9
**proceeding** [1] - 7:8
**proceedings** [2] - 6:18, 135:9
**process** [7] - 38:24,
39:20, 40:15, 46:25, 48:3, 48:11, 130:4
**produce** [6] - 96:1, 96:13, 96:22, 97:6, 97:7, 130:25
**produced** [28] - 8:22, 9:7, 9:18, 9:20, 9:23, 10:3, 10:8, 11:15, 11:18, 11:22, 12:6, 12:15, 32:6, 45:25, 53:10, 53:24, 53:25, 56:6, 56:7, 68:4, 91:20, 92:17, 109:14, 110:24, 130:9, 130:19, 130:23
**producing** [1] - 96:19
**production** [2] - 10:14, 12:10
**Professional** [1] - 1:23
**professional** [2] - 16:8, 26:15
**promise** [1] - 80:12
**promptly** [1] - 21:4
**proper** [5] - 50:3, 81:14, 82:9, 83:9, 126:7
**property** [1] - 22:9
**proposed** [2] - 58:10, 58:13
**protect** [2] - 63:5, 78:14
**protected** [2] - 77:19, 78:20
**provide** [6] - 8:21, 28:15, 62:14, 101:2, 101:15, 114:1
**provided** [10] - 10:21, 11:14, 26:25, 27:13, 34:19, 57:5, 57:15, 99:4, 106:21, 107:6
**providing** [2] - 7:18, 106:15
**provision** [1] - 124:6
**Public** [3] - 1:23, 134:16, 135:8
**Puerto** [1] - 118:25
**pull** [1] - 82:16
**Purchase** [26] - 28:18, 33:18, 38:2, 50:20, 59:17, 59:19, 61:12, 61:20, 62:1, 62:5, 62:25, 64:17, 74:6, 74:12, 77:6, 77:13, 78:6, 78:11, 79:23, 81:13, 81:20, 84:15, 85:21, 85:25, 86:4, 101:4
**purchase** [4] - 42:3,
42:24, 59:21, 73:12
**purchasing** [1] - 41:22
**purely** [2] - 87:14, 90:9
**purpose** [4] - 38:22, 49:22, 90:7, 101:12
**purposes** [2] - 39:3, 40:16
**Pursuant** [1] - 1:12
**pursuant** [1] - 1:24
**put** [6] - 23:21, 31:1, 55:8, 79:24, 82:12, 113:19

**Q**

**qualifications** [2] - 27:16, 107:25
**qualified** [4] - 25:7, 48:10, 118:5, 118:8
**queries** [2] - 99:4, 106:16
**questioning** [1] - 67:7
**questions** [23] - 6:5, 7:11, 7:18, 25:22, 27:2, 28:16, 34:3, 34:6, 83:5, 83:6, 98:23, 101:3, 102:11, 120:9, 122:8, 122:11, 122:13, 128:10, 129:19, 132:20, 132:24, 133:1
**quick** [2] - 67:7, 128:11
**quickly** [4] - 19:25, 23:13, 33:22, 126:18
**quiet** [1] - 114:23
**quite** [3] - 37:14, 75:7, 108:20
**quotation** [2] - 109:17, 111:3
**Quotation** [1] - 110:13
**quotations** [1] - 115:21
**quote** [3] - 110:21, 112:3, 112:7
**quoted** [2] - 121:6, 121:21

**R**

**R-O-S-E-N** [1] - 19:1
**raise** [1] - 4:14
**raises** [1] - 50:6
**Ray** [2] - 119:9, 120:4
**RBC _A&A** [1] - 57:9
**RBC _A&A72900 -101** [1] - 46:2

**RBC _A&A72900 -101 _000001** [1] - 53:11
**Re** [1] - 115:5
**re** [5] - 46:18, 61:14, 63:1, 63:10, 133:10
**re-attach** [1] - 46:18
**re-depose** [1] - 133:10
**re-rusting** [2] - 61:14, 63:1
**reached** [1] - 30:16
**read** [9] - 26:24, 59:16, 82:17, 83:12, 110:9, 115:21, 119:13, 120:1, 133:6
**reading** [7] - 83:15, 84:18, 84:20, 119:19, 119:20, 133:4, 133:15
**reads** [1] - 128:13
**ready** [1] - 38:16
**reality** [1] - 58:14
**really** [2] - 17:8, 19:25
**rear** [1] - 117:18
**reason** [3] - 11:22, 24:24, 73:3
**reasonably** [2] - 50:2, 82:20
**recap** [1] - 61:23
**receipt** [1] - 52:2
**received** [25] - 24:1, 24:5, 24:16, 25:10, 25:15, 26:11, 29:6, 29:15, 29:20, 29:21, 29:24, 30:6, 30:25, 31:3, 33:23, 33:24, 34:5, 39:19, 39:21, 52:6, 61:21, 101:24, 113:17, 122:23
**recess** [2] - 67:21, 111:18
**recognize** [5] - 7:7, 7:22, 38:21, 109:19
**recommend** [1] - 109:4
**recommendation** [19] - 61:11, 62:13, 64:3, 64:20, 65:1, 65:17, 65:25, 70:25, 74:16, 77:18, 78:12, 80:22, 81:20, 82:1, 82:8, 83:7, 86:8, 86:17, 108:25
**recommendations** [23] - 27:9, 28:8, 28:11, 28:18, 28:25, 41:1, 41:2, 41:8, 41:12, 41:14, 41:15, 48:13, 48:19, 50:19, 51:24, 52:10, 52:15, 52:22, 59:17, 60:14,

66:5, 87:15, 87:17
**Recommendations** [1] - 39:15
**recommended** [1] - 75:20
**reconcile** [1] - 56:21
**record** [19] - 4:7, 5:10, 5:25, 6:17, 45:7, 45:19, 45:21, 67:18, 67:20, 67:23, 85:5, 93:22, 110:4, 110:6, 111:17, 111:20, 130:1, 133:23, 135:11
**recorded** [1] - 35:4
**recordings** [1] - 102:15
**records** [4] - 23:12, 52:8, 52:9, 75:2
**RECROSS** [1] - 2:15
**red** [1] - 88:18
**REDIRECT** [1] - 2:15
**refer** [3] - 11:16, 31:24, 82:15
**reference** [1] - 30:21, 79:20
**referred** [5] - 13:8, 24:3, 24:24, 81:12, 81:25
**referring** [9] - 24:10, 24:12, 35:13, 94:21, 98:21, 129:14, 129:16, 132:9, 132:10
**refers** [1] - 22:25
**reflected** [2] - 70:16, 70:20
**reflecting** [1] - 107:8
**reflection** [1] - 72:17
**refrain** [1] - 85:3
**regard** [21] - 9:19, 10:6, 12:6, 22:8, 31:4, 33:7, 34:17, 40:10, 48:23, 52:9, 62:5, 74:5, 78:11, 81:3, 87:18, 101:4, 126:8, 128:19, 129:4, 129:24, 131:5
**regarding** [10] - 6:5, 34:3, 35:6, 35:11, 51:24, 73:12, 77:12, 98:22, 113:18, 124:6
**regards** [4] - 9:1, 12:23, 28:25, 60:20
**regulatory** [1] - 16:14
**related** [4] - 10:12, 13:14, 17:7, 22:2
**relates** [1] - 64:13, 79:8
**relation** [1] - 81:9

**relative** [1] - 135:14
**release** [1] - 81:5
**relied** [12] - 40:20, 40:21, 42:3, 42:7, 42:15, 48:5, 53:1, 88:22, 107:17, 108:23, 108:24, 109:5
**relief** [1] - 77:3
**relies** [1] - 39:4
**rely** [3] - 37:8, 39:9, 42:24
**relying** [5] - 42:1, 49:10, 51:2, 52:16, 130:16
**remainder** [1] - 97:8
**remaining** [1] - 93:8
**remains** [1] - 78:18
**remember** [7] - 18:25, 19:19, 19:20, 36:4, 81:23, 127:21
**Remote** [1] - 1:12
**remote** [1] - 124:16
**remove** [1] - 94:25
**renew** [4] - 40:22, 62:15, 63:19, 65:4
**renewal** [2] - 40:22, 94:25
**renewing** [1] - 40:16
**Rental** [18] - 4:2, 4:9, 5:4, 22:6, 34:24, 35:5, 41:22, 41:25, 42:2, 42:7, 42:15, 42:23, 44:11, 46:8, 101:21, 107:17, 108:7, 112:9
**RENTAL** [1] - 1:4
**repainting** [3] - 80:15, 80:22, 82:3
**repair** [2] - 52:9, 75:2
**repaired** [10] - 61:6, 61:13, 63:1, 73:20, 74:4, 74:10, 74:17, 76:17, 76:18, 85:18
**repairs** [2] - 128:19, 128:23
**repeat** [3] - 50:11, 74:7, 84:5
**repeating** [1] - 27:24
**rephrase** [6] - 6:10, 37:3, 42:6, 42:9, 42:12, 101:20
**replace** [3] - 63:6, 65:2, 78:12
**replaced** [4] - 62:20, 75:3, 80:2, 80:6
**report** [19] - 24:5, 24:17, 24:22, 25:3, 33:24, 36:21, 39:5, 41:1, 41:7, 53:12,

54:6, 54:8, 60:22, 73:11, 73:17, 73:20, 76:22, 76:23, 135:9
**Report** [3] - 3:6, 54:7, 69:7
**reported** [7] - 21:2, 21:5, 21:7, 21:9, 23:16, 23:25, 59:17
**Reporter** [1] - 1:23
**reporter** [2] - 6:7, 6:22
**REPORTER** [8] - 4:13, 4:20, 61:8, 84:4, 84:9, 114:10, 117:24, 135:1
**Reporting** [1] - 2:10
**reporting** [5] - 15:12, 22:8, 22:14, 55:12, 132:22
**reports** [7] - 15:14, 55:13, 129:1, 129:23, 130:10, 130:19, 130:23
**represent** [2] - 5:4, 14:1
**representation** [1] - 79:25
**representations** [1] - 48:6
**REPRESENTATIVE** [1] - 1:18
**representative** [10] - 5:6, 7:21, 8:15, 18:5, 18:18, 18:23, 43:19, 124:4, 125:11, 131:14
**Request** [1] - 99:20
**request** [15] - 7:3, 9:17, 10:7, 10:14, 12:7, 25:10, 26:12, 29:22, 30:12, 99:24, 101:12, 101:13, 101:18, 101:21, 101:25
**requested** [9] - 10:7, 10:13, 25:12, 25:21, 26:21, 28:15, 30:10, 52:8, 99:12
**requesting** [2] - 25:15, 27:1
**requests** [4] - 8:23, 10:21, 34:23, 35:2
**require** [4] - 27:8, 90:18, 108:17, 121:6
**required** [3] - 41:11, 113:20, 128:24
**requirement** [5] - 7:3, 94:16, 94:18, 95:1, 95:21
**requirements** [1] - 16:22

**requiring** [1] - 60:8
**reserve** [1] - 133:10
**reserves** [1] - 15:14
**reset** [1] - 31:13
**respect** [11] - 11:14, 11:24, 19:24, 47:9, 50:15, 51:2, 53:16, 75:14, 77:12, 86:4, 88:1
**responded** [1] - 35:1
**responds** [1] - 29:1
**Response** [1] - 3:11
**response** [24] - 9:1, 12:15, 19:24, 25:5, 26:23, 27:13, 28:21, 28:22, 29:6, 29:9, 29:14, 29:25, 30:14, 30:19, 31:3, 32:14, 34:5, 91:21, 94:12, 101:22, 101:24, 102:8, 129:1, 130:8
**responses** [1] - 106:15
**responsibilities** [2] - 15:4, 15:7
**responsibility** [1] - 49:25
**responsible** [1] - 13:10
**responsive** [4] - 8:23, 9:17, 10:20, 130:18
**restroom** [1] - 111:14
**Reunion** [1] - 18:14
**revealed** [2] - 48:15, 48:18
**review** [10] - 12:13, 32:15, 34:7, 44:6, 46:4, 57:21, 59:7, 60:21, 108:9, 109:19
**reviewed** [6] - 8:9, 8:24, 41:1, 56:4, 59:9, 128:5
**reviewing** [1] - 13:1
**Rico** [1] - 118:25
**riders** [1] - 46:13
**right-hand** [1] - 69:14
**rightly** [1] - 54:10
**ring** [2] - 36:6, 36:7
**Risk** [1] - 18:12
**risk** [2] - 15:12, 120:11
**Risks** [8] - 13:14, 13:20, 14:5, 15:2, 15:8, 15:23, 15:24, 21:8
**Risks )** [1] - 15:25
**Risks .Co.uk** [1] - 21:12
**road** [2] - 87:10, 87:16
**Robaina** [1] - 1:22
**ROBAINA** [3] -

134:16, 135:7,
135:21
**Rome** [1] - 38:3
**Rosen** [2] - 19:1,
19:13
**roughly** [2] - 85:15,
89:3
**route** [1] - 111:7
**row** [1] - 37:13
**Rule** [1] - 131:16
**rules** [1] - 5:24
**running** [1] - 17:12
**Russell** [1] - 26:24
**rust** [12] - 61:5, 61:12,
61:19, 62:24, 63:4,
63:17, 63:21, 64:2,
64:16, 65:7, 65:10,
90:16
**rusting** [17] - 61:7,
61:14, 61:18, 62:16,
62:19, 62:24, 63:1,
63:4, 63:10, 63:16,
63:19, 63:21, 63:24,
65:6, 65:11, 77:2,
77:19
**rustings** [1] - 63:19

## S

**safely** [2] - 93:15,
93:19
**Safety** [1] - 60:6
**sailboat** [2] - 119:1,
119:3
**sake** [2] - 58:2, 103:25
**Salas** [3] - 4:8, 5:4,
9:22
**SALAS** [101] - 2:2, 2:4,
2:16, 4:8, 5:2, 8:4,
9:8, 9:10, 9:24, 10:4,
11:25, 12:2, 14:23,
14:24, 37:23, 42:11,
43:1, 43:12, 44:1,
45:8, 45:22, 45:23,
51:7, 53:7, 55:17,
55:23, 56:2, 57:10,
57:17, 57:19, 58:17,
58:24, 59:5, 61:15,
64:24, 65:14, 66:1,
67:13, 67:15, 67:24,
68:2, 68:23, 70:12,
78:1, 78:23, 79:15,
80:10, 83:2, 83:4,
83:14, 84:10, 84:24,
85:1, 85:7, 87:1,
89:8, 90:22, 91:8,
93:25, 95:25, 96:12,
96:16, 96:21, 96:24,
97:5, 97:11, 97:20,

99:9, 100:10, 102:5,
106:2, 108:22,
110:1, 110:5,
110:11, 110:16,
111:23, 113:16,
114:6, 114:12,
114:24, 115:2,
118:6, 118:16,
121:14, 125:21,
125:24, 126:14,
126:25, 127:10,
127:15, 127:22,
129:9, 129:16,
129:20, 129:21,
130:6, 131:4, 133:2,
133:14, 133:18
**Sam** [4] - 21:17, 96:7,
96:9, 98:7
**Samantha** [13] -
10:25, 11:6, 21:15,
21:17, 22:2, 35:21,
94:11, 97:24, 98:7,
106:4, 106:9,
131:22, 132:13
**Sarah** [6] - 11:1,
21:16, 25:17, 94:11,
97:25, 132:14
**sat** [1] - 19:21
**saw** [1] - 60:15
**scenario** [1] - 122:15
**schedule** [1] - 114:20
**Schedule** [2] - 8:20,
12:16
**scheduled** [1] - 26:15
**Scheduled** [3] - 49:22,
50:1, 115:23
**school** [1] - 17:5
**screen** [21] - 7:25, 8:3,
8:8, 37:18, 38:11,
44:7, 57:22, 69:9,
69:13, 69:15, 69:20,
70:3, 82:13, 82:23,
82:25, 98:9, 100:12,
100:19, 100:20,
103:21, 106:4
**screenshots** [7] -
29:4, 102:15, 103:6,
103:21, 103:22,
106:22, 107:2
**scroll** [3] - 44:16,
45:9, 54:1
**scrolling** [1] - 38:17
**SE** [4] - 1:7, 1:19, 4:3,
5:7
**Sea** [2] - 119:9, 120:4
**seal** [1] - 134:10
**search** [1] - 10:11
**seaworthiness** [3] -
49:17, 49:22, 50:7
**seaworthy** [5] - 49:15,

49:21, 50:2, 50:13,
50:23
**sec** [1] - 25:19
**second** [14] - 36:4,
36:20, 37:12, 37:17,
50:19, 71:8, 71:14,
90:7, 92:20, 104:10,
106:20, 111:12,
120:2, 127:20
**secondary** [1] - 49:4
**section** [3] - 39:14,
112:13, 120:2
**secured** [3] - 75:20,
75:21, 76:2
**Sedan** [1] - 118:24
**See** [1] - 129:1
**see** [70] - 8:5, 14:12,
14:15, 14:16, 14:17,
25:3, 28:20, 29:4,
29:18, 36:11, 38:4,
54:22, 56:20, 56:23,
59:11, 60:9, 60:13,
62:16, 68:11, 68:18,
69:3, 69:4, 69:12,
69:13, 71:1, 73:1,
75:21, 76:18, 77:6,
77:9, 77:15, 80:20,
81:17, 82:11, 82:22,
83:22, 89:10, 92:6,
92:8, 94:3, 95:3,
95:6, 96:5, 96:17,
97:9, 97:23, 98:10,
99:12, 99:19,
100:18, 100:20,
100:25, 102:16,
104:8, 104:23,
106:24, 109:19,
109:25, 112:12,
115:7, 115:8,
115:25, 124:15,
127:1, 127:12,
128:9, 130:19,
130:20
**seeing** [4] - 36:21,
36:22, 94:5, 127:21
**send** [19] - 33:11,
53:23, 53:24, 56:24,
57:20, 57:24, 57:25,
58:3, 58:4, 58:10,
58:22, 59:4, 82:24,
96:4, 96:9, 108:19,
126:20, 127:4, 127:9
**sending** [4] - 99:11,
123:19, 127:8,
127:10
**sends** [1] - 55:14
**senior** [6] - 36:12,
36:14, 36:18, 72:14,
72:19, 72:21
**sense** [3] - 62:8, 62:9,

98:15
**sent** [24] - 21:10,
22:12, 24:7, 24:17,
27:20, 29:20, 29:23,
30:15, 32:21, 33:5,
34:13, 54:6, 58:13,
58:25, 59:4, 96:5,
99:25, 100:3, 100:4,
100:6, 103:22,
108:16, 115:17,
127:15
**separate** [5] - 8:13,
50:23, 55:15,
103:11, 114:19
**September** [10] - 1:14,
4:4, 31:8, 31:10,
33:6, 34:11, 52:23,
115:4, 115:11,
135:17
**series** [1] - 6:4
**serve** [1] - 48:25
**service** [1] - 22:11
**serviceable** [2] - 77:4,
77:9
**serviced** [2] - 63:23,
65:9
**services** [1] - 17:13
**Services** [1] - 16:19
**set** [3] - 92:22, 92:24,
126:6
**Set** [1] - 126:21
**sets** [4] - 92:16, 92:19,
92:21, 93:1
**several** [3] - 92:4,
92:18, 97:25
**shall** [1] - 21:8
**shape** [1] - 53:15
**share** [6] - 7:24, 7:25,
37:16, 37:24, 57:22,
69:8
**sharing** [1] - 14:14
**Sharing** [2] - 8:3,
37:18
**short** [1] - 54:8
**show** [5] - 51:9, 54:2,
68:4, 102:6, 126:16
**showing** [4] - 14:11,
14:12, 77:2, 109:24
**shows** [1] - 90:15
**sic** [2] - 46:8, 116:21
**side** [2] - 85:14, 86:6
**signature** [4] - 44:22,
44:24, 128:2, 128:3
**signed** [9] - 44:20,
45:2, 48:12, 51:10,
52:17, 53:12, 53:20,
70:17, 128:6
**similar** [8] - 73:10,
95:2, 112:22,
119:11, 120:5,

120:17, 123:4
**Simms** [11] - 11:1,
11:11, 21:16, 21:23,
35:21, 94:3, 94:11,
97:25, 131:22,
132:14
**simple** [1] - 90:9
**simply** [3] - 87:14,
99:17, 99:18
**simultaneous** [1] -
117:23
**single** [8] - 9:16,
60:24, 60:25, 68:8,
102:17, 105:13,
117:19
**sit** [6] - 19:18, 48:24,
49:6, 129:5, 129:7,
130:7
**situation** [3] - 58:12,
125:18, 128:1
**six** [1] - 23:7
**size** [5] - 95:4, 118:13,
119:11, 120:5,
120:17
**sized** [1] - 112:23
**Skyler** [17] - 36:3,
53:20, 54:10, 64:6,
66:7, 69:1, 75:17,
76:14, 83:20, 98:8,
98:18, 98:22,
100:14, 102:10,
106:4, 115:15,
131:18
**slightly** [1] - 20:14
**slowly** [4] - 44:7,
44:16, 44:17
**small** [1] - 69:23
**Smith** [1] - 119:21
**snapshots** [1] - 28:12
**so..** [3] - 32:6, 92:4,
94:6
**sole** [1] - 25:11
**solely** [3] - 37:6, 37:7,
53:1
**someone** [1] - 124:15
**something 's** [1] - 31:9
**sometime** [5] - 29:20,
29:25, 30:9, 33:23,
101:24
**somewhat** [1] -
122:15
**somewhere** [2] -
38:18, 98:12
**sorry** [27] - 21:20,
24:7, 25:18, 25:25,
28:10, 30:10, 30:15,
30:16, 31:11, 38:17,
39:18, 45:13, 50:11,
60:19, 61:8, 71:3,
74:7, 84:4, 88:11,

89:11, 92:3, 98:4, 99:15, 114:10, 114:21, 117:24, 119:6
**sort** [3] - 17:8, 86:20, 98:9
**Southern** [3] - 19:6, 19:9, 19:15
**SOUTHERN** [1] - 1:1
**Spanish** [2] - 103:17, 103:22
**speaking** [2] - 13:1, 117:23
**Special** [8] - 13:13, 13:19, 14:5, 15:2, 15:8, 15:23, 15:24
**specific** [5] - 26:13, 47:24, 62:10, 98:22, 128:10
**Specifically** [1] - 128:21
**specifically** [5] - 61:3, 62:6, 62:9, 81:10, 121:24
**specificity** [1] - 128:22
**specify** [1] - 131:11
**staff** [10] - 10:15, 10:19, 10:23, 12:22, 13:2, 98:21, 122:2, 122:21, 131:21, 132:10
**stains** [2] - 63:21, 65:6
**stamp** [1] - 98:6
**stamped** [2] - 46:1, 53:11
**standard** [1] - 55:13
**Starboard** [1] - 85:14
**started** [1] - 61:9
**starting** [1] - 132:21
**starts** [2] - 100:23, 102:10
**State** [3] - 1:24, 130:14, 134:16
**STATE** [2] - 134:3, 135:3
**state** [7] - 4:6, 5:9, 121:21, 121:24, 128:14, 128:21, 131:7
**statement** [5] - 35:4, 40:11, 72:15, 73:4, 116:19
**statements** [2] - 35:9
**states** [3] - 74:11, 121:25, 128:17
**STATES** [1] - 1:1
**stating** [1] - 51:23
**Stenographer** [2] - 135:7, 135:21
**stenographically** [1] -

135:9
**stern** [6] - 74:2, 74:20, 74:22, 79:21, 80:6, 90:3
**Steve** [3] - 57:24, 57:25, 114:15
**STEVEN** [1] - 2:8
**Steven** [3] - 4:10, 96:3, 96:17
**still** [11] - 14:15, 17:5, 40:18, 61:6, 73:21, 74:18, 75:8, 79:25, 85:19, 113:13
**stipulate** [1] - 83:11, 86:8, 104:1, 104:2
**stipulation** [1] - 83:16
**stockholder** [1] - 15:22
**stop** [3] - 14:13, 45:5, 82:15
**stretch** [1] - 19:3
**strike** [5] - 37:3, 52:4, 63:10, 79:4, 108:6
**structurally** [2] - 63:20, 65:5
**stuff** [1] - 104:1
**styled** [1] - 4:1
**subject** [10] - 20:1, 40:1, 41:8, 47:10, 47:14, 49:11, 95:11, 112:21, 116:21, 131:11
**submission** [1] - 104:3
**submitted** [1] - 105:16
**subsequent** [5] - 76:23, 85:9, 85:10, 89:2, 89:23
**subsequently** [1] - 103:5
**substance** [2] - 12:21, 20:9
**sufficient** [5] - 26:8, 27:16, 65:24, 66:4, 119:5
**sufficiently** [1] - 107:13
**suitable** [2] - 27:16, 50:3
**Suite** [1] - 2:3
**suite** [1] - 2:7
**summarize** [1] - 33:20
**summary** [1] - 14:4
**Sunrise** [1] - 2:3
**supervise** [2] - 122:6, 124:15
**supervised** [24] - 25:7, 26:18, 26:20, 29:10, 34:4, 48:10, 48:17, 50:18, 94:19,

112:19, 115:22, 116:3, 116:5, 116:8, 116:17, 116:20, 121:25, 123:16, 124:9, 124:19, 125:6, 125:16, 125:17, 126:8
**supervisee** [1] - 116:10
**supervising** [6] - 120:22, 122:3, 122:21, 122:24, 123:10, 123:13
**supervision** [20] - 26:6, 26:7, 26:9, 27:5, 27:7, 27:15, 27:17, 28:3, 28:4, 28:6, 28:24, 34:3, 94:18, 95:21, 97:12, 113:9, 113:20, 119:14, 120:14, 124:7
**supervisor** [3] - 14:25, 116:9, 124:10
**supplement** [2] - 129:13, 130:1
**supplied** [3] - 61:3, 62:7, 88:5
**supply** [1] - 82:14
**support** [3] - 47:25, 128:15, 130:24
**supposed** [1] - 25:6
**Supreme** [1] - 1:12
**Survey** [29] - 3:5, 3:6, 28:18, 33:18, 38:3, 50:20, 59:17, 59:19, 61:13, 61:20, 62:1, 62:5, 62:25, 64:17, 71:6, 74:6, 74:12, 77:6, 77:13, 78:6, 78:11, 79:23, 81:13, 81:20, 84:15, 85:21, 85:25, 86:4, 101:5
**survey** [35] - 27:10, 33:19, 38:23, 39:19, 40:14, 40:19, 40:20, 40:22, 42:16, 42:24, 43:5, 43:8, 48:14, 48:19, 51:24, 52:9, 53:12, 54:8, 54:12, 55:13, 59:24, 60:22, 64:19, 65:17, 71:8, 71:14, 73:17, 75:16, 75:21, 76:16, 82:17, 83:7, 86:3, 89:2, 89:3
**survey 's** [1] - 64:15
**surveyed** [2] - 70:24, 71:12
**surveying** [1] - 55:11

**surveyor** [6] - 41:21, 72:20, 81:21, 81:24, 84:21, 90:6
**Surveyor 's** [1] - 86:5
**surveyor 's** [2] - 28:10, 74:16
**Surveyors** [2] - 3:4, 38:2
**surveyors** [1] - 24:4
**suspect** [1] - 62:15
**swear** [1] - 4:16
**swim** [10] - 80:14, 81:2, 81:5, 81:6, 81:10, 82:2, 83:25, 85:14, 85:17, 90:17
**switch** [1] - 70:10
**sworn** [2] - 4:24, 134:9
**sync** [1] - 50:12
**system** [8] - 61:1, 61:3, 62:7, 62:10, 63:22, 65:8

### T

**talks** [1] - 73:6
**teaching** [1] - 122:16
**telephone** [4] - 25:16, 28:24, 29:12, 131:7
**ten** [7] - 28:8, 48:18, 50:19, 67:8, 67:16, 101:7, 103:12
**ten-minute** [1] - 67:8
**term** [3] - 40:23, 60:12, 117:15
**termed** [1] - 112:8
**terminals** [2] - 62:23, 63:4
**terms** [13] - 37:14, 38:23, 47:24, 49:10, 60:2, 85:11, 89:17, 107:7, 112:14, 112:17, 113:1, 113:4, 130:10
**Terms** [2] - 112:15, 113:11
**terribly** [1] - 104:9
**test** [1] - 19:4
**tested** [1] - 79:24
**testified** [8] - 4:24, 18:22, 30:3, 47:18, 87:2, 99:3, 100:1, 131:21
**testifying** [1] - 85:3
**testimony** [5] - 12:23, 17:21, 33:21, 101:23, 133:8
**Texas** [1] - 16:3
**text** [11] - 28:13, 29:5,

32:15, 66:15, 102:15, 105:14, 106:22, 107:3, 108:10, 108:11, 108:18
**texts** [2] - 103:13, 104:4
**THE** [45] - 2:2, 2:6, 4:19, 4:25, 10:2, 14:21, 42:22, 43:10, 53:1, 55:3, 57:8, 59:2, 61:10, 64:22, 65:4, 65:20, 70:7, 78:22, 79:14, 80:9, 83:11, 84:6, 84:19, 86:24, 90:21, 90:25, 96:7, 108:14, 110:8, 111:21, 113:13, 114:10, 114:15, 117:22, 117:24, 118:3, 118:11, 121:12, 125:20, 126:11, 127:20, 130:3, 131:3, 133:13, 133:17
**thereabouts** [1] - 34:1
**thereafter** [2] - 34:10, 34:12
**therefore** [6] - 29:19, 48:5, 48:17, 74:1, 93:8, 126:2
**Thereupon** [19] - 4:21, 37:19, 37:21, 43:24, 51:5, 53:5, 67:25, 68:21, 89:6, 91:6, 93:23, 97:18, 99:7, 100:8, 102:3, 105:24, 114:25, 126:23, 133:24
**they 've** [5] - 64:22, 65:21, 65:23, 86:24, 103:16
**third** [3] - 35:10, 50:21, 70:22
**Thomas** [36] - 3:9, 10:25, 11:6, 11:9, 16:3, 19:2, 19:14, 21:16, 21:17, 21:22, 21:25, 24:17, 24:24, 25:20, 32:11, 32:19, 35:20, 35:21, 69:6, 94:2, 94:3, 94:10, 94:11, 94:12, 97:24, 97:25, 98:7, 98:22, 106:5, 131:21, 131:22, 132:13
**three** [20] - 19:17, 21:19, 40:19, 50:23, 51:1, 52:23, 63:3, 74:5, 74:13, 77:14,

77:22, 77:24, 78:19, 80:7, 85:25, 89:3, 92:16, 102:22, 105:1, 131:19
**Thursday** [2] - 110:12, 111:22
**TIME** [1] - 1:15
**tiny** [2] - 69:13, 69:19
**TL** [4] - 15:24, 16:1, 16:2
**to..** [1] - 69:25
**today** [14] - 7:20, 8:10, 8:21, 9:4, 9:12, 12:23, 19:19, 41:3, 48:24, 49:7, 58:15, 129:5, 129:7, 130:7
**today 's** [4] - 8:1, 8:14, 8:17, 13:3
**together** [2] - 23:22, 103:16
**tomorrow** [1] - 55:10
**Tony** [2] - 4:4, 59:3
**TONY** [4] - 1:17, 2:15, 4:22, 134:8
**took** [5] - 52:16, 68:10, 68:12, 89:14, 91:12, 93:2
**top** [2] - 70:2, 70:3
**topics** [1] - 10:13
**total** [4] - 92:2, 104:25, 112:13
**totality** [2] - 47:8, 95:19
**totalling** [1] - 92:17
**totally** [2] - 69:5, 97:1
**touch** [1] - 86:9
**training** [1] - 17:1
**transacted** [1] - 13:11
**transacting** [1] - 17:12
**transcribed** [1] - 6:6
**transcript** [1] - 135:10
**translated** [4] - 104:18, 104:19, 105:3, 105:17
**translation** [6] - 103:17, 104:5, 104:14, 105:8, 107:6, 108:10
**translations** [7] - 103:7, 103:23, 103:25, 104:8, 104:11, 104:22, 104:23
**translator** [1] - 105:6
**transom** [4] - 73:18, 74:10, 74:24, 90:3
**treat** [4] - 63:4, 63:18, 77:18, 78:13
**Treat** [1] - 63:19
**treated** [3] - 64:2,

77:23, 78:20
**treating** [2] - 63:24, 65:12
**trial** [1] - 17:21
**trials** [1] - 18:17
**tried** [1] - 114:7
**true** [3] - 80:5, 83:13, 135:10
**truth** [3] - 4:16, 4:17
**truthful** [1] - 7:18
**try** [2] - 33:21, 70:8
**trying** [16] - 14:10, 23:21, 38:17, 54:19, 55:24, 56:7, 64:1, 66:18, 66:20, 86:14, 92:15, 92:18, 92:25, 99:23, 111:6
**two** [35] - 45:18, 48:7, 48:11, 48:24, 49:2, 49:7, 50:8, 50:15, 51:13, 51:15, 51:19, 54:21, 55:4, 58:11, 62:14, 64:10, 73:20, 74:17, 74:18, 74:23, 75:8, 75:10, 76:12, 82:12, 91:2, 92:16, 92:19, 100:22, 102:22, 104:17, 106:21, 108:11, 112:5
**Two** [1] - 73:17
**two -page** [1] - 100:22
**Type** [1] - 119:1
**type** [3] - 112:23, 119:12, 120:5
**types** [1] - 95:2
**typically** [1] - 127:24
**typographical** [1] - 66:25

## U

**U-S-H-E-R** [1] - 5:12
**U.K** [1] - 17:9
**U.S** [2] - 17:23, 127:24
**ultimately** [1] - 47:18
**unable** [5] - 60:8, 73:19, 74:1, 88:7
**unclear** [2] - 30:4, 69:5
**uncovered** [1] - 48:23
**undated** [9] - 29:17, 29:19, 30:14, 91:10, 93:1, 93:10, 101:22, 102:25, 103:2
**under** [22] - 7:8, 7:12, 13:8, 13:11, 23:3, 28:5, 28:23, 59:15, 60:6, 71:6, 85:9,

101:8, 112:14, 113:10, 115:5, 118:24, 119:14, 119:17, 120:13, 122:2, 133:8
**underneath** [1] - 87:22
**Underside** [1] - 87:19
**undersigned** [1] - 134:7
**understood** [9] - 6:11, 6:14, 7:5, 7:6, 16:5, 31:2, 33:13, 42:19, 64:13
**Underwater** [1] - 80:13
**underwater** [9] - 73:18, 74:2, 74:10, 74:24, 81:14, 82:1, 82:8, 83:8, 83:25
**underwrite** [1] - 120:11
**underwriter** [3] - 25:1, 45:1, 45:2
**Underwriters** [1] - 100:25
**underwriters** [1] - 24:18
**underwriting** [12] - 15:9, 15:10, 15:11, 25:4, 35:24, 38:24, 39:19, 40:15, 82:16, 109:14, 110:25, 118:19
**undisclosed** [1] - 129:5
**unique** [2] - 61:2, 62:6
**United** [2] - 13:17, 16:12
**UNITED** [1] - 1:1
**unsecured** [1] - 76:4
**unsigned** [2] - 102:24, 103:1
**up** [20] - 19:22, 23:19, 31:7, 50:10, 54:1, 66:11, 69:20, 70:24, 74:1, 82:16, 82:25, 84:5, 86:9, 89:24, 90:1, 90:2, 106:3, 106:13, 126:17, 132:25
**update** [1] - 26:12
**upper** [1] - 70:16
**usher** [1] - 45:24
**USHER** [4] - 1:17, 2:15, 4:22, 134:8
**Usher** [20] - 4:4, 5:12, 55:20, 58:3, 58:23, 59:8, 67:3, 68:9, 83:5, 84:11, 92:14,

96:4, 97:15, 109:22, 114:5, 127:8, 127:9, 127:13, 129:15, 129:22
**Usher 's** [2] - 55:9, 58:4

## V

**valid** [1] - 40:19
**valuation** [1] - 39:1
**valve** [1] - 77:3
**various** [2] - 78:6, 102:14
**vehicle** [2] - 124:1, 124:14
**verbatim** [1] - 83:15
**verify** [5] - 73:19, 88:7, 88:8, 107:1, 107:6
**versus** [6] - 4:2, 19:1, 19:2, 19:13, 19:14
**vessel** [69] - 26:4, 26:9, 26:15, 26:22, 27:4, 27:17, 28:1, 28:3, 28:4, 28:5, 29:2, 32:14, 32:18, 33:15, 39:1, 39:11, 40:7, 40:16, 40:21, 41:6, 41:23, 42:2, 42:4, 42:25, 47:10, 48:9, 48:16, 50:6, 50:9, 50:22, 52:21, 64:18, 65:18, 70:25, 81:5, 84:2, 84:13, 84:16, 89:24, 90:2, 95:2, 95:4, 97:14, 98:24, 107:15, 108:12, 112:10, 112:20, 112:23, 116:5, 116:21, 117:14, 117:17, 117:19, 118:4, 118:13, 119:8, 120:3, 120:13, 121:8, 121:9, 121:16, 121:23, 122:12, 123:6, 124:1, 124:14
**Vessel** [2] - 50:1, 115:24
**Vessel 's** [1] - 49:22
**vessels** [5] - 95:5, 112:23, 119:11, 120:4, 120:17
**VIA** [2] - 1:20, 2:1
**video** [6] - 4:3, 103:25, 104:17, 104:18, 104:20, 104:24
**Video** [2] - 1:12, 2:10

**VIDEOGRAPHER** [10] - 4:1, 14:19, 14:22, 45:20, 67:18, 67:22, 70:2, 111:16, 111:19, 133:22
**videos** [10] - 28:13, 29:4, 102:16, 103:7, 103:12, 103:24, 104:4, 104:22, 105:14, 106:21
**VIDEOTAPED** [1] - 1:17
**view** [3] - 69:24, 70:6, 70:10
**View** [1] - 70:3
**Virgin** [1] - 118:23
**virtue** [2] - 50:4, 101:16
**visit** [2] - 89:23, 90:7
**voice** [5] - 50:10, 102:15, 103:13, 104:4, 105:14
**vs** [1] - 1:6

## W

**wait** [3] - 6:18, 36:20, 99:10
**waited** [1] - 58:15
**waive** [1] - 133:15
**waived** [1] - 133:4
**waives** [1] - 133:1
**Walter** [2] - 26:19, 26:20
**warrant** [1] - 65:22
**Warranted** [2] - 115:21, 116:19
**warranted** [2] - 26:14, 26:17
**Warranties** [2] - 112:15, 113:11
**warranties** [1] - 112:17
**Warranty** [1] - 115:6
**warranty** [9] - 27:15, 97:12, 112:14, 112:18, 113:10, 113:20, 113:21, 116:14, 121:5
**watch** [1] - 117:3
**water** [6] - 77:1, 78:13, 79:7, 81:6, 90:15, 117:20
**website** [1] - 21:21
**week** [1] - 27:1
**West** [2] - 2:3, 2:7
**wet** [2] - 60:25, 62:14
**WhatsApp** [7] - 28:13, 29:4, 32:15, 103:7,

103:12, 104:3,
106:21
**whereas** [1] - 120:19
**whilst** [1] - 116:20
**whole** [3] - 4:17,
69:20, 114:18
**willing** [1] - 94:25
**withheld** [1] - 12:10
**WITNESS** [42] - 4:19,
4:25, 10:2, 14:21,
42:22, 43:10, 53:1,
55:3, 57:8, 59:2,
61:10, 64:22, 65:4,
65:20, 70:7, 78:22,
79:14, 80:9, 83:11,
84:6, 84:19, 86:24,
90:21, 90:25, 96:7,
108:14, 110:8,
111:21, 113:13,
114:15, 117:22,
118:3, 118:11,
121:12, 125:20,
126:11, 127:20,
130:3, 131:3,
133:13, 133:17,
134:10
**witness** [8] - 4:23, 9:9,
9:25, 12:1, 85:3,
110:2, 114:13,
131:11
**witnesses** [1] - 35:10
**wondering** [3] - 53:17,
87:4, 91:11
**word** [1] - 96:16
**wording** [2] - 46:17,
109:24
**words** [3] - 55:8,
81:24, 82:18
**worsened** [2] - 79:7,
79:12
**worsening** [1] - 77:23
**wrap** [1] - 126:17
**write** [1] - 82:17
**writes** [2] - 71:11,
72:24
**written** [3] - 28:17,
28:20, 35:9
**wrote** [4] - 30:13,
54:18, 56:13, 56:14

## Y

**yacht** [5] - 15:10, 39:6,
72:25, 119:2, 123:21
**year** [18] - 26:5, 27:4,
28:2, 52:17, 52:23,
74:4, 74:13, 75:4,
77:13, 77:22, 77:23,
78:19, 80:7, 85:25,

86:19, 95:12
**year's** [3] - 110:20,
110:23, 111:2
**years** [7] - 18:9, 18:10,
18:16, 18:17, 40:19,
108:3
**yesterday** [1] - 58:13

## Z

**zip** [1] - 96:8
**ZOOM** [2] - 1:20, 2:1